UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NATALIA POZNIAK,

                Petitioner,

v.

VLADIMIR SHWARTSMAN,

                Respondent.

Case No. _____

**PETITION UNDER THE HAGUE CONVENTION
FOR THE RETURN OF CHILD**

**INTRODUCTION**

1.      Petitioner Natalia Pozniak ("Petitioner"), a resident of Israel, brings this action to secure the return of her nine-year-old son, S.P. ("S.P." or the "Child").[1] Respondent Vladimir Shwartsman ("Respondent"), the Child's father, brought S.P. from Israel to the United States and has wrongfully retained (*i.e.*, abducted) him in the United States since September 2019 without Petitioner's consent or acquiescence. Respondent's unilateral choice to retain the Child in the United States and disregard his agreement with the Petitioner to return S.P. by September 1, 2019 violated her custodial rights under Israeli law.

---

[1] To comply with Rule 5.2 of the Federal Rules of Civil Procedure, Petitioner redacts the full name of her son from this Petition, and also attaches similarly redacted versions of each supporting exhibit that includes her son's full name or date of birth. Petitioner is ready to provide original copies of all redacted exhibits should the Court find their review necessary.

1

2. This Petition is filed under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) (the "Hague Convention") implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* A copy of the Hague Convention is attached hereto as Exhibit A.

3. The Hague Convention came into effect in the United States on July 1, 1988, and has been ratified between, among other Contracting States, the United States and Israel.

4. As set forth in Article 1 of the Hague Convention, its objects are: "(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."

5. The Hague Convention authorizes a federal district court to determine the merits of a claim for the wrongful removal or retention of a child; it does not, however, permit the district court to consider the merits of any underlying custody dispute.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this case pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

7. Venue is proper pursuant to 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because, on information and belief, Respondent and the Child are residing in the Eastern District of New York at 5819 188th Street, Fresh Meadows, NY, 11365.

## PARTIES

8. Petitioner Natalia Pozniak was born in the former Soviet Union, now the country of Russia, in 1981. She is a Ukrainian citizen residing in Israel and is working toward obtaining

Israeli resident status. Petitioner has lived in Israel continuously since 2014 and currently resides in Kiryat Motzkin, a suburb of Haifa, Israel.

9. Respondent Vladimir Shwartsman was born in Kazakhstan in 1977. He is an Israeli citizen. On information and belief, Respondent currently resides in Fresh Meadows, New York.

10. The Child is the biological son of Petitioner and Respondent. The Child was born in Ukraine in June 2011. He is a dual Israeli-Ukrainian citizen. Prior to Respondent's wrongful retention of the Child in the United States in September 2019, S.P. lived in Israel for most of his life. On information and belief, the Child currently resides with Respondent and Respondent's girlfriend in Fresh Meadows, New York.

## FACTUAL ALLEGATIONS

### A.   *Background*

11. Petitioner and Respondent met online in or around May 2010.

12. Petitioner and Respondent have never been married.

13. After meeting online, Petitioner visited Respondent in Israel in August 2010. Petitioner and Respondent began a romantic relationship, and Petitioner moved in with Respondent. In October 2010, Petitioner learned she was pregnant. When Respondent indicated he would be unwilling to help take care of the future child, Petitioner returned to Ukraine that month.

14. In June 2011, Petitioner gave birth to S.P. in Lugansk, Ukraine. The Child's birth certificate identifies Petitioner as his mother and "Vladimir Pozniak" as his father. In Ukraine, single mothers must list a father to get a birth certificate issued. Petitioner only gave Respondent's first name, and upon information and belief, the issuer then recorded S.P.'s father

3

as "Vladimir Pozniak." A copy of the Child's birth certificate and translation thereof are attached hereto as Exhibit B.

15. Respondent was aware at that time that S.P. was born, but he did not express interest in being a part of the Child's life. Petitioner even informed Respondent that he had one month after S.P.'s birth to declare himself as the Child's father on the Ukrainian birth certificate, but Respondent made no effort to do so.

16. Petitioner and S.P. lived together in an apartment located a few minutes' walk from Petitioner's parents. Petitioner's parents visited S.P. every day and helped Petitioner with taking care of the Child. Petitioner's brother and his wife would also visit Petitioner and S.P. once every one or two weeks. Petitioner's friends and their children would often stop by Petitioner and S.P.'s apartment or join them on walks to the park. Though the first year as a single parent was especially difficult, Petitioner and S.P. were lucky to have ample support from family and friends.

17. In June 2012, Respondent sent Petitioner a text with birthday wishes for the Child. In response, Petitioner expressed her worry that S.P. needed a father figure and that she wanted the Child to be raised in a family unit. Respondent said he would consider it and asked Petitioner to come to Israel with S.P. so they could be together. Respondent purchased tickets for Petitioner and S.P. to travel to Israel and asked that Petitioner collect a number of documents from Ukrainian authorities so that Petitioner and the Child could file for immigration status in Israel. Petitioner was excited to start a real life together with Respondent and for them to live with S.P. as a family.

18. Towards the end of the summer in 2012, Petitioner and S.P. moved to Israel and began residing with Respondent. It soon became clear to Petitioner that Respondent was not

4

willing to put time and energy into family life.  Respondent did not spend time with S.P. and regularly made decisions that affected Petitioner and S.P. without consulting Petitioner.  Respondent often exhibited disrespectful and controlling behavior towards Petitioner, so much so that Respondent's family told Petitioner she would be better off without Respondent.

19. After one year, in or around September 2013, Petitioner and Respondent ended their romantic relationship, and Petitioner moved with S.P. back to Ukraine for a few months.  In November or December 2013, Respondent surprised Petitioner and S.P. in Ukraine with a two to three week visit.  Respondent spent some time with S.P., but focused most of the trip on convincing Petitioner to reestablish a romantic relationship with him.

20. In February 2014, Russian military began occupying the region of Ukraine where Petitioner and the Child lived.  The area became very dangerous, and many people in the region were killed during military operations.  Petitioner and S.P. no longer felt safe living there.

21. In the spring of 2014, Petitioner and Respondent reconciled.  Given the unrest in Ukraine and Petitioner's desire to provide a family unit for her son, Petitioner and S.P. returned to Israel to live with Respondent in or around May 2014.  Since then, S.P. has lived continuously in Israel with his mother until Respondent's wrongful retention of S.P. in the United States in September 2019.

22. Using his status as an Israeli citizen, Respondent helped S.P. and Petitioner obtain immigration status in Israel.  S.P. became an Israeli citizen, and Petitioner acquired a work visa and, later, a temporary residence card.

23. While Petitioner and Respondent lived together, Respondent did not spend a lot of time with the Child.  As the owner of a successful event-planning business, Respondent worked mostly night shifts and had to sleep during the day.  Even while sharing a residence, Petitioner

5

continued to be the Child's primary caretaker. Petitioner also provided care to Respondent's sick, elderly mother, who lived a five-minute walk from Petitioner and Respondent's shared home.

24. While living together, Petitioner and Respondent's romantic relationship deteriorated because of Respondent's controlling and aggressive behavior, and in or around September 2015, Petitioner and Respondent separated permanently. They lived in separate residences in Israel thereafter. Petitioner moved with S.P. to another neighborhood that was a short distance away from where they previously lived, meaning that S.P. could remain enrolled at the same kindergarten. S.P. lived with the Petitioner continuously from this point forward.

25. While there were no formal agreements regarding the parents' custody of their son, Petitioner and Respondent worked out an informal arrangement whereby Respondent took custody of S.P. on many weekends, holidays, and vacations. As a result of this informal agreement, the Child was with Petitioner approximately 70 percent of the time and was with Respondent approximately 30 percent of the time.

26. Though not romantically involved and living separately, Petitioner and Respondent now had a relationship of mutual understanding and assistance, with Petitioner continuing to help care for Respondent's mother and both parties communicating openly about shared custody of S.P.

27. S.P. enjoyed a vibrant and fulfilling life in Israel. Petitioner, Respondent, and S.P. are Jewish, and it was important to Petitioner that her son be raised in a community where he would be surrounded by strong Jewish traditions. S.P. began attending kindergarten in 2014 and elementary school in 2017. At school, the Child's teachers had expressed some concern with "his difficulties in learning and functioning." S.P. received therapy through horse-riding at a

6

nearby educational nature center. He also participated in several sports and activities at his local community center, including soccer and karate.

28. The Child was surrounded by friends and loved ones in Israel. He frequently played with his classmates and with children of the Petitioner's friends. Petitioner's parents would also regularly visit S.P. and Petitioner in Israel twice a year from Ukraine and would typically stay for about one month each time.

### B. *Respondent's Travel to the United States Before 2019*

29. In or around November 2015, Respondent and the Child visited the United States for the first time for a sightseeing trip. Petitioner believes that Respondent began a relationship with his current girlfriend, Irina Bolotovsky, during this trip. Soon after this trip, Respondent first expressed an interest in acquiring a visa to work in the United States.

30. Around 2016, Respondent began pursuing permanent residency in the United States.

31. After Respondent's trip in November 2015, Respondent also began an annual tradition of traveling to the United States with S.P. for approximately one month during the Child's vacations from school, typically during the summer.

32. Respondent did not ask for Petitioner's consent to take S.P. on these annual trips, but rather told Petitioner that the trips would take place. However, Petitioner and Respondent always discussed the approximate length of these short trips before Respondent and S.P. left Israel. Typically, Petitioner and Respondent would agree upon the date that Respondent and the Child would depart from Israel. To maintain some flexibility for Respondent and S.P. and to take advantage of the most cost-efficient return flights, however, Petitioner and Respondent would jointly decide on the Child's exact date of return after Petitioner and Respondent had arrived in the United States.

33.     During these annual vacations, Respondent and S.P. would usually stay in the New York area.  Respondent typically placed the Child in a week-long day camp for a portion of the trip and afterwards would sometimes take trips with him to different parts of the United States, including at least one trip to visit Respondent's Israeli friends who lived in Texas.  During these trips, Petitioner would speak with S.P. every day and confirm that the Child's accounts of the day matched Respondent's purported itinerary.

34.     Petitioner felt that these prolonged separations from the Child's life in Israel were affecting him negatively.  In particular, Petitioner noticed that the Child would have trouble adjusting back to his daily routine upon his return from these lengthy vacations.  Though Petitioner was concerned with the impact of these trips, she did not want to upset S.P. or anger Respondent by objecting to them.  When Respondent was angry, he frequently claimed that he could have Petitioner removed from Israel or take S.P. away from Petitioner by asserting his status as an Israeli citizen.  Although Petitioner was not in favor of the trips, she felt threatened by Respondent and so did not oppose them.

35.     In July 2017, Respondent's elderly mother passed away.  After this, Respondent asked Petitioner if she and the Child would accompany him on visits to the United States.  Petitioner was not sure why Respondent was suggesting that she and S.P. join Respondent.  Nevertheless, Petitioner declined because she did not want to leave Israel for many reasons.  At the time, she was hoping to pursue Israeli citizenship and did not want to jeopardize that effort by leaving Israel.  Additionally, Petitioner did not have any visa to visit the United States and was not interested in acquiring one.  Most importantly, Petitioner wanted to continue raising S.P. in their Jewish community in Israel.

36. Until 2019, Respondent regularly traveled back and forth between Israel and the United States to file paperwork related to his immigration petition in the United States. On information and belief, Respondent stayed with his girlfriend in New York during those times.

37. Based on events at a May 2019 conference at S.P.'s Israeli school, Petitioner now believes that Respondent made the decision to move to the United States permanently around that time. During a routine meeting between S.P.'s teachers, school psychologist, and parents, the Child's teachers expressed concern that S.P. had an "imbalance" in his emotional life. The teachers explained that S.P. would sometimes confuse the traditions and holidays of the United States with those of Israel, and they believed that Respondent was trying to impose American culture and lifestyle on the Child. In front of the school staff, Petitioner agreed with the Child's teachers and voiced her opposition to Respondent's regular trips with S.P. to the United States.

38. Respondent denied this characterization and said S.P. was fine. Respondent reminded Petitioner that her opinion was irrelevant because, as a citizen of Israel, Respondent could take the Child away from Petitioner without consequence, and that Petitioner could not stop him from taking the Child to the United States. Petitioner became very upset and began to cry. The school psychologist had to intervene and assure Petitioner that Respondent could not unilaterally remove S.P. without her consent.

C. *Respondent's Wrongful Retention of the Child in the United States in 2019 and 2020*

39. As he had done in years past, Respondent decided to take S.P. on another trip to the United States in July 2019. Remembering the school meeting, Petitioner was concerned with Respondent's threats, as well as the toll another month-long trip would have on the Child. In response to these concerns, Respondent tried to persuade Petitioner that he was not trying to

9

remove S.P. to the United States.  He told Petitioner that this trip would be just like the others and assured her that the Child would return before school started in September.

40. Respondent found other ways to pressure Petitioner, too.  First, Respondent promised S.P. that, once they arrived in the United States, they would take a cruise to visit multiple U.S. cities.  At the prospect of a cruise, the Child became very excited and urged Petitioner to let him go.  Petitioner did not want to disappoint S.P. by refusing to let him travel to the United States.

41. Second, Respondent indicated to Petitioner that he could damage her chances of one day becoming an Israeli citizen if she refused to allow Respondent to travel to the United States with the Child.  As a citizen himself, Respondent made veiled threats that he had the power to denounce that Petitioner had a connection to Israel, which could potentially derail her immigration petition in Israel.  Even though Petitioner had a temporary resident card at the time, Respondent claimed he could report Petitioner to the authorities for being out of status.  He also threatened to use her lack of citizenship to gain full custody of the Child.  Petitioner was unsure of whether Respondent's threats had merit, as she was unfamiliar with Israeli immigration laws at that time.  But Petitioner nevertheless heeded his threats because Petitioner believed that Respondent was familiar with the Israeli system and that he wielded influence in the community.  Since continuing her life with S.P. in Israel was of the utmost importance to her, she felt trapped.

42. Petitioner did not believe that Respondent could ever make good on threats to permanently remove the Child from Israel.  So, while she was wary of the trip to the United States because of Respondent's threats, Petitioner ultimately did not object to the trip because she did not want to disappoint her son and she believed that Respondent would return S.P. to Israel at the end of the vacation as he promised.

43. The parties established that Respondent and S.P. would leave on July 19, 2019, but as they had in the past, they waited to purchase a ticket for an affordable return flight. However, they agreed that S.P. needed to be home in Israel by September 1, 2019 for the start of the school year.

44. Though Petitioner did not believe at the time that Respondent would ever actually wrongfully retain the Child in the United States, Petitioner recalls a few troubling instances in hindsight.

45. Shortly before the trip, S.P. told Petitioner that Respondent mentioned they may be delayed in returning to Israel. According to the Child, Respondent told S.P. that staying longer in the United States would not be a big deal. Petitioner was alarmed and confronted Respondent with this information, reminding him of their agreement and the requirement that the Child return to Israel by September 1, 2019, in time for the first day of school. Respondent denied that he had ever mentioned a delay and told Petitioner that the Child made everything up.

46. Around the same time, Respondent asked Petitioner if she would accompany him to renew the Child's Israeli passport. In Israel, both parents must be present to renew a minor's passport. However, Petitioner denied Respondent's request because the Child's passport would not expire until around March 2020. Petitioner did not see a reason to renew S.P.'s passport at that time, as this could easily be done once the Child returned to Israel.

47. Respondent also asked Petitioner to sign some documents that his Israeli legal counsel had prepared. Petitioner asked Respondent to provide her the documents so that she could have them reviewed by her counsel. Once Petitioner mentioned her legal counsel, Respondent dropped the topic and did not bring up these documents again.

48. On July 19, 2019, Respondent left Israel for New York with the Child. Petitioner does not know the exact nature of Respondent's or S.P.'s immigration status when they entered the United States.

49. Around one week after S.P. left, Petitioner asked Respondent on what date he planned to return to Israel with the Child. Respondent said he did not have a specific date in mind. This statement did not worry Petitioner because Respondent had maintained open-ended return dates during his past trips to the United States with the Child.

50. After that conversation, Petitioner regularly asked Respondent to select a return date for S.P. before September 1, 2019. Respondent evaded Petitioner's requests. In or around late August 2019, Respondent informed Petitioner that he and the Child were being delayed in the United States because he needed to complete some documents for his United States immigration petition. Petitioner was shocked and angry when Respondent gave this excuse because Petitioner and Respondent had never discussed S.P. staying in the United States past September 1, 2019. Petitioner reiterated that she and Respondent had an agreement that the Child was to be returned to Israel by that date and then demanded that Respondent return S.P. to Israel as soon as possible.

51. Despite the express and agreed-upon return date, Respondent did not return with the Child by September 1, 2019.

### D. *Respondent's Refusal to Return the Child to Israel*

52. After the September 1, 2019 deadline passed, Petitioner persisted in her demands that Respondent return S.P. to Israel. Respondent first told Petitioner that he and the Child would return to Israel around September 20, 2019. Petitioner continued to press Respondent, but as this date neared, Respondent did not take any actions to return the Child. Respondent then stated that he would return S.P. to Israel on October 15 or 16, 2019. Respondent was also communicating

these proposed dates to the director of the Child's Israeli school, claiming the Child would soon return.

53. As October 15 drew near, Respondent again delayed the Child's date of return, now saying that the Child could not return to Israel until he had attended an in-person meeting with immigration authorities in the United States that was scheduled for some time in either December 2019 or January 2020. Throughout these conversations, Petitioner consistently demanded the return of the Child to Israel and never consented to S.P.'s prolonged stay in the United States past the agreed-upon date of September 1, 2019.

54. At this time, Petitioner met with the Child's Israeli school director and psychologist. After hearing about their communications with Respondent, Petitioner finally concluded that Respondent had no intention of returning the Child, and she immediately took legal action.

55. In mid-October 2019, Petitioner contacted legal counsel in Israel to file an abduction case with the Israeli prosecutorial authorities. In November 2019, Petitioner's Israeli counsel filed a case with the Israeli Prosecutor-General's Office. This filing included a variety of identity documents to help authorities ascertain S.P.'s location, since Petitioner did not have Respondent's address in the United States and, due to her immigration status, could not travel to the United States to retrieve her son.

56. On December 26, 2019, Petitioner filed a request for her son's return under the Hague Convention with the appropriate authorities in Israel.

57. In the meantime, Petitioner continued reaching out to Respondent, regularly reminding him that he was in violation of their agreement to return S.P. to Israel by September 1, 2019. Since Respondent's wrongful retention of the Child, Petitioner has repeatedly asked

13

Respondent on WhatsApp when he would return S.P., requests which Respondent either evaded or ignored. Petitioner also contacted Respondent's girlfriend via social media to ask for help in returning the Child.

58. In or around the end of January 2020, Petitioner informed Respondent that the Israeli prosecutorial office was investigating S.P.'s removal and that Petitioner was seeking counsel in the United States to secure the Child's return.

59. Despite Petitioner's constant objections, Respondent has not returned the Child and has instead taken steps to seize sole custody of S.P. in the United States. In early March 2020, Petitioner received a package containing a custody petition filed by Respondent seeking sole custody of S.P. in Queens County Family Court (the "Family Court Petition"). The Family Court Petition contains many fabrications, including untrue allegations that Respondent was always S.P.'s primary caretaker, that Petitioner had "alcohol related issues," and that Respondent was unaware of any other country seeking return of the Child. On March 12, 2020, the Department of State, the Central Authority of the United States under the Hague Convention, gave notice to the Queens Family Court that the Child was the subject of a Hague Convention application. On June 23, 2020, Petitioner's counsel sent a letter requesting the Queens Family Court indefinitely stay all proceedings in connection with the Family Court Petition, pending resolution of this Petition, and attached a copy of the State Department's March 12 notice. A copy of the Family Court Petition and letter from Petitioner's counsel are attached hereto as Exhibits C and D.

60. At present, Petitioner is able to communicate with S.P. through WhatsApp calls and text messages. Initially, the Child used Respondent's device to speak with Petitioner. Though the Child eventually received his own device, Respondent frequently monitored

communications between Petitioner and her son by remaining in the room or listening on the line.

61. Based on conversations with the Child, Petitioner understands that S.P. has asked Respondent when he will be able to return to Israel, and in reply, Respondent has told the Child that the United States is a better place to live. The Child regularly expresses to Petitioner that he misses her and his friends who live in Israel. He plays with his friends who live in Israel online and asks Petitioner's help to arrange these hangouts. However, these limited playdates do not amount to the full life that S.P. had in Israel. For example, when Petitioner spoke with S.P. on June 18, 2020, the day before his birthday, Petitioner told him that she would buy a cake and gather S.P.'s friends so that they could call him together for his birthday. Hearing this, the Child began to cry because he missed Petitioner and friends and was upset that they would have fun without him.

62. The Child is Petitioner's first priority. Petitioner loves S.P. very much, and everything she does is in his best interest. Petitioner has suffered from the grief and trauma of being wrongfully separated from the Child.

63. Petitioner's worries for her son have only been exacerbated by watching the news related to the COVID-19 pandemic and social unrest in New York City. She fears for the Child's safety, and the trauma of being separated is further compounded by Petitioner's inability to protect her son in this stressful time.

64. In May 2020, the U.S. State Department connected Petitioner with pro bono counsel.

65. After interviewing Petitioner several times in late May and June 2020 to gather the facts necessary to draft this Petition, counsel for Petitioner prepared and filed this Petition seeking the immediate return of the Child to Israel under the Hague Convention.

## CLAIM FOR RELIEF UNDER THE HAGUE CONVENTION

66. As set forth above, on or about September 1, 2019, Respondent wrongfully retained the Child within the meaning of Article 3 of the Hague Convention and continues to wrongfully retain the Child in the state of New York in violation of Article 3.

67. Petitioner has never acquiesced or consented to the retention of the Child in the United States or to his living outside of Israel.

68. There are no orders or other agreements that limit Petitioner's custodial rights over the Child under Israeli law.

69. Respondent's retention of the Child in the United States is wrongful within the meaning of Article 3 of the Hague Convention because:

   a. It is in violation of Petitioner's rights of custody as established by Israeli law under, *inter alia*, sections 14 and 15 of Israel's Capacity and Guardianship Law 1962. Specifically, Respondent's unilateral retention of the Child violates Petitioner's right as a mother to determine, among other things, the Child's place of residence. A copy of an excerpt of Israel's Capacity and Guardianship Law is attached hereto as Exhibit E. *See* Hague Convention, Art. 5(a) (defining "rights of custody" under Article 3 to include, "in particular, the right to determine the child's place of residence");

   b. At the time of Respondent's wrongful retention of the Child, Petitioner was actually exercising her rights of custody within the meaning of Articles 3 and 5 of

16

       the Convention, and, but for Respondent's retention of the Child, Petitioner would have continued to exercise those rights; and,

   c. The Child was habitually resident in Israel within the meaning of Article 3 of the Convention immediately before his wrongful retention by Respondent.

70. Upon information and belief, Respondent is presently wrongfully retaining the Child in the State of New York, County of Queens.

71. Upon information and belief, Respondent is keeping the Child at 5819 188th Street, Fresh Meadows, NY, 11365.

72. The Child is now nine years old. The Hague Convention applies to children under sixteen (16) years of age and thus applies to the Child.

73. This Petition is filed less than one year from Respondent's wrongful retention of the Child in the United States.

74. Respondent's unilateral and unauthorized retention of the Child in the United States has denied Petitioner the fundamental right to parent her child for nearly a year, which has been especially difficult given the context of a global pandemic. This Court should order Respondent to promptly return the Child to Israel, so that Petitioner is no longer denied the ability to care for her son and the harm already inflicted on both Petitioner and the Child is not further exacerbated.

**COSTS AND FEES**
**(22 U.S.C. § 9007)**

75. To date, Petitioner has incurred necessary expenses, including court costs and legal fees, as a result of Respondent's wrongful retention of the Child.

76. Petitioner respectfully requests that this Court award her all costs and fees incurred to date, as well as any transportation costs related to the return of the Child, as required by 22 U.S.C. § 9007(b), reserving jurisdiction over further expenses.

## NOTICE OF HEARING

77. Pursuant to 22 U.S.C. § 9003(c), Respondent shall be given notice of these proceedings in accordance with the applicable law governing notice in interstate child custody proceedings.

## RELIEF REQUESTED

**WHEREFORE**, Petitioner Natalia Pozniak respectfully requests the following relief:

a. the issuance of an immediate Order, pursuant to 22 U.S.C. § 9004(a), commanding Respondent to appear in this Court with the Child to show cause why the Child has been kept from Petitioner in violation of Israeli law and why the Child should not be returned to Israel;

b. the issuance of an Order, pursuant to 22 U.S.C. § 9003 and Hague Convention Article 12, directing a prompt return of the Child to his habitual residence in Israel;

c. the issuance of an Order, pursuant to 22 U.S.C. § 9007 and Hague Convention Article 26, awarding Petitioner all fees and expenses, including but not limited to necessary travel costs, incurred in connection with this proceeding; and

d. any such further relief as justice and its cause may require.

| | |
|---|---|
| New York, New York<br>Dated: July 3, 2020 | AKIN GUMP STRAUSS HAUER & FELD LLP<br><br>*/s/ Robert H. Pees*<br>Robert H. Pees<br>Saurabh Sharad<br>John Kane<br>Victoria Fydrych (*Admission Forthcoming*)<br>One Bryant Park<br>New York, New York 10036<br>Telephone: (212) 872-1000<br>Facsimile: (212) 872-1002<br>E-mail: rpees@akingump.com<br>E-mail: ssharad@akingump.com<br>E-mail: jkane@akingump.com<br>E-mail: vfydrych@akingump.com<br><br>*Counsel for Petitioner* |