UNITED STATES DISTRICT COURT
<u>EASTERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| NATALIA POZNIAK,<br><br>         Petitioner,<br><br>   v.<br><br>VLADIMIR SHWARTSMAN,<br><br>         Respondent. | Case No. 20-cv-02956-AMD-RML<br><br>Electronically Filed |

<h2 style="text-align:center"><u>PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u></h2>

                AKIN GUMP STRAUSS HAUER & FELD LLP
                Robert H. Pees
                Saurabh Sharad
                John P. Kane
                Victoria Fydrych (*Admission Forthcoming*)
                One Bryant Park
                New York, New York 10036
                Telephone: 212-872-1000

                *Counsel for Petitioner*

## TABLE OF CONTENTS

                                                                                                                 **Page**

PRELIMINARY STATEMENT ...................................................................................................1

PROPOSED FINDINGS OF FACT ..............................................................................................1

PROPOSED CONCLUSIONS OF LAW .......................................................................................9

    I.    Petitioner has established a *prima facie* case for the Child's return to Israel. .....................9

    II.   Respondent has failed to establish any affirmative defense. ............................................12

CONCLUSION ..............................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG*,
 926 F. Supp. 378 (S.D.N.Y. 1996) ................................................................................................4

*Casimiro v. Chavez*,
 06-CV-1889-ODE, 2006 WL 2938713 (N.D. Ga. Oct. 13, 2006) ..........................................14

*Friedrich v. Friedrich*,
 78 F.3d 1060 (6th Cir. 1996) ..................................................................................................10

*Garcia v. Angrita*,
 440 F. Supp. 2d 1364 (S.D. Fla. 2006) ...................................................................................13

*Gitter v. Gitter*,
 396 F.3d 124 (2d Cir. 2005) .....................................................................................................9

*Haimdas v. Haimdas*,
 720 F. Supp. 2d 183 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010) ........................13, 14

*In re Koc*,
 181 F. Supp. 2d 136 (E.D.N.Y. 2001) ....................................................................................12

*Mendoza v. Miranda*,
 525 F. Supp. 2d 1182 (C.D. Cal. 2007) ..................................................................................14

*Miltiadous v. Tetervak*,
 686 F. Supp. 2d 544 (E.D. Pa. 2010) ......................................................................................14

*Monasky v. Taglieri*,
 140 S. Ct. 719 (2020) ................................................................................................................9

*Mota v. Castillo*,
 692 F.3d 108 (2d Cir. 2012) .....................................................................................................9

*Olguin v. Santana*,
 03-cv-6299 (JG), 2004 WL 1752444 (E.D.N.Y. Aug. 5, 2004) .............................................11

*In re R.V.B.*,
 29 F. Supp. 3d 243 (E.D.N.Y. 2014) ..........................................................................12, 13, 14

*Souratgar v. Lee*,
 720 F.3d 96 (2d Cir. 2013) ................................................................................................12, 14

*Wtulich v. Filipkowska*,
   16-cv-2941 (JO), 2019 WL 1274694 (E.D.N.Y. Mar. 20, 2019) ............................................10

**Statutes**

22 U.S.C. § 9003(e)(1)(A) ................................................................................................................9

22 U.S.C. § 9003(e)(1)(B) ..............................................................................................................13

International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.*..........................................1

Legal Capacity and Guardianship Law, 5722–1962, §§ 14–15 (1962) (Isr.) ................................11

**Other Authorities**

Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980,
   T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494
   (Mar. 26, 1986) ..........................................................................................................1, 13

## PRELIMINARY STATEMENT

On July 19, 2019, Petitioner's son left on what was supposed to be a routine summer holiday to New York with Respondent. Petitioner and Respondent agreed that their son was to be returned to Israel by September 1, 2019. But Respondent did not return Petitioner's son as he had promised and has continued to unlawfully retain the Child here, depriving Petitioner of seeing her beloved son and preventing her from exercising her lawful custody rights over him.

Respondent contends that the Child would face a "grave risk" if he returned to Israel because he would suffer psychological harm and/or Petitioner may be deported from Israel. To prove grave risk, however, Respondent must submit clear and convincing evidence that the Child would suffer psychological harm if he were returned to Israel or that Petitioner is likely to be deported, assuming deportation in itself poses an "intolerable situation."

To aid in this Court's determination, Petitioner respectfully submits these proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

1.  This is an action seeking the return of Petitioner's nine-year-old son, S.P. (the "Child") to Israel pursuant to the Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) (the "Hague Convention" or "Convention"), implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*.[1]

2.  Petitioner Natalia Pozniak ("Petitioner") was born in the former Soviet Union in 1981. She is a Ukrainian citizen residing in Israel. Petitioner has lived in Israel continuously since 2014 and currently resides in Kiryat Motzkin, a suburb of Haifa, Israel. *See* Joint Statement of

---

[1] To comply with Rule 5.2 of the Federal Rules of Civil Procedure, Petitioner redacts the full name of her son from these Proposed Findings of Fact and Conclusions of Law.

1

Stipulated Facts (ECF No. 34) ("Stip. Facts") at ¶ 1; Petition Under the Hague Convention for the Return of the Child (ECF No. 1) (the "Petition") at ¶ 8; Declaration of Vladimir Shvartsman (ECF No. 16) ("Resp. Decl.") at ¶ 5.

3. Respondent Vladimir Shwartsman ("Respondent") was born in Kazakhstan in 1977. He is an Israeli citizen. Respondent currently resides at 5819 188th Street, Fresh Meadows, New York. *See* Stip. Facts at ¶ 2; Petition at ¶ 9; Response to Petition for Return of Child to Petitioner (ECF No. 12) (the "Response") at ¶ 9; Resp. Decl. at ¶ 4.

4. S.P. (the "Child") is the biological son of Petitioner and Respondent. The Child was born in Ukraine in June 2011. He is a dual Israeli-Ukrainian citizen. Before July 19, 2019, S.P. lived in Israel for most of his life. The Child currently resides with Respondent and Respondent's wife in Fresh Meadows, New York. *See* Stip. Facts at ¶ 3; Petition at ¶ 10; Response at ¶ 10; Resp. Decl. at ¶ 12.

5. Petitioner and Respondent met online in or around May 2010. *See* Stip. Facts at ¶ 4; Petition at ¶ 11; Response at ¶ 11.

6. Petitioner and Respondent have never been married. *See* Stip. Facts at ¶ 5; Petition at ¶ 12; Response at ¶ 12.

7. In May of 2010, Respondent met the Petitioner through the Internet. At that time, Respondent resided in Israel and the Petitioner lived in Ukraine. After approximately two and a half months of communication by Internet and phone, the Petitioner decided to come to Israel. After meeting online, Petitioner visited Respondent in Israel in August 2010. During her stay in Israel, the Petitioner stayed with Respondent in his home. In October 2010, Petitioner learned she was pregnant and returned to Ukraine that month. *See* Stip. Facts at ¶ 6; Petition at ¶ 13; Response at ¶ 13; Resp. Decl. at ¶ 6.

8. In June 2011, Petitioner gave birth to S.P. in Lugansk, Ukraine. The Child's birth certificate identifies Petitioner as his mother and "Vladimir Pozniak" as his father. Petitioner and S.P. lived together in Ukraine. *See* Stip. Facts at ¶ 7; Petition at ¶ 14; Response at ¶ 14; Resp. Decl. at ¶¶ 12, 13.

9. Towards the end of the summer in 2012, Petitioner and S.P. moved to Israel. After one year, in or around September 2013, Petitioner moved with S.P. back to Ukraine. In November or December 2013, Respondent visited Petitioner and S.P. in Ukraine for two to three weeks. *See* Stip. Facts at ¶ 8; Petition at ¶ 18; Response at ¶ 18; Resp. Decl. at ¶ 21.

10. In February 2014, the Russian military began occupying the region of Ukraine where the Petitioner and Child resided. *See* Stip. Facts at ¶ 30; Petition at ¶ 20.

11. Subsequent thereto, Petitioner no longer felt safe living in Ukraine with the child. *See* Stip. Facts at ¶ 31; Petition at ¶ 20.

12. In the spring of 2014, Petitioner and S.P. returned to Israel to live with Respondent. Since then, S.P. has lived continuously in Israel until Respondent brought him to the United States on July 19, 2019. *See* Stip. Facts at ¶ 9; Petition at ¶ 21; Resp. Decl. at ¶¶ 26, 46.

13. Using his status as an Israeli citizen, Respondent helped S.P. and Petitioner obtain immigration status in Israel. S.P. became an Israeli citizen, and Petitioner acquired a work visa and, later, a temporary residence card. *See* Stip. Facts at ¶ 10; Petition at ¶ 22; Response at ¶ 22; Resp. Decl. at ¶ 46.

14. In or around September 2015, Petitioner and Respondent began living in separate residences in Israel, but S.P. stayed in the same kindergarten. *See* Stip. Facts at ¶ 11; Petition at ¶ 24; Response at ¶ 24.

15. Though Petitioner and Respondent did not have a formal custody agreement, they worked out an informal arrangement pursuant to which both exercised shared custody over S.P. Petitioner and Respondent had a relationship of mutual understanding and assistance, with both parties communicating openly about shared custody of their son. *See* Stip. Facts at ¶ 12; Petition at ¶ 25–26; Response at ¶ 26; Resp. Decl. at ¶¶ 33, 37.

16. Respondent has provided financial support to Petitioner. *See* Stip. Facts at ¶ 29; Resp. Decl. at ¶ 9.

17. There are no orders or other agreements that limit Petitioner's custodial rights over the Child under Israeli law. *See* Stip. Facts at ¶ 13; Petition at ¶ 68; Ex. A to Petitioner's Memorandum of Law in Support of Motion for Judicial Notice and Extension of Comity (ECF No. 24) (the "Decision") at ¶ 62.[2]

18. S.P. enjoyed a vibrant and fulfilling life in Israel. S.P. began attending kindergarten in 2014 and elementary school in 2017. At school, the Child's teachers had expressed some concern with "his difficulties in learning and functioning." S.P. received therapy through horse-riding at a nearby educational nature center. He also participated in several sports and activities at his local community center, including soccer and karate. *See* Stip. Facts at ¶ 14; Petitioner at ¶ 27; Response at ¶ 27; Resp. Decl. at ¶¶ 40, 43.

19. The Child was surrounded by friends and loved ones in Israel, including neighbors and friends. He frequently played with his classmates and with children of the Petitioner's friends. Petitioner's parents would also regularly visit S.P. and Petitioner in Israel twice a year from

---

[2] On October 25, 2020, this Court took judicial notice of the Decision, *see* Oct. 27, 2020 Hr'g Tr. at 14:23–15:1, and it is thus "treated as prima facie evidence of the facts and opinions contained therein." *See A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 388 (S.D.N.Y. 1996).

Ukraine and would typically stay for about one month each time. *See* Stip. Facts at ¶ 15; Petition at ¶ 28; Response at ¶ 28; Resp. Decl. at ¶ 44.

20. In November 2015, Respondent and the Child visited the United States for the first time for a sightseeing trip. *See* Petition at ¶ 29; Response at ¶ 29; Resp. Decl at ¶ 47. Including that first trip in November 2015, S.P. came to the United States for a total of three visits prior to July 2019. Each visit lasted between 2–3 weeks and was during S.P.'s summer vacation from school. *See* Stip. Facts at ¶ 16; Petition at ¶ 31; Resp. Decl. at ¶ 49.

21. Petitioner and Respondent always discussed the approximate length of these short trips before Respondent and S.P. left Israel. Typically, Petitioner and Respondent would agree upon the date that Respondent and the Child would depart from Israel. To maintain some flexibility for Respondent and S.P. and to take advantage of the most cost-efficient return flights, however, Petitioner and Respondent would jointly decide on the Child's exact date of return after Petitioner and Respondent had arrived in the United States. *See* Stip. Facts at ¶ 17; Petition at ¶ 32; Response at ¶ 32; Resp. Decl. at ¶¶ 50, 51.

22. During these trips, Petitioner would speak with S.P. every day and confirm that the Child's accounts of the day matched Respondent's purported itinerary. *See* Stip. Facts at ¶ 18; Petition at ¶ 33; Response at ¶ 33; Resp. Decl. at ¶ 52.

23. Around 2016, Respondent began pursuing permanent residency in the United States. *See* Stip. Facts at ¶ 19; Petition at ¶ 30; Response at ¶ 30; Resp. Decl. at ¶ 48.

24. On July 12, 2017, respondent's mother passed away in Israel. *See* Stip. Facts at ¶ 32; Petition at ¶ 35; Resp. Decl. at ¶ 55.

25. Until 2019, Respondent regularly traveled back and forth between Israel and the United States to file paperwork related to his immigration petition in the United States. *See* Stip. Facts at ¶ 20; Petition at ¶ 36; Response at ¶ 36; Resp. Decl. at ¶ 63.

26. In May 2019, Petitioner and Respondent participated in a meeting at S.P.'s Israeli school among S.P.'s teachers, the school psychologist, and themselves as parents, during which the Child's teachers expressed concern that S.P. had an "imbalance" in his emotional life. *See* Stip. Facts at ¶ 21; Petition at ¶ 37; Response at ¶ 37.

27. Respondent decided to take S.P. on another trip to the United States in July 2019. Respondent had told S.P. that he intended to take S.P. on a cruise when they were in the United States. *See* Stip. Facts at ¶ 22; Petition at ¶¶ 39, 40; Response at ¶¶ 39, 40; Resp. Decl. at ¶ 66.

28. The parties established that Respondent and S.P. would leave on July 19, 2019. *See* Stip. Facts at ¶ 23; Petition at ¶ 43; Response at ¶ 43.

29. On July 19, 2019, Respondent left Israel for New York with the Child. *See* Stip. Facts at ¶ 24; Petition at ¶ 48; Response at ¶ 48; Resp. Decl. at ¶ 73.

30. Around one week after S.P. left, Petitioner and Respondent communicated regarding the Child. *See* Stip. Facts at ¶ 25; Petition at ¶ 49; Response at ¶ 49.

31. In those communications, Petitioner regularly asked Respondent to select a return date for S.P. before September 1, 2019 because that was the first day of school. *See* Petition at ¶ 50; Decision at ¶ 56.

32. On August 27, 2019, Respondent wrote a letter to S.P.'s school in Israel that Respondent and S.P. would return to Israel in October, after the holidays, and asked that the school principal reserve a spot for S.P. in the class. *See* Decision at ¶ 66; Ex. B to Declaration of Natalia Pozniak ("Pozniak Decl.") (ECF No. 26).

33. Respondent did not return with the Child by September 1, 2019. *See* Stip. Facts at ¶ 26; Petition at ¶ 51; Response at ¶ 51.

34. Petitioner did not consent to extending S.P.'s vacation, and has never acquiesced or consented to Respondent's retention of S.P. in the United States after September 1, 2019. *See* Petition at ¶ 67.

35. After September 1, 2019, Petitioner persisted in her demands that Respondent return S.P. to Israel. Respondent then stated that he would return S.P. to Israel on October 15 or 16, 2019. Respondent was also communicating about dates of return with the director of the Child's Israeli school, claiming the Child would soon return. *See* Petition at ¶ 52; Decision at ¶¶ 56, 66, 67.

36. On October 3, 2019, the principal of S.P.'s school in Israel wrote to Respondent inquiring about S.P.'s return to school. *See* Decision at ¶ 67.

37. On October 22, 2019, Respondent replied to the principal of S.P.'s school and explained that S.P. had been registered for school in New York and that his date of return to Israel was unknown. *See* Ex. C to Pozniak Decl.

38. In mid-October 2019, Petitioner contacted legal counsel in Israel to file an abduction case with the Israeli prosecutorial authorities. In November 2019, Petitioner's Israeli counsel filed a case with the Israeli Prosecutor General's Office. *See* Petition at ¶ 55; Decision at ¶ 53.

39. On December 26, 2019, Petitioner filed a request for her son's return under the Hague Convention with the appropriate authorities in Israel. An application on behalf of the International Department of Israel was filed with the Central Authority in the United States on December 29, 2019. *See* Petition at ¶ 56; Decision at ¶ 53.

40. In the meantime, Petitioner continued reaching out to Respondent and asking Respondent on WhatsApp when he would return S.P. *See* Petition at ¶ 57; Decision at ¶ 56.

41. In or around the end of January 2020, Petitioner informed Respondent that the Israeli prosecutorial office was investigating S.P.'s removal and that Petitioner was seeking counsel in the United States to secure the Child's return. *See* Petition at ¶ 58.

42. Respondent has not returned S.P. and has instead taken steps to seize sole custody of S.P. in the United States. In early March 2020, Petitioner received a package containing a custody petition filed by Respondent seeking sole custody of S.P. in Queens County Family Court (the "Family Court Petition"). On March 12, 2020, the Department of State, the Central Authority of the United States under the Hague Convention, gave notice to the Queens Family Court that the Child was the subject of a Hague Convention application. On June 23, 2020, Petitioner's counsel sent a letter requesting the Queens Family Court indefinitely stay all proceedings in connection with the Family Court Petition, pending resolution of this Petition, and attached a copy of the State Department's March 12 notice. *See* Stip. Facts at ¶ 27; Petition at ¶ 59; Response at ¶ 59.

43. In May 2020, the U.S. State Department connected Petitioner with pro bono counsel to file the instant proceedings. *See* Stip. Facts at ¶ 28; Petition at ¶ 64.

44. In May 2020, Petitioner filed an Article 15 petition under the Hague Convention in the Kiryat Shmona Family Court in Israel, captioned Natalia Pozniak v. Vladimir Schwartzman, Dkt. No. 61676-05-20. Both parties participated in that proceeding. *See* Decision at ¶¶ 11, 22, 33. On August 25, 2010, the Kiryat Shmona Family Court issued its decision, concluding that Respondent's retention of S.P. in the United States was wrongful under Article 3 of the Convention and that Petitioner's custodial rights under Israeli law had been violated. *See* Decision at ¶ 71.

45. The Child's most recent Israeli passport is expired. *See* Stip. Facts at ¶ 33.

## PROPOSED CONCLUSIONS OF LAW

Petitioner has established a *prima facie* case under the Hague Convention for the return of her son to Israel. Respondent cannot show clear and convincing evidence required to prove that S.P's return to Israel would subject him to grave risk of harm, and the Child must therefore be returned to Israel so that the appropriate courts can adjudicate any custody dispute.

**I. Petitioner has established a *prima facie* case for the Child's return to Israel.**

The primary objective of the Hague Convention is to facilitate "the restoration of the *status quo*" for the child. *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). Thus, the focus of the Convention is not on matters of custody, but rather "simply upon whether a child should be returned to her country of habitual residence for custody proceedings." *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012). To state a *prima facie* case under the Hague Convention, Petitioner must establish that: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the [her] custody rights under the law of the State of habitual residence; and (3) [she] was exercising those rights at the time of the removal or retention." *Gitter*, 396 F.3d at 130–31. Petitioner has proven each *Gitter* prong by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A).

First, Petitioner has shown that S.P. was habitually resident in Israel prior to his unlawful retention in the United States. Though there is no strict definition of "habitual residence," the Supreme Court in *Monasky v. Taglieri* has set out a holistic standard, where a "child's habitual residence depends on the totality of the circumstances specific to the case" and "the determination of habitual residence does not turn on the existence of an actual agreement" between parents. 140 S. Ct. 719, 723, 726 (2020). In making their decision, courts should be "informed by common sense." *Id*. at 727.

9

The Child lived in Israel continuously from the spring of 2014 until July 19, 2019. *See* Proposed Findings of Fact *supra* at ¶ 12. There, S.P. lived a full and vibrant life, surrounded by loving family and friends. *See* Proposed Findings of Fact *supra* at ¶¶ 18–19. Before Respondent and S.P. left Israel in July 19, 2019, S.P. had been to the United States only three times. *See* Proposed Findings of Fact *supra* at ¶ 20. Thus, Israel was S.P.'s habitual residence when his father took him to the United States on July 19, 2019.

Petitioner did not know of or agree to Respondent's plan to permanently relocate S.P. to the United States, where she could not be a part of his life in any meaningful way. Respondent claims that Petitioner agreed to S.P.'s permanent move to the United States because she was allegedly aware that *Respondent* intended to move there. *See* Resp. Decl. at ¶¶ 55, 56. However, these statements show only that Petitioner may have known Respondent was interested in living in the United States permanently, but not that she *knew and agreed* to allow her only son to move a continent away. And Petitioner has never acquiesced to her son's unlawful retention in the United States since his arrival—indeed, she repeatedly vehemently opposed her son remaining here. *See* Proposed Findings of Fact *supra* at ¶¶ 30, 31, 34, 35, 38–41, 43–44. Any references to instances where Petitioner, despondent at the separation from her child, may have attempted to placate Respondent and maintain her only line of communication with her son do not rise to the level of consent. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996) ("Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights."); *see also Wtulich v. Filipkowska*, 16-cv-2941 (JO), 2019 WL 1274694, at *9 (E.D.N.Y. Mar. 20, 2019) (rejecting acquiescence defense where left behind parent sent placating emails).

Furthermore, Respondent's own actions undermine his story that Petitioner had agreed to her son's permanent move to the United States. On August 27, 2019, Mr. Shwartsman

10

communicated with an official at S.P.'s school in Israel and confirmed that S.P. would attend school in the fall and thus requested that the school leave a spot open for S.P. *See* Proposed Findings of Fact at ¶ 32. Only on October 22, 2019 did Mr. Shwartsman explain that S.P.'s date of return to Israel was unknown. *See* Proposed Findings of Fact at ¶ 37. If both parents had agreed that their son was to move to the United States permanently, why did Respondent initially reserve a spot for his son in the Israeli school for the 2019 school year only to change his mind two months later? He did so to appease Petitioner, who believed her son was going to return to Israel by the start of the school year. *See* Decision at ¶ 66. In short, the parents did not agree to any permanent move of S.P.

Second, Petitioner has established both that she exercised her custody rights over S.P. and that his unlawful retention in the United States was in violation of those rights. Under the law of this Court, Petitioner "need only provide some preliminary evidence that [she] actually exercised custody of the child, for instance, took physical care of the child." *See Olguin v. Santana*, 03-cv-6299 (JG), 2004 WL 1752444, at *4 (E.D.N.Y. Aug. 5, 2004) (internal citations omitted). Petitioner has exercised custody over her son for his entire life. *See* Proposed Findings of Fact *supra* at ¶¶ 8–12, 19, 21–22, 26. Further, Petitioner and Respondent never obtained a court-ordered custody arrangement. *See* Proposed Findings of Fact *supra* at ¶¶ 15, 17. Under Israeli law, both parents have equal rights to custody regardless of who possesses physical custody of the child. *See* Legal Capacity and Guardianship Law, 5722–1962, §§ 14–15 (1962) (Isr.). This includes the right to determine a child's place of residence. *Id.* By depriving Petitioner of any ability to exercise custody over her child and unilaterally retaining S.P. in the United States, Respondent violated Petitioner's custodial rights. An Israeli court agreed, ruling in an August 25, 2020 decision on Article 15 proceedings under the Hague Convention that Petitioner's custodial rights under Israeli

11

law had been violated and that Respondent's retention of S.P. in the United States was wrongful under Article 3 of the Convention. *See* Decision at ¶ 71.

In sum, Petitioner has stated a *prima facie* case for the return of her son to Israel.

**II.    Respondent has failed to establish any affirmative defense.**

Since Petitioner has stated a *prima face* case, the Child must be returned to Israel unless Respondent can establish an affirmative defense. *Souratgar v. Lee*, 720 F.3d 96, 100 (2d Cir. 2013). Respondent, however, has failed to show by clear and convincing evidence the only affirmative defense that he raises: that the Child will face a "grave risk" of physical, psychological, and/or neurological harm, or would otherwise be placed in an intolerable situation, should he return to Israel.

The Article 13(b) "grave risk" defense is exceedingly narrow. "The level of risk and danger required to trigger this exception under Article 13(b) has consistently held to be very high." *In re Koc*, 181 F. Supp. 2d 136, 155 (E.D.N.Y. 2001) (internal citation, quotations, and alterations omitted). "'Grave risk of harm' arises in two situations: '(1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.'" *In re R.V.B.*, 29 F. Supp. 3d 243, 258 (E.D.N.Y. 2014) (quoting *Souratgar*, 720 F.3d at 103). "The potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high. The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Souratgar*, 720 F.3d at 103 (internal citations, quotations, and alterations omitted).

The crux of Respondent's "grave risk" argument rests on the potential harm that may befall the Child should he be separated from Respondent, not should he return to Israel. *See*

12

Respondent's Memorandum of Law in Opposition to Petition for Return of Child (ECF No. 20) ("Opposition") at 29–30. This falls far short of the high bar the "grave risk" defense requires. The fact that a child "is attached to his father," *see id.* at 30, simply does not rise to the level of "grave risk of psychological harm" under the Convention. *See In re R.V.B.*, 29 F. Supp. 3d at 258 (noting that war, famine, and serious abuse satisfy the "grave risk" defense). Further, this "grave risk" would be cured if Respondent returned with his son to Israel, where they are both citizens. Respondent presents no argument as to why he cannot do so, even if only temporarily to resolve the custody dispute. The "goals of the Convention would be frustrated if an abducting parent were permitted to thwart a return by causing, or refusing to ameliorate, psychological harm to the child." *Garcia v. Angrita*, 440 F. Supp. 2d 1364, 1382-83 (S.D. Fla. 2006). Thus, Respondent's argument in this respect fails.

In addition to alleging that S.P. would suffer psychological harm if separated from his father, Respondent also states that the Child does not wish to return to Israel and would like to stay in the United States with Respondent. Under the "mature child" exception, courts have at times taken into account the objection of a child who "has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention, Art. 13. "Whether a child is mature enough to have its views considered is a factual finding that a district court must make in light of the specific circumstances of each case." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 205 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010) (internal citations and quotations omitted). It is Respondent's burden to prove that maturity by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(B). Respondent has not done so here. S.P. is a nine-year-old boy—courts have often ruled that children of that age are not of the requisite maturity required by the Article 13 exception. *See Haimdas*, 720 F. Supp. 2d at 207–208 (concluding that respondent did not satisfy burden to

13

prove child "two months shy of his tenth birthday" was "sufficiently mature for the Court to take his views into account"); *In re R.V.B.*, 29 F. Supp. 3d at 258 ("Despite the Child's charm and maturity for her age, the Court notes that she is only eight years old, and she does not possess the sufficient 'age and degree of maturity' such that her opinion could be a sole basis to deny the petition."). The Child is not mature enough to decide where he should live, nor powerful enough to defy his father. Further, this Court has warned that the abducting parent's influence, even if unintentional, can be especially impactful in situations like this one, where Respondent has unlawfully retained the Child for almost one and half years. *Haimdas*, 720 F. Supp. 2d at 207–208 (noting that a "lengthy wrongful retention" could influence child's desire to remain and observing that nine-year-old's view of petitioner had "clearly been impacted by . . . the strained and often bitter relationship between his parents").

Finally, Respondent claims that Petitioner's potential deportation from Israel to Ukraine presents an "intolerable situation." *See* Opposition at 30–31. Respondent has not cited, and Petitioner is not aware of, a single case where a court has held that the left-behind parent's immigration status would constitute a grave risk to the child. And the cases Respondent has cited are not on point.[3] On the merits, Respondent's claims regarding any *potential* threat of deportation do not satisfy his burden to make "a clear and convincing case" that the harm is "likely to occur." *Souratgar*, 720 F.3d at 106. Though Petitioner's immigration status in Israel may be relevant to a custody proceeding there, it is has no relevance to these proceedings, which focus only on determining whether the child should be returned to Israel.

---

[3] *Miltiadous v. Tetervak*, considers the respondent's immigration status *in the United States* as part of the broad habitual residence inquiry, not the much more narrow "grave risk" defense. 686 F. Supp. 2d 544, 552 n.9 (E.D. Pa. 2010). *Mendoza v. Miranda*, 525 F. Supp. 2d 1182, 1195 (C.D. Cal. 2007) considers the child's immigration status in the context of the "well-settled" defense, and *Casimiro v. Chavez*, 06-CV-1889-ODE, 2006 WL 2938713, at *6–7 (N.D. Ga. Oct. 13, 2006) considers the child's immigration status in its exercise of discretion to return a child despite her preference to remain in the United States.s

14

## CONCLUSION

For the reasons set forth above, as well as the reasons explained in Petitioner's initial application, ECF No. 1, and Petitioner's Reply Memorandum in Support of the Petition, ECF No. 25, the Court should order the return of the Child forthwith.

New York, New York
Dated: December 1, 2020

AKIN GUMP STRAUSS HAUER & FELD LLP

*/s/ Robert H. Pees*
Robert H. Pees
Saurabh Sharad
John P. Kane
Victoria Fydrych (*Admission Forthcoming*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
E-mail: rpees@akingump.com
E-mail: ssharad@akingump.com
E-mail: jkane@akingump.com
E-mail: vfydrych@akingump.com

*Counsel for Petitioner*