**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

NATALIA POZNIAK,

               Petitioner,

        v.

VLADIMIR SHWARTSMAN,

               Respondent.

Case No. 20-cv-02956-AMD-RML

Electronically Filed

## PETITIONER'S PROPOSED POST-TRIAL
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AKIN GUMP STRAUSS HAUER & FELD LLP
Robert H. Pees
Saurabh Sharad
John P. Kane
Victoria Fydrych
One Bryant Park
New York, New York 10036
Telephone: 212-872-1000

*Counsel for Petitioner*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

PROPOSED POST-TRIAL FINDINGS OF FACT .....................................................2

PROPOSED CONCLUSIONS OF LAW ...................................................................14

   I.    Respondent's claims are barred by *res judicata*. ...............................................14

   II.   As in the Israeli court, Petitioner has in this Court established a *prima facie* case for the Child's return to Israel. ....................................................................................................15

   III.  Respondent has established no affirmative defense..........................................19

     A.   Petitioner never consented to the Child's retention in the United States......................19

     B.   Respondent has not proven his "grave risk" defense....................................23

        1.   Respondent has not proven that the Child will be harmed if returned to Israel.........24

        2.   Respondent has not shown that the Child will be returned to an "intolerable situation" if he is returned to Israel...............................................................................27

CONCLUSION...........................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG,*
    926 F. Supp. 378 (S.D.N.Y. 1996) ......................................................................4

*Abbott v. Abbott,*
    560 U.S. 1 (2010)...........................................................................................24

*Baxter v. Baxter,*
    423 F.3d 363 (3d Cir. 2005)............................................................................20

*Blondin v. Dubois,*
    238 F.3d 153 (2d Cir. 2001).............................................................................24

*Casimiro v. Chavez,*
    No. 06-CV-1889-ODE, 2006 WL 2938713 (N.D. Ga. Oct. 13, 2006)...................27

*Chumachenko ex rel. P.B. v. Belan,*
    No. 18-CV-9728, 2018 WL 6437062 (S.D.N.Y. Dec. 7, 2018) ...........................20

*Friedrich v. Friedrich,*
    78 F.3d 1060 (6th Cir. 1996) ...........................................................................20

*Garcia v. Angrita,*
    440 F. Supp. 2d 1364 (S.D. Fla. 2006) ..............................................................25

*Gitter v. Gitter,*
    396 F.3d 124 (2d Cir. 2005)........................................................................15, 16

*Grano v. Martin,*
    443 F. Supp. 3d 510 (S.D.N.Y. 2020), *aff'd*, 821 F. App'x 26 (2d Cir. 2020).................18, 19

*Guzzo v. Cristofano,*
    719 F.3d 100 (2d Cir. 2013)............................................................................18

*Haimdas v. Haimdas,*
    720 F. Supp. 2d 183 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010).........................26, 27

*Hofmann v. Sender,*
    716 F.3d 282 (2d Cir. 2013)............................................................................20

*Karkkainen v. Kovalchuk,*
    445 F.3d 280 (3d Cir. 2006)............................................................................18

*In re Koc*,
  181 F. Supp. 2d 136 (E.D.N.Y. 2001) ........................................................20, 21, 23

*Mendoza v. Miranda*,
  525 F. Supp. 2d 1182 (C.D. Cal. 2007) ................................................................27

*Mendoza v. Miranda*,
  559 F.3d 999 (9th Cir. 2009) ................................................................................27

*Miltiadous v. Tetervak*,
  686 F. Supp. 2d 544 (E.D. Pa. 2010) ..................................................................27

*Monahan v. N.Y.C. Dep't of Corr.*,
  214 F.3d 275 (2d Cir. 2000) ................................................................................14

*Monasky v. Taglieri*,
  140 S. Ct. 719 (2020) ....................................................................16, 17, 18, 19

*Mota v. Castillo*,
  692 F.3d 108 (2d Cir. 2012) ................................................................................16

*Nissim v. Kirsh*,
  394 F. Supp. 3d 386 (S.D.N.Y. 2019) ................................................................20

*In re R.V.B.*,
  29 F. Supp. 3d 243 (E.D.N.Y. 2014) ............................................................23, 26

*Souratgar v. Lee*,
  720 F.3d 96 (2d Cir. 2013) ........................................................................19, 23, 28

**Statutes**

Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980,
  T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494
  (Mar. 26, 1986), implemented by the International Child Abduction Remedies
  Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* ..................................................2, 17, 19

22 U.S.C. § 9003(e) ........................................................................................16, 19, 23

## PRELIMINARY STATEMENT

Under the Hague Convention on the Civil Aspects of International Child Abduction, the Petitioner Natalia Pozniak seeks the return of her nine-year-old son to Israel.

The bench trial on Monday, January 25th focused on three contested issues: (1) Where did the child habitually reside within the meaning of the Convention? (2) Did the mother consent or acquiesce to the father keeping the child in the United States? (3) Will the child face a grave risk of harm if he is returned to Israel?

Regarding the first two questions, the evidence showed that the child had habitually resided in Israel prior to his abduction and that the mother never consented or acquiesced to the child's retention by the father in the United States. On both of these questions, the evidence was consistent with an Israeli court's judgment, of which this Court has already taken judicial notice. The Israeli court concluded that the child habitually resided in Israel and that the mother never consented to the father keeping the child in the United States. The evidence at the recent bench trial in the United States further bolsters those Israeli court findings. The evidence was substantial, consisting of both testimony and documents, including a document—never produced by the father in discovery—in which the father acknowledged that he and the child "are supposed to come back to Israel in October, after the holidays" and asked the child's Israeli school to "reserve a spot for him in the class." (Ex. 5.)

Regarding the third question, which requires the father to supply clear and convincing evidence, the father has not shown that a return to Israel would expose the child to a grave risk of harm. In fact, even when advocating for the father as the better custodial parent, the father's own expert witness conceded that it does not matter whether the child lives with his father in Israel or the United States. (Tr. 138:7–13.) In fact, the parties have stipulated that the child's pre-abduction

life in Israel was "vibrant and fulfilling." (Ex. 22 (Joint Statement of Stipulated Facts) ("Stip. Facts") ¶ 14.)

Petitioner asks this Court to fulfill the Convention's mandate and return her son to Israel, where he can resume a vibrant and fulfilling life with any custody determinations to be made by the capable Israeli judiciary.

## PROPOSED POST-TRIAL FINDINGS OF FACT[1]

1. This is an action seeking the return of Petitioner's nine-year-old son, S.P. ("S.P." or the "Child") to Israel pursuant to the Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) (the "Hague Convention" or "Convention"), implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*[2]

2. Petitioner Natalia Pozniak ("Petitioner") was born in the former Soviet Union in 1981. She is a Ukrainian citizen residing in Israel. (Tr. 34:19–20.) Petitioner has lived in Israel continuously since 2014 and currently resides in Kiryat Motzkin, a suburb of Haifa, Israel. (Stip. Facts ¶ 1; Tr. 20:24–25, Tr. 56:22–23.)

3. Respondent Vladimir Shwartsman ("Respondent") was born in Kazakhstan in 1977. He is an Israeli citizen. (Stip. Facts ¶ 2.) Respondent currently resides at 5819 188th Street, Fresh Meadows, New York. (Stip. Facts ¶ 2.) Respondent has property in Israel (Tr. 79:13–15), and he still owns a business in Israel. (Tr. 84:8–9, 88:15–17.) Respondent lived in Israel for over

---

[1] The proposed facts contained herein are taken from live testimony given during the trial held on January 25, 2021 (transcript cites herein "Tr."); the parties' exhibits admitted at the January 25, 2021 trial; the August 25, 2020 decision of the Kiryat Shmona Family Court (Ex. 17A), which the Court took judicial notice of on October 27, 2020; and the Declarations of Karen Pagosov (ECF No. 13), Gregory Lifshits (ECF No. 15), and Michael Braverman (ECF No. 19), which were admitted as live testimony without cross examination.

[2] To comply with Rule 5.2 of the Federal Rules of Civil Procedure, Petitioner redacts the full name of her son from these Proposed Post-Trial Findings of Fact and Conclusions of Law.

27 years and almost all of his relatives lived in Israel, including his cousin, who still resides in Israel.  (Tr. 84:15–21, 87:24–25.)  Respondent has a business that continues to operate in Israel. (Tr. 88:15-17.)

4.      The Child is the biological son of Petitioner and Respondent.  (Stip. Facts ¶ 3; Tr. 19:21–22.)  The Child was born in Ukraine in June 2011.  (Tr. 20:2–3.)  He is a dual Israeli-Ukrainian citizen.  (Tr. 34:13–14.)  Before July 19, 2019, S.P. lived in Israel for most of his life. (Tr. 21:1–3.)  The Child currently resides with Respondent and Respondent's wife in Fresh Meadows, New York.  (Stip. Facts ¶ 3).

5.      Petitioner and Respondent met online in or around May 2010.  (Stip. Facts ¶ 4.)

6.      Petitioner and Respondent have never been married.  (Stip. Facts ¶ 5.)

7.      In May of 2010, Respondent met the Petitioner through the Internet.  At that time, Respondent resided in Israel and the Petitioner lived in Ukraine.  After approximately two and a half months of communication by Internet and phone, the Petitioner decided to come to Israel. After meeting online, Petitioner visited Respondent in Israel in August 2010.  During her stay in Israel, the Petitioner stayed with Respondent in his home.  In October 2010, Petitioner learned she was pregnant and returned to Ukraine that month.  (Stip. Facts ¶ 6.)

8.      In June 2011, Petitioner gave birth to S.P. in Lugansk, Ukraine.  The Child's birth certificate identifies Petitioner as his mother and "Vladimir Pozniak" as his father.  Petitioner and S.P. lived together in Ukraine.  (Stip. Facts ¶ 7; Ex. D; Tr. 20:5–9.)

9.      Towards the end of the summer in 2012, Petitioner and S.P. moved to Israel.  (Tr. 20:20–23.)  After one year, in or around September 2013, Petitioner moved with S.P. back to Ukraine.  (Stip. Facts ¶ 8; Tr. 56:5–6.)  In November or December 2013, Respondent visited Petitioner and S.P. in Ukraine for two to three weeks.  (Stip. Facts ¶ 8.)

10.     In February 2014, the Russian military began occupying the region of Ukraine where the Petitioner and Child resided.  (Stip. Facts ¶ 30; Tr. 73:9–15.)

11.     After the Russian military incursion, Petitioner no longer felt safe living in Ukraine with the child.  (Stip. Facts ¶ 31.)

12.     In the spring of 2014, Petitioner and S.P. returned to Israel to live with Respondent. (Tr. 21:5, 56:7–15, 57:16–18.)  Since then, S.P. has lived continuously in Israel until Respondent brought him to the United States on July 19, 2019.  (Stip. Facts ¶ 9; Tr. 21:1–3.)

13.     S.P. became an Israeli citizen, and Petitioner acquired a work visa and, later, a temporary residence card.  (Stip. Facts ¶ 10; Tr. 34:13–14.)

14.     In or around September 2015, Petitioner and Respondent began living in separate residences in Israel, but S.P. stayed in the same kindergarten.  (Stip. Facts ¶ 11; Tr. 56:13–15.

15.     Though Petitioner and Respondent did not have a formal custody agreement, they worked out an informal arrangement pursuant to which both exercised shared custody over S.P. Petitioner and Respondent had a relationship of mutual understanding and assistance, with both parties communicating openly about shared custody of their son.  (Stip. Facts ¶ 12.)

16.     There are no orders or other agreements that limit Petitioner's custodial rights over the Child under Israeli law.  (Stip. Facts ¶ 13; Ex. 17A (Israeli Court Decision, English Translation) ("Israeli Decision") ¶ 62.)[3]

17.     S.P. enjoyed a vibrant and fulfilling life in Israel.  S.P. began attending kindergarten in 2014 and elementary school in 2017.  (Stip. Facts ¶ 14; Tr. 21:5–8, 21:21–24.)  At school, the

---

[3] On October 27, 2020, this Court took judicial notice of the Israeli Decision, *see* Oct. 27, 2020 Hr'g Tr. at 14:23–15:1, and it is thus "treated as prima facie evidence of the facts and opinions contained therein." *A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 387 (S.D.N.Y. 1996).  Despite bearing the burden to "rebut these facts with evidence of [his] own," *see id.*, Respondent did not present any evidence that would rebut the truth of the facts and opinions contained in the Israeli Decision.

Child's teachers had expressed some concern with "his difficulties in learning and functioning." (Stip. Facts ¶ 14.)  S.P. received therapy through horse-riding at a nearby educational nature center. (Stip. Facts ¶ 14; Tr. 21:16–17.)  He also participated in several sports and activities at his local community center, including soccer and karate.  (Stip. Facts ¶ 14; Tr. 21:19–20.)

18.     The Child was surrounded by loved ones in Israel, including neighbors and friends. (Tr. 21:13–15, 22:7–19, 69:24–70:6.)  He frequently played with his classmates and with children of the Petitioner's friends.  (Tr. 21:13–15, 22:7–19.)  Petitioner's parents would also visit S.P. and Petitioner in Israel twice a year from Ukraine and would typically stay for about one month each time.  (Stip. Facts ¶ 15; Tr. 21:10–12.)

19.     In November 2015, Respondent and the Child visited the United States for the first time for a sightseeing trip.  (Stip. Facts ¶ 16; Tr. 24:11–13.)  Including that first trip in November 2015, S.P. came to the United States for a total of three visits prior to July 2019.  (Stip. Facts ¶ 16; Tr. 24:25–25:5, 86:19–22.)  Each visit lasted between 2–3 weeks and was usually during S.P.'s summer vacation from school.  (Stip. Facts ¶ 16; Tr. 25:14–17.)  S.P. never missed school to go on these trips to the United States.  (Tr. 25:14–17.)

20.     Petitioner and Respondent always discussed the approximate length of these short trips before Respondent and S.P. left Israel.  (Stip. Facts ¶ 17; Tr. 87:3–7.)  Typically, Petitioner and Respondent would agree upon the date that Respondent and the Child would depart from Israel.  (Stip. Facts ¶ 17.)  To maintain some flexibility for Respondent and S.P. and to take advantage of the most cost-efficient return flights, however, Petitioner and Respondent would jointly decide on the Child's exact date of return after Petitioner and Respondent had arrived in the United States.  (Stip. Facts ¶ 17.)

21.     During these trips, Petitioner would speak with S.P. every day and confirm that the Child's accounts of the day matched Respondent's purported itinerary.  (Stip. Facts ¶ 18.)

22.     On July 12, 2017, Respondent's mother passed away in Israel.  (Stip. Facts ¶ 32; Tr. 84:22–85:1.)

23.     Respondent decided to take S.P. on another trip to the United States in July 2019.  (Stip. Facts ¶ 22; Tr. 25:18–22.)  Respondent had told S.P. that he intended to take S.P. on a cruise when they were in the United States.  (Stip. Facts ¶ 22.)

24.     The parties established that Respondent and S.P. would leave on July 19, 2019 (Stip. Facts ¶ 23; Tr. 25:18–22), and Petitioner expected that Respondent would bring the Child back by the time school began in early September.  (Tr. 26:10–15, 43:11–13, 44:24–45:1.)

25.     Petitioner did not agree that her son could move to the United States permanently, and Respondent does not have any such agreement in writing.  (Tr. 103:7–104:8.)  Indeed, Respondent never raised the issue of moving to the United States, let alone moving S.P. there permanently.  (Tr. 67:14–20.)

26.     In the morning of July 19, 2019, Respondent brought S.P. to Petitioner to say good-bye.  (Tr. 26:22–27:1.)  Later that day, Respondent left Israel for New York with the Child.  (Stip. Facts ¶ 24; Tr. 26:16–18.)

27.     Around one week after S.P. left, Petitioner and Respondent communicated regarding the Child.  (Stip. Facts ¶ 25; Tr. 27:16–22.)  In mid-August, Petitioner started asking Respondent when he planned to return to Israel with the Child.  (Tr. 27:20–22; Ex. 1 at 2.)  On August 26, 2019, Petitioner asked Respondent, "When will you bring [S.P.] home?" to which Respondent answered, "[w]e're here for now."  (Ex. 1. at 2; Tr. 27:23–28:1, 29:10–18, 44:5–14.)

28.     On August 27, 2019, Respondent wrote a letter to the Avital School, S.P.'s school in Israel, that Respondent and S.P. would return to Israel in October, after the holidays, and asked that the school principal reserve a spot for S.P. in the class.  (Ex. 5; Israeli Decision ¶ 66; Tr. 35:13–18; *compare* Ex. 5 ("We are supposed to come back to Israel in October, after the holidays.") *with* ECF No. 13 (Pagosov Declaration where Respondent discussed "long-term trip") *and* ECF No. 15 (Lifshits Declaration where Respondent shared "plans to move to New York with their son and remain there indefinitely.").)  Petitioner received this letter from Hila Kudish, a director at the Avital School.  (Ex. 4; Tr. 35:19–25.)

29.     Respondent did not return with the Child by September 1, 2019.  (Stip. Facts ¶ 26.) The Child is still in the United States.  (Stip. Facts ¶ 3; Tr. 24:9–10.)

30.     Respondent stated that he was going to enroll the Child in school in the United States for about a month.  (Tr. 29:17–18, 40:11–17, 45:24–46:1; Ex. 1 at 2.)  In mid-September, Respondent stated that he would return S.P. to Israel on October 15 or 16, 2019.  (Tr. 29:22–25, 40:17–19, 47:1–5.)

31.     On October 3, 2019, the principal of S.P.'s school in Israel wrote to Respondent inquiring about S.P.'s return to school.  (Israeli Decision ¶ 67.)

32.     On October 22, 2019, Respondent sent another letter to the principal of the Avital School and explained that S.P. had been registered for school in New York and that his date of return to Israel was unknown.  (Ex. 9; Tr. 41:1–3.)  Petitioner received this letter from Hila Kudish, a director at the Avital School.  (Ex. 8; Tr. 40:23–25.)

33.     Petitioner did not consent to extending S.P.'s vacation, and has never acquiesced or consented to Respondent's retention of S.P. in the United States after September 1, 2019.  Indeed, after September 1, 2019, Petitioner persisted in her demands that Respondent return S.P. to Israel.

(Ex. 1 at 4–6; Ex. 21 at 1; Tr. 29:22–25, 42:8–11, 43:3–5, 43:13–18, 46:1–5, 47:9–13.) Respondent evaded Petitioner's questions, responding that he "[didn't] know yet" and that he and the Child were in the United States "for now" (Ex. 21 at 1, 6), or not responding at all. (Ex. 1 at 4–6; Tr. 42:8–11, 42:14–18, 43:6–8, 43:13–14, 46:1–2, 47:10–11, 48:7–9.)

34.     On October 22, 2019, Petitioner met with the director and psychologist at the Avital School to discuss Respondent's plans to return to Israel. (Tr. 30:12–31:1, 66:15–18.) During that meeting, Petitioner asked if the Avital School employees knew when Respondent planned to return to Israel, and they informed Petitioner that Respondent had registered S.P. in a school in New York. (Tr. 30:12–22.) Thereafter, Petitioner contacted legal counsel in Israel to file an abduction case with the Israeli prosecutorial authorities. (Tr. 31:2–4.) Around October 30, 2019, Petitioner realized that Respondent would not be returning to Israel with the Child. (Tr. 47:14–17.) In November 2019, Petitioner's Israeli counsel filed a case with the Israeli Prosecutor General's Office. (Tr. 31:5–10; Israeli Decision ¶ 53.)

35.     On December 26, 2019, Petitioner filed a request for her son's return under the Hague Convention with the appropriate authorities in Israel. An application on behalf of the International Department of Israel was filed with the Central Authority in the United States on December 29, 2019. (Israeli Decision ¶ 53.)

36.     In the meantime, Petitioner continued reaching out to Respondent and asking Respondent on WhatsApp when he would return S.P. (Israeli Decision ¶ 56; *see also generally*, Ex. 1 at 4–6; Ex. 21 at 1, 4, 6; Tr. 26:12–15, 27:20–28:5, 29:22–25, 42:8–22, 43:11–18, 44:5–12, 46:1–5, 47:6–13.)

37.     Respondent has not returned S.P. and has instead taken steps to seize sole custody of S.P. in the United States. In early March 2020, Petitioner received a package containing a

custody petition filed by Respondent seeking sole custody of S.P. in Queens County Family Court (the "Family Court Petition"). On March 12, 2020, the Department of State, the Central Authority of the United States under the Hague Convention, gave notice to the Queens Family Court that the Child was the subject of a Hague Convention application. On June 23, 2020, Petitioner's counsel sent a letter requesting the Queens Family Court indefinitely stay all proceedings in connection with the Family Court Petition, pending resolution of this Petition, and attached a copy of the State Department's March 12 notice. (Stip. Facts ¶ 27.)

38.     In May 2020, the U.S. State Department connected Petitioner with pro bono counsel to file the instant proceedings. (Stip. Facts ¶ 28.)

39.     In May 2020, Petitioner filed an Article 15 petition under the Hague Convention in the Kiryat Shmona Family Court in Israel, captioned *Natalia Pozniak v. Vladimir Schwartzman*, Dkt. No. 61676-05-20. Both parties participated in that proceeding. (Israeli Decision ¶¶ 11.) Respondent raised the exact arguments in the Israeli proceeding that he has here, including some of the same witness testimony from his friends and associates. (Israeli Decision ¶¶ 25, 27, 28, 30, 31; *compare id.* ¶ 52 (discussing affidavit of Mr. Pagosov attesting to travel for "long period"), *with* ECF No. 13 ¶ 5 (Pagosov Declaration attesting to a "long-term trip")).) On August 25, 2020, the Kiryat Shmona Family Court issued its decision, concluding that Respondent's retention of S.P. in the United States was wrongful under Article 3 of the Convention and that Petitioner's custodial rights under Israeli law had been violated. (Israeli Decision ¶ 71.) The Israeli court's conclusions rested on findings that the S.P.'s habitual residence was Israel and that S.P.'s mother had neither consented nor acquiesced to S.P. being relocated to the United States. (Israeli Decision ¶¶ 48-57.)

40.     Petitioner has applied for a humanitarian visa in Israel.  (Tr. 34:22–24, 70:16–18.) Petitioner's application is based on the political instability and military conflict in her home country of Ukraine (Tr. 72:20–23, 73:16–18) and her integration into Israel.  (Tr. 73:24–25.)  The Israeli government has not begun any deportation proceedings against Petitioner.  (Tr. 34:21–35:3.) Petitioner wishes to remain in Israel so she can raise the Child there.  (Tr. 72:6–8, 72:15–19.)  In response to a question from Respondent's counsel as to why she wishes her son to return to Israel and remain with her there instead of Ukraine, Ms. Pozniak explained that she wants "him to live in Israel because he is Israeli by mentality.  He has been residing here [Israel] since two years old." (Tr. 72:17-19.)

41.     Petitioner's relationship with the Child has changed since he arrived in the United States in July 2019.  From July to November 2019, Petitioner spoke with her son every day.  (Tr. 32:12–15.) The Child told Petitioner he loved her.  (Tr. 32:13–15.)  In November 2019, Petitioner's communications with the Child began to change.  Petitioner was not able to reach the Child with the same frequency.  (Tr. 33:18–24, 34:1–9, 47:25–48:9.)  The tenor of the conversations changed, too—the Child's attitude toward the Petitioner became inconsistent, sometimes being affectionate, other times angry and impatient.  (Tr. 32:16–33:8.)

42.     Dr. Vera Kishinevsky, Respondent's proffered expert witness, began providing individual and family therapy to S.P. and Respondent's family in November 2019 (Tr. 112:8, 126:10–15, 126:21–23), and continues to do so.  (Tr. 126:18–20.)  During the therapy sessions, Dr. Kishinevsky observed the Child with Respondent and the Child's step-mother (Tr. 127:2–7), but she never spoke to Petitioner.  (Tr. 130:18–20, 133:5–10, 137:11–137:13.)  Based on her observations of the Child, Dr. Kishinevsky's opined that it was unfair for the Child "[t]o be put in a situation when he has to make choices that are not age appropriate."  (Tr. 114:20–22.)

43. Dr. Kishinevsky provided a report dated August 8, 2020.  (Ex. F.)  Dr. Kishinevsky *does not* conclude that returning S.P. to Israel will cause him any psychological harm at all. Instead, she recommends only that S.P. continue living with his father, without regard to country. (Ex. F; Tr. 138:4–13) ("But your report doesn't offer a conclusion on whether [the Child] should live with his father in Israel versus the United States, right?"  "Doesn't matter to me.").

44. Dr. Kishinevsky also offers no psychological diagnosis of S.P., and does not conclude that he suffers from post-traumatic stress disorder (PTSD) from his life in Israel.  (Ex. F; Tr. 137:21–138:3.)

45. Rather, Dr. Kishinevsky opines that *if* S.P. is returned to his mother's care, he "*may* suffer from emotional and behavioral stressors that are beyond his coping skills [that] may cause him significant mental health problems."  (Ex. F) (emphasis added).  She does not offer this opinion with any degree of psychological certainty.  (Tr. 138:14–139:15.)

46. Dr. Kishinevsky's report and opinions rested only her therapy sessions with the Child, Respondent, and Respondent's family—she did not refer to collateral sources such as court documents or medical records.  (Ex. F; Tr. 129:16–23, 136:12–14, 136:17–23.)  Despite being aware that Petitioner had filed a petition with a differing version of events, Dr. Kishinevsky did not reference that petition when drawing her conclusions.  (Tr. 131:6–15.)

47. Dr. Kishinevsky is familiar with the Model Standards of Practice for Child Custody Evaluation (the "Model Standards"), and is aware that the Model Standards are "intended to provide best practices for evaluators who work with children in custody disputes."  (Tr. 127:18–128:5.)  She did not, however, consider it necessary to reference the Model Standards when preparing her report.  (Tr. 128:11–14.)

48. Dr. Kishinevsky testified that the "specific purpose" of her work was to "support[] the child." (Tr. 131:17–22.) She explained that her participation in these proceedings was "secondary" to that purpose. (*Id.; see also id.* 130:25–131:5 ("My work with the child was to help [S.P.] relieve the stress, help him develop better coping skills, strengthen his father's parenting skills."); 132:8–17 ("I repeat, my role and my goal was to help the child. And I am not a court psychologist in this case. . . . My purpose was to help the child and to help his family."); 133:12–18 ("I was hired to help the child.").)

49. Because the purpose of Dr. Kishinevsky's work was to "help[] the child in his struggle" and provide "supportive therapy," she was "not authorized to explore the other side." (Tr. 136:12–16.) Accordingly, the purpose of her report in this case was not to explore any alternative hypotheses for the Child's behavior. (Tr. 136:24–137:2.)

50. In her report, Dr. Kishinevsky noted that the Child could not recall a single pleasant positive experience with Petitioner, but recalled with joy multiple experiences with Respondent. (Ex. F; Tr. 135:8–16.) Dr. Kishinevsky's report makes no mention of parental alienation or reference to the potential that the Child could be influenced by Respondent. (Ex. F; Tr. 135:24–136:6.)

51. Dr. Alberto Yohananoff, Petitioner's expert, prepared a rebuttal report. (Ex. 23.) Dr. Yohananoff's report considered Dr. Kishinevsky's report and certain collateral sources, including the Petition and Respondent's Declaration (ECF No. 16). Dr. Yohananoff observed that Dr. Kishinevsky did not adhere to the Model Standards in several material respects, and concluded that her report was unreliable for multiple reasons. (Ex. 23 at 1–4; Tr. 145:9–13, 150:22–151:4.)

52. First, Dr. Yohananoff concluded that Dr. Kishinevsky was "likely to be less objective as a forensic evaluator because she has functioned as a doctor of the child," and in that

role, "probably formed some type of alliance with the child." (Tr. 146:2–21; Ex. 23 at 2.) Dr. Yohananoff identified certain aspects of Dr. Kishinevsky's report that supported his conclusion, including that Dr. Kishinevsky had adopted the views of Respondent and the Child without any deeper investigation, including the use of collateral information or psychological testing as recommended by the Model Standards. (Tr. 146:24–147:12, 148:2–6; Ex. 23 at 2–3.)

53. Second, Dr. Yohananoff noted that Dr. Kishinevsky's report included statements from the Child that suggested the process of parental alienation may have been at play in the relationship between Petitioner, Respondent, and the Child. (Ex. 23 at 3–4; Tr. 149:6–16.) Parental alienation is a phenomenon that often comes up in high conflict situations between parents—including custody disputes—in which a child unconsciously decides to align himself with one parent and reject the other. (Ex. 23 at 3; Tr. 148:9–19.) Dr. Yohananoff identified as red flags of possible parental alienation the Child's statements that he could not recall any positive memories about his mother, that she has "no heart," and that Petitioner always called at the wrong time. (Ex. 23 at 3; Tr. 149:6–16.) Dr. Yohananoff also identified that the Child had adopted a perspective similar to Respondent's as another red flag of parental alienation. (Ex. 23 at 3; Tr. 149:6–16.) Dr. Yohananoff opined that, as a result of these red flags, Dr. Kishinevsky should have investigated the possibility of parental alienation, but did not. (Ex. 23 at 3–4; Tr. 149:15–16.) Dr. Yohananoff also opined that if parental alienation had occurred between the Child and Petitioner, then returning to Israel may better serve the best interests of the Child because Petitioner may be completely cut off from her son otherwise (Ex. 23 at 4; Tr. 149:16–150:2), and there is reason to doubt that the Child's stated preference for living with Respondent is a true reflection of his desires. (Tr. 154:14–19.)

## PROPOSED CONCLUSIONS OF LAW

The parties have already litigated the merits of Petitioner's *prima facie* case in Israel—and Respondent has already lost. The Israeli Decision is *res judicata* on Petitioner's claim under Article 3 of the Hague Convention, and Respondent should be barred from re-litigating it here.

Even if *res judicata* does not apply, all of the relevant evidence in this case shows that S.P.'s habitual residence—measured at the time of this wrongful retention, as required by the Convention—is Israel. Respondent's argument to the contrary is based on an incorrect interpretation of recent Supreme Court precedent that would gut the Hague Convention entirely. Because there is no dispute that Petitioner's custody rights under Israeli law were breached by the abduction, and that she exercised custody prior to the abduction, Petitioner has plainly established her *prima facie* case under the Convention.

By contrast, Respondent has failed to meet his burden to prove either of his two asserted affirmative defenses. He has not shown by a preponderance of the evidence that Petitioner agreed to allow her son to move to the United States permanently. The record evidence shows Petitioner made no such agreement, and instead continually demanded to know when her son would be returned to Israel. He also has not presented *any* evidence, much less any clear and convincing evidence, to support any plausible "grave risk" defense. Indeed, Respondent's novel theories regarding "grave risk" fail as a matter of law. Therefore, the Child must be returned to Israel.

## I.   Respondent's claims are barred by *res judicata*.

The Israeli Decision is a final adjudication on the merits of Petitioner's *prima facie* case under the Hague Convention, and thus bars Respondent from re-litigating the issue here. A claim is barred by *res judicata* where "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been raised, in the prior action." *Monahan v. N.Y.C.*

*Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000). These three elements have been satisfied here. First, the Israeli court reached a decision on the merits on the three issues that are germane to Petitioner's *prima facie* case under the Hague Convention: namely, whether Israel was the Child's habitual residence (it is); whether Petitioner had custodial rights and was exercising her custodial rights at the time of the abduction (she did, and she was); and whether her custodial rights had been violated under Israeli law (they had). (Israeli Decision ¶¶ 47, 59–62, 71.) Second, the parties in these two actions are identical. Third, with respect to Petitioner's *prima facie* case, Respondent asserted the exact argument—that Petitioner agreed to S.P.'s permanent move to the United States—in the Israeli proceeding that he has here. (*Id.* ¶¶ 25, 27, 28, 30, 31, 52.) Respondent had a full and fair opportunity to present his witnesses in Israel, (*id.* ¶ 68 (noting parties "waived witness examinations")), and has made no argument to the contrary.

Respondent is therefore barred from re-litigating whether his retention of S.P. was wrongful under Article 3 of the Convention.[4] And, as discussed in Section III below, the Israeli court also addressed the issue of consent, which is one of the two affirmative defenses raised by Respondent here, and it ruled that Respondent had failed to establish any such consent.

## II. As in the Israeli court, Petitioner has in this Court established a *prima facie* case for the Child's return to Israel.

The primary objective of the Hague Convention is to facilitate "the restoration of the *status quo*" for the child. *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). Thus, the focus of the Convention is not on matters of custody, but rather "simply upon whether a child should be

---

[4] Even if the Decision were not *res judicata*, the Israeli court's findings of fact and conclusions of law are nonetheless entitled to comity here. *See* Petitioner's Memorandum of Law in Support of Motion for Judicial Notice and Extension of Comity (ECF No. 24). The Court declined to adopt the Israeli court's findings as a matter of international comity earlier, but should certainly now consider those findings when making its "determination as to whether removal [or retention] was wrongful within the meaning of the Convention." Minute Entry dated October 27, 2020.

returned to her country of habitual residence for custody proceedings." *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012). To state a *prima facie* case under the Hague Convention, Petitioner must establish that: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the [her] custody rights under the law of the State of habitual residence; and (3) [she] was exercising those rights at the time of the removal or retention." *Gitter*, 396 F.3d at 130–31. Petitioner must prove each prong by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A).

Here, the only prong Respondent contests in Petitioner's *prima facie* case is whether Israel is S.P.'s habitual residence. (Tr. 14:20-24 (arguing "the child's habitual residence was not Israel").) Though the Convention provides no strict definition of "habitual residence," the Supreme Court in *Monasky v. Taglieri* set out a holistic standard, where a "child's habitual residence depends on the totality of the circumstances specific to the case" and "the determination of habitual residence does not turn on the existence of an actual agreement" between parents. 140 S. Ct. 719, 723, 726 (2020). In making their decision, courts should be "informed by common sense." *Id*. at 727 (internal citations omitted). While "no single fact" is "dispositive across all cases," the Court observed the commonsense principle that "[w]here a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id.*; *see also id.* at 734 (Alito, J., concurring in part and concurring in the judgment) (habitual residence "means the place where the child in fact has been living for an extended period").

Applying the *Monasky* standard, Petitioner has shown that Israel is S.P.'s habitual residence by a preponderance of the evidence. S.P. lived in Israel continuously from the spring of 2014 until July 19, 2019 and is an Israeli citizen. *See supra* Proposed Post-Trial Findings of Fact ("FOF") ¶¶ 12–13. There, S.P. lived a full and vibrant life, surrounded by loving family and friends. FOF ¶¶

17–18.  Before Respondent and S.P. left Israel in July 19, 2019, S.P. had been to the United States only three times.  FOF ¶ 19.  Despite occasional trips abroad, S.P. "lived in one place"—Israel—"with [his] family indefinitely," and certainly did not reside, habitually or otherwise, in the United States prior to the abduction.  *See Monasky*, 140 S. Ct at 727.  Thus, the "straightforward" conclusion is that Israel was S.P.'s habitual residence when his father took him to the United States on July 19, 2019.  *See id.*

Respondent attempts to defeat this commonsense conclusion and argues that the "totality of the circumstances" standard announced in *Monasky* means that S.P. has *no* home country at all.  Instead, in Respondent's view, the circumstances of S.P.'s life (all *after* the abduction) show that the boy's habitual residence simply follows his father, no matter where his father goes.  Respondent's misguided reading of *Monasky* would turn every Hague Convention case into a custody dispute, with courts deciding which parent—not which country—should decide where a child lives.  Neither the text of the Convention nor *Monasky* endorse Respondent's amorphous and free-flowing understanding of the term "habitual residence."[5]

The text of the Convention first refers to a child's habitual residence in Article 3 to determine when a child's removal or retention is "wrongful."  In particular, Article 3 of the Convention asks whether the left-behind parent's custody rights were breached "under the law of the State in which the Child was habitually resident *immediately before removal or retention*," (emphasis added).  In turn, Article 12, which provides for the Convention's central return remedy, then refers back to the definition provided in Article 3.  The Convention's plain text thus makes clear that the proper frame of reference for a child's habitual residence is the circumstances of his

---

[5] The Court said as much during the January 25, 2021 trial.  (Tr. 60:1–13 ("That's fine.  I do have to tell you that your interpretation of *Monasky* for the proposition that a child's habitual residence is wherever a parent is is not what that case says . . . what you're saying, in fact, is that the child has no habitual residence. . . but the idea that habitual residence is this sort of floating thing that depends on the location of the parent is not what *Monasky* says.").)

or her life "immediately before" the abduction.[6]  It also makes clear that a child's habitual residence must be in a discrete "State," without any regard to either parent's whereabouts.

*Monasky* confirms what the Convention's text plainly states:  a child's habitual residence is "[t]he *place* where a child is at home, *at the time of removal or retention*."  140 S. Ct at 726–27. (emphasis added) (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006)).  *Monasky* concerned the removal of a two-month-old infant from Italy to the United States.  *Id.* at 724.  The Supreme Court held that the lack of an "actual agreement" between the parents was not necessary to establish the infant's habitual residence; rather, any child's "habitual residence depends on the totality of the circumstances specific to the case."  *Id.* at 723.  Although the litigation in *Monasky* lasted nearly five years, the Court looked only to the "totality of the circumstances" prior to removal, *i.e.*, the child's early infancy:  the child was "born into a marital home in Italy. . . . that her parents established with no definitive plan to return to the United States."  *Id.* at 731 (quotation marks and citation omitted).  The Court did not consider any circumstances that occurred *after* she arrived in the United States, and instead affirmed that, at the time of her removal, Italy was the child's habitual residence.  *Id.*

Contrary to Respondent's argument, *Monasky* did not break any new ground on the meaning of "habitual residence."  The Second Circuit has for years recognized that "the Hague Convention uses the terms 'habitual residence' and 'habitually resident' in a practical way, referring to the country where a child usually or customarily lives."  *Guzzo v. Cristofano*, 719 F.3d 100, 103 (2d Cir. 2013).  And the reference point of that determination is "at the time of the contested removal."  *Id.* at 107; *see also Grano v. Martin*, 443 F. Supp. 3d 510, 539 (S.D.N.Y.

---

[6] Again, this Court already recognized this fundamental principle of the Convention at trial.  Tr. 61:22–23 ("I think the determination of habitual residence is made at the time of the alleged abduction, not what happens afterwards.").

2020) (noting *Monasky* "seemingly adopted" Second Circuit's instruction that the "inquiry is designed simply to ascertain where a child usually or customarily lives."), *aff'd*, 821 F. App'x 26 (2d Cir. 2020).

Therefore, Respondent's interpretation of *Monasky* is incorrect, and his argument that S.P.'s habitual residence is somewhere other than Israel fails both as a matter of law and common sense. Rather, as previously stated, "the totality of circumstances specific to this case," *see Monasky*, 140 S. Ct. at 723, confirm that S.P.'s habitual residence at the time of his removal was indeed Israel.

## III.    Respondent has established no affirmative defense.

Since Petitioner has stated a *prima face* case, the Child must be returned to Israel unless Respondent can establish an affirmative defense. *See Souratgar v. Lee*, 720 F.3d 96, 100 (2d Cir. 2013). Respondent has asserted two affirmative defenses: that Petitioner consented to the Child's retention in the United States, and that the Child will face a "grave risk" of physical, psychological, and/or neurological harm, or would otherwise be placed in an intolerable situation, should he return to Israel. Respondent has established neither defense.[7]

### A.    Petitioner never consented to the Child's retention in the United States.

Respondent has asserted Petitioner consented to Respondent's retention of the Child in the United States. Under Article 13(a) of the Hague Convention, the return of a child to his habitual residence is not necessary where the party seeking return "had consented to or subsequently acquiesced in the removal or retention." Respondent bears the burden of establishing the consent defense by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). As discussed below,

---

[7] Respondent has also suggested that proof of the child's settlement could provide the basis for a well-settled defense under Article 12. But, because Petitioner initiated these proceedings within one year of S.P.'s departure from Israel, that defense is not available to Respondent. *See* Convention, Art. 12.

Respondent's consent defense fails because he has not shown any such agreement by a preponderance of the evidence. Indeed, the evidence presented at trial shows definitively that Petitioner never consented to her son's permanent retention in the United States.

Under Article 13(a), a parent's consent for temporary removal of a child "under certain conditions or circumstances" does not indicate "that retention of the child beyond those conditions or circumstances is necessarily permissible." *Hofmann v. Sender*, 716 F.3d 282, 295 (2d Cir. 2013) (citing *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005)). The consent defense analysis focuses on "the petitioner's subjective intent," which "includes the nature and scope of the alleged consent." *Nissim v. Kirsh*, 394 F. Supp. 3d 386, 398 (S.D.N.Y. 2019) (internal citations and quotations omitted). That inquiry "consider[s] what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Chumachenko ex rel. P.B. v. Belan*, No. 18-CV-9728, 2018 WL 6437062, at *8 (S.D.N.Y. Dec. 7, 2018) (quoting *Baxter*, 423 F.3d at 371) (internal quotations omitted). Establishing post-abduction acquiescence requires "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *In re Koc*, 181 F. Supp. 2d 136, 151 (E.D.N.Y. 2001), *report and recommendation adopted* (Apr. 3, 2001) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996)).

To reiterate, Respondent's arguments on this point and the evidence introduced at trial in support thereof are identical to the arguments and evidence presented to the Israeli court. FOF ¶ 39. Specifically, the Israeli Decision thoughtfully considered the evidence and found that S.P.'s habitual residence was Israel and that S.P.'s mother had neither consented nor acquiesced to S.P. being relocated to the United States. FOF ¶ 39.

Here, the evidence presented at trial shows definitively that Petitioner never consented to or acquiesced in the Child's retention in the United States. FOF ¶¶ 27, 29, 35. Petitioner did not even know of or agree to Respondent's plan to permanently relocate S.P. to the United States, where she could not be a part of his life in any meaningful way. FOF ¶ 27. Respondent claims that Petitioner agreed to S.P.'s permanent move to the United States because she was allegedly aware that *Respondent* intended to move there. (Tr. 87:20–23, 89:20–22.) However, these statements show only that Petitioner may have known Respondent was interested in living in the United States permanently, but not that she *knew and agreed* to allow her only son to move a continent away. And Petitioner has never acquiesced to her son's unlawful retention in the United States since his arrival—indeed, she repeatedly objected to her son remaining. FOF ¶¶ 35, 38. Petitioner also commenced legal proceedings days after she suspected that Respondent was not planning to return S.P. to Israel. FOF ¶ 34. None of these behaviors are consistent with consent or acquiescence. *See, e.g.*, *In re Koc*, 181 F. Supp. 2d at 149–52 (rejecting acquiescence defense where father demanded daughter's return and sought assistance from home Central Authority).

Respondent's own statements and actions undermine his story that Petitioner had agreed to her son's permanent move to the United States. On August 26, 2019, in response to Petitioner's question "When will you bring [S.P.] home," Respondent stated "[w]e're here for now." FOF ¶ 27. Similarly, Respondent told Petitioner during an October 4, 2019 phone call that he "didn't know yet" when he and S.P. would return to Israel, but they were in the United States "for now." FOF ¶ 33. Critically, Respondent's ambivalent statements regarding S.P.'s return were not reserved only for S.P.'s mother. On August 27, 2019, Respondent communicated with an official at S.P.'s school in Israel, confirmed that S.P. would attend school in the fall, and thus requested

that the school leave a spot open for S.P.  FOF ¶ 28.  Only on October 22, 2019 did Respondent explain that S.P.'s date of return to Israel was unknown.  FOF ¶ 32.[8]

If Petitioner had agreed with Respondent's plan to move her son to the United States permanently, why did Petitioner begin asking for their return date in August—a little over a month after Respondent and S.P. left Israel—and why did Respondent state he and S.P. were in the United States "for now" and that he "didn't know yet?"  FOF ¶¶ 27, 33.  Likewise, if both parents had agreed that their son was to move to the United States permanently, why did Respondent initially reserve a spot for his son in the Israeli school for the 2019 school year only to change his mind two months later?  The only logical—and accurate—answer is that there was no agreement between the parents, and Respondent unilaterally decided not to return S.P. to Israel.

Although the record does not specify exactly when the father decided that he would not be returning his son to Israel, the record does show the following:  First, the father was married to a woman in the United States, a fact that was unknown to the Petitioner.  Indeed, in her petition, Ms. Pozniak referred to the woman as a "girlfriend" (Petition ¶¶ 10, 29, 36, 57) and at the bench trial testified that she learned Respondent was married only during the course of this legal proceeding.  (Tr. 66:1–6.)  Second, approximately fourteen months ago, while Respondent was in the United States with the then eight-year-old son of Petitioner, Respondent's wife became pregnant and approximately five months ago gave birth to his daughter.  (Tr. 98:11–16.)  This sequence of events suggests that Respondent may have made the final determination not to return his son to Israel after their most recent arrival in the United States.  But whether the abduction was pre-meditated or spontaneous is not critical—the important point is that the evidence shows that Petitioner never consented to the child remaining permanently in the United States.

---

[8] At trial, Respondent did not deny making these statements and representations to the school.

The evidence shows that Petitioner did not know of or consent to Respondent's plan to move S.P. to the United States permanently. She believed her son was going to return to Israel by the start of the school year, but all of her requests for his return were stonewalled by Respondent. (Israeli Decision ¶ 66.) In short, the parents did not agree to any permanent move of S.P.

**B.** **Respondent has not proven his "grave risk" defense.**

Respondent has also asserted an Article 13(b) "grave risk" defense based on two equally unsupported claims: that the Child will suffer emotionally should he be separated from Respondent, and that Petitioner is likely to be deported from Israel to Ukraine, which will cause the Child to be placed in an intolerable situation. Respondent, however, has failed to show by clear and convincing evidence that either outcome is likely. *See* 22 U.S.C. § 9003(e)(1)(A).

The Article 13(b) "grave risk" defense is exceedingly narrow. "The level of risk and danger required to trigger this exception under Article 13(b) has consistently been held to be very high." *In re Koc*, 181 F. Supp. 2d at 155 (internal citation, quotations, and alterations omitted). "'Grave risk of harm' arises in two situations: '(1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.'" *In re R.V.B.*, 29 F. Supp. 3d 243, 258 (E.D.N.Y. 2014) (quoting *Souratgar*, 720 F.3d at 103). "The potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high. The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Souratgar*, 720 F.3d at 103 (internal citations, quotations, and alterations omitted).

1. *Respondent has not proven that the Child will be harmed if returned to Israel.*

The crux of Respondent's "grave risk" argument rests on the potential harm that may befall the Child should he be separated from Respondent upon return to Israel. As an initial matter, despite bearing the burden of establishing this defense, Respondent introduced *no evidence* that S.P.'s return to Israel would necessarily separate the two. But it is well-settled that "[a] return remedy does not alter the preabduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence." *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). In other words, the Convention's return remedy can only return S.P. to Israel, not to either parent's exclusive custody. *See id.; see also* FOF ¶ 15 (both parents "shared" custody prior to abduction). Despite this Court's reminder at the outset of trial that the parties address whether "the abducting parent also returns to the jurisdiction," Tr. 16:2–7, Respondent *never testified* that he would not return to Israel with his son. He also presented no evidence to show any hindrance to his ability to travel, and all the evidence suggests that he in fact can travel between the two countries as he pleases. Beyond speculation, there is simply no evidence in the record that S.P.'s return to Israel would mean a return to Petitioner's sole custody.

The evidence that Respondent does offer in support of this defense—the testimony and expert report of Dr. Kishinevsky—cannot support this claim and may even undermine it. For starters, Dr. Kishinevsky, like Respondent, also conflates return to Israel with return to Petitioner's custody. That is not what a return order does. *See Abbott*, 560 U.S. at 9. But even on the merits, her opinions fall far short of the "grave risk" standard. She concludes only that *if* the Child returns to his *mother*, he "*may* suffer from emotional and behavioral stressors," and does not offer this prediction with any degree of certainty. FOF ¶ 45. Notably, she *does not* offer any conclusion on whether *return to Israel* would cause any such psychological trauma, and testified that it "[d]oesn't matter" to her. FOF ¶ 43. Even if the Court were to credit her opinions—and it should not—Dr.

Kishinevsky's conclusions are nothing more than a custody recommendation, and a far cry from the psychological evidence that the "grave risk" defense requires. *See Blondin v. Dubois*, 238 F.3d 153, 161, 165 n.14 (2d Cir. 2001) (affirming "grave risk" in "exceptional case" where children suffered years of physical abuse in France, based on psychologist's uncontroverted opinion that return would trigger unavoidable PTSD, and French authorities could not prevent it "*even with all the*[] *arrangements in place*") (emphasis in original).

This "grave risk"—to the extent it exists—would be cured if Respondent returned with his son to Israel, where they are both citizens. FOF ¶¶ 3–4. As mentioned above, Respondent presented *no evidence* or argument as to why he cannot do so, even if only temporarily to resolve the custody dispute. The "goals of the Convention would be frustrated if an abducting parent were permitted to thwart a return by causing, or refusing to ameliorate, psychological harm to the child." *Garcia v. Angrita*, 440 F. Supp. 2d 1364, 1382–83 (S.D. Fla. 2006). Thus, even if Dr. Kishinevsky's report contained reliable conclusions, Respondent's argument in this respect fails.

But Dr. Kishinevsky's conclusions *are* unreliable. For one, Dr. Kishinevsky served and continues to serve as the Child's therapist, FOF ¶ 42, and she viewed her role here as part of her supportive therapy to help S.P. and Respondent. *Id.* ¶ 48. As such, her report and conclusions relied solely on her observations of Respondent and the Child made during therapy sessions. FOF ¶ 46. She never spoke to Petitioner, *see* FOF ¶ 42, and she did not refer to any collateral sources, such as court documents or the Child's medical records. *Id.* In short, Dr. Kishinevsky was not an impartial evaluator, and functioned more as an advocate than an expert witness. FOF ¶ 52.

Dr. Kishinevsky's report and conclusions are also unreliable because she failed to consider the phenomenon known as "parental alienation," even though multiple textbook signals of parental alienation are present in this case. FOF ¶ 53. Specifically, the Child's statements that he could

not recall any positive memories about his mother, that she has "no heart," and that Petitioner always called at the wrong time are red flags of potential parental alienation. *Id.* Another red flag of parental alienation is that the Child had adopted a perspective similar to Respondent's. *Id.* What's more, Petitioner's testimony regarding her relationship and communications with her son since he arrived in the United States may reflect additional signs of parental alienation. FOF ¶ 41. It is Dr. Yohananoff's opinion that if parental alienation has occurred between the Child and Petitioner, then returning to Israel may better serve the best interests of the Child because Petitioner may be completely cut off from her son otherwise. FOF ¶ 53. But Dr. Kishinevsky ignored these red flags to reach her conclusion that S.P. should remain with Respondent.

As part of his "grave risk" defense, Respondent also claims that the Child does not wish to return to Israel and would like to stay in the United States with Respondent. (Ex. F; Tr. 97:19-21; 112:9-12; 119:16-20.) But he never asked this Court to inquire as to S.P.'s views, much less evaluate whether S.P. "is mature enough" to maintain a well-reasoned objection to return. *See Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 205 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010) (internal citations and quotations omitted). In any event, S.P. is a nine-year-old boy, and courts have often ruled that children of that age are not of the requisite maturity required by the Article 13 exception. *See id.*, at 207–08 (concluding that respondent did not satisfy burden to prove child "two months shy of his tenth birthday" was "sufficiently mature for the Court to take his views into account"); *In re R.V.B.*, 29 F. Supp. 3d at 258 ("Despite the Child's charm and maturity for her age, the Court notes that she is only eight years old, and she does not possess the sufficient 'age and degree of maturity' such that her opinion could be a sole basis to deny the petition.").

And Dr. Kishinevsky cast doubt on his maturity. FOF ¶ 42 (It is unfair for the Child "[t]o be put in a situation when he has to make choices that are not age appropriate.").[9]

Therefore, Respondent has not shown by clear and convincing evidence that there is a "grave risk" that the Child's return to Israel would expose him to physical or psychological harm, and the Child's wishes to remain in the United States with his father carry little weight in this analysis.

> 2. *Respondent has not shown that the Child will be returned to an "intolerable situation" if he is returned to Israel.*

Finally, Respondent claims that Petitioner's potential deportation from Israel to Ukraine presents an "intolerable situation." (Tr. 15:5–14.) This claim is baseless. Petitioner has applied for a humanitarian visa in Israel based on the instability and conflict in her home country of Ukraine. FOF ¶ 40. Petitioner is not currently subject to any deportation proceedings or removal orders. *Id.* Further, Respondent did not introduce *any* evidence to the contrary, let alone evidence that would meet the clear convincing evidence standard. But even if Respondent had established a risk of deportation, Respondent has also not cited, and Petitioner is not aware of, a single case where a court has held that the left-behind parent's immigration status would constitute a grave risk to the child. The cases Respondent has cited on this topic are not on point.[10]

---

[9] Dr. Yohananoff also observed that the evidence of potential parental alienation provides ample reason to doubt the Child's stated preferences. FOF ¶ 53. Parental alienation notwithstanding, this Court has warned that the abducting parent's influence, even if unintentional, can be especially impactful in situations like this one, where Respondent has unlawfully retained the Child for almost one and half years. *Haimdas*, 720 F. Supp. 2d at 204, 207 (noting that a "lengthy wrongful retention" could influence child's desire to remain and observing that nine-year-old's view of petitioner had "clearly been impacted by . . . the strained and often bitter relationship between his parents").

[10] *Miltiadous v. Tetervak* considers the respondent's immigration status *in the United States* as part of the broad habitual residence inquiry, not the much more narrow "grave risk" defense. 686 F. Supp. 2d 544, 551 n.9 (E.D. Pa. 2010). *Mendoza v. Miranda*, 525 F. Supp. 2d 1182, 1195 (C.D. Cal. 2007) considers the child's immigration status in the context of the "well-settled" defense and was later reversed. *Mendoza v. Miranda*, 559 F.3d 999 (9th Cir. 2009). And, *Casimiro v. Chavez*, No. 06-CV-1889-ODE, 2006 WL 2938713, at *6–7 (N.D. Ga. Oct. 13, 2006) considers the child's immigration status in its exercise of discretion to return a child despite her preference to remain in the United States.

Respondent moreover presented no evidence, aside from his own speculation, that—*if* Petitioner is deported to Ukraine, and *if* S.P. is also deported with her—she and her child would in fact be shipped to a "war zone" in the country. His argument rests on nothing more than layers of unfounded speculation. None of these *potential* threats satisfy his burden to make "a clear and convincing" case that the alleged harm is "likely to occur." *Souratgar*, 720 F.3d at 106. Though Petitioner's immigration status in Israel may be relevant to a custody proceeding there, it is has no relevance to these proceedings, which focus only on determining whether the child should be returned to Israel.

## CONCLUSION

For the reasons set forth above, the Court should grant the Petition in its entirety and return the Child to Israel forthwith.

New York, New York
Dated: February 1, 2021

AKIN GUMP STRAUSS HAUER & FELD LLP

    */s/ Robert H. Pees*
Robert H. Pees
Saurabh Sharad
John P. Kane
Victoria Fydrych
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
E-mail: rpees@akingump.com
E-mail: ssharad@akingump.com
E-mail: jkane@akingump.com
E-mail: vfydrych@akingump.com

*Counsel for Petitioner*