**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATALIA POZNIAK,<br><br>*Petitioner,*<br><br>– *vs.* –<br><br>VLADIMIR SHVARTSMAN,<br><br>*Respondent.* | CIVIL ACTION<br><br><br>Docket No.: 20-cv-02956-AMD-RML |

## <u>RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

**FISHKIN, GURSHUMOV & NUSSBAUM, P.C.**
Marcus A. Nussbaum, Esq. (MN 9581)
3059 Brighton 7th Street, Fl. 1
Brooklyn, New York 11235
Tel: 201-956-7071
***Attorneys for Respondent***
marcus.nussbaum@gmail.com

## PRELIMINARY STATEMENT

Respondent, Vladimir Shvartsman ("Respondent"), by his attorneys Fishkin, Gurshumov & Nussbaum, P.C., respectfully submits these proposed Findings of Fact and Conclusions of Law in the instant matter brought by Natalia Pozniak ("Petitioner") seeking return of the Child, S.P. ("S.P." or "Child") to Israel (the "Petition").

At the time of the bench trial on January 25, 2020, the Court heard testimony and considered evidence on the issues of: a) whether or not the Child habitually resided in Israel; b) whether petitioner was aware of respondent's plans to move permanently to the United States with the Child and agreed to those plans; c) the grave risk of harm that the Child would suffer if returned to Israel due to Petitioner's lack of Israeli citizenship, expiration of her Temporary Resident Status, expiration of her Israeli Work Permit, and the likelihood of petitioner's deportation back to the city of Lugansk in Ukraine, which is a war zone (resulting in the Child either becoming a ward of the State of Israel or returning with his mother to a war zone in Ukraine); and d) the grave risk of harm (and specifically psychological harm) that the Child would suffer if returned to Israel after being ripped away from his family unit here in the United States with which he is well-settled (including his father, step-mother, step-sisters and half-sister) and returning to a country with no other relatives than Petitioner (who now lives 70 Kilometers from where she previously resided with respondent and the child).

As to the Child's habitual residence, the evidence and testimony established that the child was born in Lugansk, Ukraine in 2011 and moved to Israel with his mother in mid-2012 where the Child resided with petitioner and respondent for one year, after which time the Child moved back to Ukraine with Petitioner in September of 2013. The Child returned to Israel in the spring of 2014

where he lived in respondent's home until Respondent brought him to the United States on July 19, 2019.

As to the petitioner's awareness of respondent's plans to move permanently to the United States with the Child and her acquiescence to those plans, the evidence demonstrated (via respondent's testimony which was also corroborated by the uncontested Declarations of witnesses Karen Pagosov [ECF No. 13], Gregory Lifshits [ECF No. 15], and Michael Braverman [ECF No. 19], which were admitted as live testimony without cross examination) that: a) respondent discussed with these witnesses his plans to move to the United States permanently with the Child and for the Child to obtain a Green Card; b) that these discussions took place in the presence of petitioner; c) at no time did petitioner ever object to these plans; d) that petitioner participated in these conversations and was pleased with the idea; and e) that that petitioner participated in these conversations and expressed interest in obtaining a Green Card based upon the Child obtaining a Green Card in the United States.

As to the grave risk of harm that the Child would suffer if returned to Israel, the evidence placed on the record included petitioner's admissions that she has no Israeli citizenship, that her Temporary Resident Status in Israel is expired, that her Israeli Work Permit is expired and she has no right to lawfully work in Israel, and that she is seeking a Humanitarian Visa in Israel to avoid deportation back to the city of Lugansk in Ukraine, which is a war zone.

Additionally, and as to the grave risk of harm that the Child would suffer if returned to Israel, respondent's Expert Witness (Dr. Vera Kishinevsky who is the Child's treating psychologist) testified that if the Child were returned to Israel after being ripped away from his family unit here in the United States with which he is well-settled (including his father, step-mother, step-sisters and half-sister), that the psychological impact on the Child would be

"devastating". She also explained that if returned to Israel, the Child will feel "depersonalized", "out of control, and that the Child wants to stay where his needs are addressed, where his feelings are respected, and where he has a "normal life".

Respondent requests that the Court consider the foregoing and the additional information set forth in detail below, and rule that in accordance with the Hague Convention on the Civil Aspects of International Child Abduction, that the Child's habitual residence was not Israel, but even if it were determined to be Israel, that the Child was not wrongfully removed due to petitioner's knowledge of, and acquiescence to respondent's plans to bring the Child to the United States permanently. Respondent also respectfully requests that the Court consider the grave risk of harm that the Child would suffer if returned to Israel and rule that this risk requires that the Child remain in the United States with his family, rather than risk deportation to a war zone in Ukraine together with his mother, or risk psychological harm by returning to Israel which would be "devastating", according to respondent's Expert Witness.

## PROPOSED POST-TRIAL FINDINGS OF FACT

1. Respondent Vladimir Shvartsman was born on May 25, 1977 in Kazakhstan. He is an Israeli citizen and a permanent resident of United States (green card holder). He is also the biological father of the Child, S.P. He has resided in New York for over one year now with the Child, together with Respondent's wife, their newborn daughter, and his two step-daughters - - a family unit. Since the recent passing of Respondent's mother in Israel, Respondent has no remaining family there with the exception of a cousin. Respondent currently resides in Fresh Meadows, Queens in New York with his wife, their newborn daughter, two step-daughters and his Child. (Stip. Facts ¶ 2-3) (Tr. p. 84/ln. 22-25; p. 85/ln. 1-20; p. 96/ln. 22-25; p. 97/ln. 1-5).

2.      Petitioner Natalia Pozniak was born in the former Soviet Union in 1981. She is a Ukrainian citizen residing in Israel without work authorization, work permits and/or any other right legally reside within the State of Israel. She is subject to deportation at any time. Petitioner has no family residing in Israel. (Stip. Facts ¶ 1) (Tr. p. 69/ln. 10-12; p. 70/ln. 16-25; p. 71/ln. 1-21; p. 73/ln. 1-7; p. 75/ln. 6-7).

3.      In May of 2010, the Respondent met the Petitioner through the Internet. At that time, the Respondent lived in Israel and the Petitioner lived in Ukraine. After approximately two and a half months of communication by internet and phone, the Petitioner decided to come to Israel after receiving a tourist visa. During her stay in Israel, the Petitioner stayed with Respondent in his home. In October 2010, Petitioner learned she was pregnant and returned to Ukraine that month. (Stip. Facts ¶¶ 4, 6).

4.      On June 19, 2011, Petitioner gave birth to S.P., the Child in Lugansk, Ukraine. The Child's Birth Certificate identified Petitioner as his mother, and "Vladimir Pozniak" as his father. (Stip. Facts ¶ 7).

5.      In August of 2012, Petitioner returned to Israel with the Child. After one year, in or around September 2013, Petitioner moved with S.P. back to Ukraine. In November or December 2013, Respondent visited Petitioner and S.P. in Ukraine for two to three weeks. (Stip. Facts ¶ 8).

6.      In February of 2014 the Russian military began occupying the region of Ukraine where the Petitioner and Child resided. The area became very dangerous, and many people in the region were killed during military operations. Petitioner and S.P. no longer felt safe living there. (Petition, ¶ 20).

7.      In the spring of 2014, Petitioner and S.P. returned to Israel to live with Respondent. Since then, S.P. has lived continuously in Israel until Respondent brought him to the United States on July 19, 2019. (Stip. Facts ¶ 9).

8.      Petitioner has lived in Israel since 2014 and as admitted in her Petition and by her testimony, she currently resides in Kiryat Motzkin, a suburb of Haifa, Israel, which is 70 kilometers away from where previously resided with the respondent and the Child (to wit: Katzrin in Israel). During this time period, S.P. became an Israeli citizen, and Petitioner acquired a work visa and, later, a temporary residence card, both of which are now expired. (Stip. Facts ¶¶ 9-10) (Tr. p. 69/ln. 10-12; p. 70/ln. 16-25; p. 71/ln. 1-21; p. 73/ln. 1-7).

9.      Though Petitioner and Respondent did not have a formal custody agreement, they worked out an informal arrangement pursuant to which both exercised shared custody over S.P. Petitioner and Respondent had a relationship of mutual understanding and assistance, with both parties communicating openly about shared custody of their son. (Stip. Facts ¶ 12).

10.     On November 16, 2015, Respondent and the Child visited United States for the first time. (Stip. Facts ¶ 16).

11.     In January of 2016, Respondent married Irina Bolotovsky, a citizen of United States. In or about 2016, Respondent began pursuing permanent residency in United States. (Tr. p. 85/ln. 20) (Petition, ¶ 30).

12.     After Respondent's trip in November 2015, Respondent also began an annual tradition of traveling to the United States with S.P. for approximately one month during the Child's vacations from school, typically during the summer. (Stip. Facts ¶ 31).

13. During these trips to United States, the Respondent and Child would join with Respondent's wife and step-children and they all would go on trips in New York, Florida or Texas, during which time petitioner was always aware of the respondent's travel plans with the Child, and the fact that respondent was spending time with the Child together with respondent's wife and her children from the United States. (Tr. p. 86/ln. 8-25; p. 87/ln. 1-15).

14. On July 12, 2017, Respondent's mother passed away. At that time, Respondent openly expressed there was nothing holding him back now from moving permanently to United States as he had a wife and step children there. Respondent started looking for someone to take over his event planning business. (Stip. Facts ¶ 35) (Tr. p. 85/ln. 15-25; p. 86/ln. 1-3, 19-25; p. 87/ln. 16-25; p. 88/ln. 1-20).

15. Petitioner spoke with respondent's friends from Texas regarding life in United States and the legalization process. Prior to moving to Texas, Mr. Braverman resided in Israel. When respondent's mother passed away in July of 2017, Mr. Braverman and his family traveled to Israel to pay their respects. At that time, petitioner noted that respondent expressed to her that now that his mother passed away, that there was nothing holding him back in Israel. Petitioner asked Mr. Braverman questions about America and particularly about Mr. Braverman's (and his family's) status in the United States. In particular, she stated that she was aware that respondent was married to an American Citizen. (See, Declaration of Michael Braverman [ECF No. 19], which was admitted as live testimony without cross examination).

16. Petitioner participated in a conversation between respondent and Mr. Karen Pagasov, whom respondent appointed to manage and operate his business in Israel. During that conversation which took place in July of 2019, on the eve of respondent's travel to the United States, petitioner was present and took part in a conversation on the issue of the respondent's plans

to move to the United States with the Child. During the conversation, respondent mentioned to petitioner that respondent's travel to the United States was "long-term" so that the Child could receive a Green Card. Mr. Pagasov testified that petitioner was "pleased with the idea" and said that the trip would be beneficial to the Child in learning the English language, and petitioner noted that when the Child receives a green card she will also be able to obtain lawful resident status through him. During this conversation, petitioner never objected to respondents' plans to move permanently to the United States with the Child. (Tr. p. 88/ln. 14-25; p. 89/ln. 1-15) (See, Declaration of Karen Pagasov [ECF No. 13], which was admitted as live testimony without cross examination).

17.    Petitioner participated in a conversation between respondent and Mr. Gregory Lifshits in the afternoon of May 10, 2019, when petitioner stopped by to pick up the Child from Mr. Lifshits' home where respondent and the Child were present at a barbeque. In the parking lot outside of Mr. Lifshits' home, petitioner joined in an ongoing conversation regarding respondents' travel plans with the Child, including respondent's plans to move to New York with the Child and remain there indefinitely. Petitioner expressed her happiness with that arrangement, stating as follows: "First you get your green cards, and then you'll use that to bring me to the United States too". In the meantime, she said, she would remain in Israel with her boyfriend. During this conversation, petitioner never objected to respondents' plans to move permanently to the United States with the Child. (Tr. p. 89/ln. 23-25; p. 90/ln. 1-19) (See, Declaration of Gregory Lifshits [ECF No. 15], which was admitted as live testimony without cross examination).

18.    Petitioner was aware of the Respondent's intent to relocate and move permanently to the United States and admits it in her Petition stating "[a]round 2016, Respondent began pursuing permanent residency in the United States". (Petition, ¶ 30). Respondent additionally

advised Petitioner that once his documents would be in order, he planned to begin the process of legalizing the Child in United States. (Tr. p. 90/ln. 4-19; pp. 98-99).

19.     Respondent also advised the Petitioner that the Child's legalization documents in United States were in process (which in this particular case took four years), so bringing the Child back for a visit to Israel in the short term might be problematic. Specifically after the Child's petition for a Green Card was filed, the Child would eventually receive "advance parole and work authorization". (Tr. p. 90/ln. 15-25; pp. 91-93) (Respondent's Exhibit "G").

20.     Advance parole allows an individual to leave the United States temporarily and to come back to the United States. Without getting advance parole and after an attempt to leave, the Child's application for a Green Card would be deemed abandoned. (Tr. p. 93/ln. 20-25; p. 94-96).

21.     The Child is well adjusted in the United States with his new family and is happy here. He has a good relationship with his step-mother, and has stepsisters and a half-sister, and is enrolled in school here. The Child has a romantic interest here. (Tr. p. 96/ln. 22-25; p. 97/ln. 1-21).

22.     Respondent's Expert Witness, Dr. Vera Kishinevsky who is the Child's treating psychologist, testified, regarding her Expert Witness Report and specifically the observations made by her during the child's visits to her office for family therapy; her observation of the Child's interaction with respondent and his stepmother in family therapy, the Child's observed emotional reactions when discussing: a) time spent with his mother and the several situations of his life with her when he was left alone for several hours due to Petitioner's unexplained absences; b) the Child's descriptions of Petitioner's angry outbursts, as well as lack of warmth, care and involvement in his life; c) the Child's desire to avoid telephone conversations with his mother when she called from Israel; d) the Child's desire to live permanently with his father e) his life

with his father; f) the respondent's care for the Child; g) family events, visits to places of interest and interaction with his stepsisters (Tr. pp. 106-121) (Amended Expert Witness Report provided to the Court and Counsel via email on January 24, 2021).

23.     Dr. Kishinevsky also specifically testified regarding: a) the Child's body language during his interaction with respondent and respondent's wife; b) the Child's inability to recall one pleasant or positive event in his life with petitioner; c) the Child's observed emotional reactions when discussing his recollection of his trips with respondent to Nevada, California, Egypt, Moscow, Germany and Eilat, robot building in a science museum and accompanying his father in organizing children's parties and other events; d) the Child's observed emotional reactions when discussing family events together with his father, stepmother and stepsisters and trick-or-treating and a Halloween party, apple picking, strawberry picking and summer camp he attended with his stepsister (Tr. pp. 106-121) (Amended Expert Witness Report provided to the Court and Counsel via email on January 24, 2021).

24.     Dr. Kishinevsky testified regarding the conclusions drawn from her observations, specifically explaining that: a) the Child was observed to be in grief and distress when discussing his life in Israel with his mother and that he was observed to express happiness and joy when describing his life with his father, step-sisters and half-sister in the United States; b) respondent's wife appears to have a positive attitude towards the Child; and c) that the psychological impact on the Child if he were ripped away from his family unit and returned to Israel would be "devastating". (Tr. pp. 115-117) (Amended Expert Witness Report provided to the Court and Counsel via email on January 24, 2021).

25.     As to the devastating psychological harm that the Child would suffer if returned to Israel, Dr. Kishinevsky also explained that she observed that the Child has an element of control over his life with his family here in the United States, and that control would be lost under the care of his mother. She testified that the Child would feel depersonalized if returned to Israel, where his emotional, physical and other needs will not be satisfied (Tr. pp. 119/ln. 15-20).

26.     Conversely, Dr. Kishinevsky testified regarding the conclusions drawn from her observations as to the benefit that the Child would have if he were to remain with his family unit here in the United States, where he will be living with two parents with siblings, and where he receives the emotional support that he needs. She also explained that it will be extremely important for the Child to stay in America in order for him to develop his sense of self (Tr. pp. 119/ln. 21-25; p. 120/ln. 1-9).

## PROPOSED CONCLUSIONS OF LAW

On February 25, 2020, the Supreme Court of the United States rendered its decision in the matter of Monasky v. Taglieri, which clarified the standard for habitual residence, answering the question of whether or not an actual agreement between the parents on where to raise their child was categorically necessary in order to establish an infant's habitual residence. Monasky v. Taglieri, 140 S. Ct. 719, 726 (2020). On this issue, the Court answered in the negative, holding that that the determination of habitual residence does not turn on the existence of an actual agreement. Id.

Against the backdrop of the Court's analysis and guidance as set forth in Monasky, supra, Respondent respectfully submits that for the reasons set forth below, and under the totality of the circumstances, the Child's habitual residence is not Israel, and is for all intents and purposes, the United States.

Additionally, and as set forth below, repatriating the child to Israel presents a grave risk of harm to the Child and/or otherwise places the child in an intolerable situation due to the fact that the petitioner is a Ukrainian citizen residing in Israel without a valid temporary resident card, without work authorization, work permits and/or any other right legally reside within Israel, and is subject to imminent deportation to Ukraine. This would result in the child either remaining in Israel and becoming a ward of the state, or result in the child being deported to Ukraine and specifically, to an area of that country which is a war zone. Additionally, and as to the grave risk of harm that the Child would suffer if ripped away from his family unit here in the United States, respondent's Expert Witness specifically explained that the psychological impact on the Child being forced to return to Israel would be devastating.

## THE INTERNATIONAL CHILD ABDUCTION
## REMEDIES ACT ("ICARA")

On July 3, 2020, Petitioner, by her counsel, filed a Petition under the International Child Abduction Remedies Act ("ICARA") alleging that the Child was wrongfully removed from Israel and requesting that this Court order the Child to be returned from the United States to Israel. 22 U.S.C. § 9001 et seq., codifies the Hague Convention on the Civil Aspects of International Child Abduction. The Hague Convention is a multilateral international treaty on parental kidnaping to which the United States and Israel are signatories. Under Article 3 of the Convention on the Civil Aspects of International Child Abduction, it states:

> The removal or the retention of a child is to be considered wrongful where—a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

This Honorable Court is well versed in the analytical framework in which to determine whether a removal was wrongful:

> A petitioner bringing a Hague Convention action for the wrongful retention of a child must show that (1) the child was "habitually resident" in one contracting state and was retained in another contracting state; (2) the retention breached the petitioner's custody rights under the law of the contracting state of habitual residence; and (3) the petitioner was exercising those rights at the time of retention or would have been exercising those rights but for the retention.

Saada v. Golan, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *14 (E.D.N.Y. 2019), *aff'd in part, vacated in part, remanded*, 930 F.3d 533 (2d Cir. 2019) (citing Gitter v. Gitter, 396 F.3d 124, 129 [2d Cir. 2005]; Hofmann v. Sender, 716 F.3d 282, 291 [2d Cir. 2013]). The petitioner must prove these elements by a preponderance of the evidence. Id.

If the petitioner establishes that the child's retention was wrongful, "the child must be returned" unless the respondent can establish one of the four defenses to a Hague Convention petition. See, Souratgar v. Lee, 720 F.3d 96, 101-02 (2d Cir. 2013) (quoting Blondin v. Dubois ["Blondin I"], 189 F.3d 240 [2d Cir. 1999]); see also 22 U.S.C. § 9001(a)(4).

Return is not automatic. Return is not required if the opponent can establish an exception under the Convention. Abbott v. Abbott, 560 U.S. 1 (2010). The United States Supreme Court recently explained one of the Convention's exceptions to return of a child as follows:

> One exception states return of the child is not required when 'there is grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation…' If, for example, [Mother] could demonstrate that returning to Chile would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer 'psychological harm' or be placed 'in an intolerable situation.' Id. [Emphasis added].

***Notably, the Supreme Court in <u>Abbott</u> separately emphasized the terms "psychological harm" and "intolerable situation" instead of combining them together as one exception.***

Of particular relevance to this case is the defense of grave risk of harm; the respondent raising this defense must show by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A). "Subsidiary facts may be proven by a preponderance of the evidence." Souratgar, 720 F.3d at 103.

## HABITUAL RESIDENCE

### The Law

Neither the Hague Convention on the Civil Aspects of International Child Abduction nor ICARA define "habitual residence." Though the term is not expressly defined in Convention or Code, "courts have inevitably tried." See, e.g., Valenzuela v. Michel, 736 F.3d 1173 (9th Cir. 2013). Up until February of this year, the law in this District required Courts to "…inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared". Saada, *supra* at 15.

On February 25, 2020, the Supreme Court of the United States rendered its decision in the matter of Monasky v. Taglieri, which clarified the standard for habitual residence, answering the question of whether or not an actual agreement between the parents on where to raise their child was categorically necessary in order to establish an infant's habitual residence. Monasky v. Taglieri, 140 S. Ct. 719, 726 (2020). On this issue, the Court answered in the negative, holding that that the determination of habitual residence does not turn on the existence of an actual agreement. Id.

More specifically, the Court explained that a child's habitual residence depends on the ***totality of the circumstances specific to the case***, not on categorical requirements such as an actual agreement between the parents. Id. at pp. 726-730. Because locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." Id. (citing Redmond v. Redmond, 724 F.3d 729, 746 [CA7 2013]). For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Id. These facts considered by Courts are listed in Footnote "3" of the Monasky Opinion, which explains that the facts courts have considered include:

- A change in geography combined with the passage of an appreciable period of time;

- Age of the child;

- Immigration status of child and parent;

- Academic activities;

- Social engagements;

- Participation in sports programs and excursions;

- Meaningful connections with the people and places in the child's new country;

- Language proficiency;

- Location of personal belongings.

Id. (citing Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 [2d ed. 2015]).

"No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an

infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus." Id. (citing <u>Karkkainen v. Kovalchuk</u>, 445 F.3d 280 [CA3 2006] ["The inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case."].

Against the backdrop of the Court's analysis and guidance as set forth in <u>Monasky</u>, *supra*, Respondent respectfully submits that for the reasons set forth below, and under the totality of the circumstances, the Child's habitual residence is not Israel, and is for all intents and purposes, the United States.

### The Child Traveled Back and Forth Between Ukraine, Israel, and the United States

As explained in <u>Monasky</u>, *supra*, "…a child habitually resides where she is at home…". Pursuant to the facts set forth above, the Child was born in Ukraine and lived there for at least one year, before traveling with Petitioner to Israel and then returning to Ukraine again. The Child again returned to Israel in the spring of 2014 with petitioner, after Lugansk in Ukraine became a war zone. As further set forth above, respondent began plans to move permanently to the United States with the Child only three (3) years later after respondent's mother passed away and there was nothing holding him there. Between 2014 and 2019, the Child traveled to the United States multiple times where he spent time with respondent and his family.

### Residential

As set forth above, the Child's Habitual Residence cannot be Israel when his mother is present in that country unlawfully without a valid Temporary Resident Card (now expired) no work permit, her immigration status is uncertain, and she is facing imminent deportation to Ukraine. As additionally set forth above, there is no other immediate family

of the Child remaining in Israel. As additionally set forth above, the Child resides here in the United States together with the Respondent and Respondent's family here, and has done so for the past year.

## **Petitioner Agreed for Respondent to Reside in the United States Permanently with the Child**

As further set forth above, the Petitioner has on multiple occasions acknowledged Respondent's desire to move permanently to the United States and admits it in her Petition (at ¶ 30), stating "[a]round 2016, Respondent began pursuing permanent residency in the United States". Additionally and as to the petitioner's awareness of respondent's plans to move permanently to the United States with the Child and her acquiescence to those plans, the evidence demonstrated (via respondent's testimony which was also corroborated by the uncontested Declarations of witnesses Karen Pagosov [ECF No. 13], Gregory Lifshits [ECF No. 15], and Michael Braverman [ECF No. 19], which were admitted as live testimony without cross examination) that: a) respondent discussed with these witnesses his plans to move to the United States permanently with the Child and for the Child to obtain a Green Card; b) that these discussions took place in the presence of petitioner; c) at no time did petitioner ever object to these plans; d) that petitioner participated in these conversations and was pleased with the idea; and e) that that petitioner participated in these conversations and expressed interest in obtaining a Green Card based upon the Child obtaining a Green Card in the United States.

Respondent also advised the Petitioner that his legalization documents in United States were in process, so bringing the Child back for a visit to Israel might be problematic. Respondent additionally advised Petitioner that once his documents would be in order, he planned to begin the process of legalizing the Child in United States.

Between the time of the Child's enrollment in school for the fall of 2019 and the filing of the Petition in July of 2020, the Petitioner raised no objection to the Child remaining in school in the United States and proceeding with his education here.

**Immigration Status of Child and Respondent**

As set forth above, the Respondent is a lawful Permanent Resident of the United States (Green Card holder). As of the time of this writing, Respondent has applied to the United States Citizenship and Immigration Services office ("USCIS") for an adjustment of the Child's immigration status. That application was received by USCIS on or about July 11, 2020. Currently, the Child's application for green card in the United States is pending.

Additionally, at this time the Child does not have advance parole to travel. Hence, if the Child departs the United States before receiving said advance parole, his application for a green card will be denied as a matter of law on abandonment grounds.

**Extended Family Relationships**

As repeatedly set forth above, and aside from Petitioner, the Child has no other immediate family in Israel. Respondent has resided in New York for over one year now with the Child, together with Respondent's wife, their newborn daughter, and his two step-daughters - - a family unit. It cannot be disputed that the Child has developed meaningful relationships with his family here in the United States. Per the testimony cited above, the Child is well adjusted in the United States with his new family and is happy here. He has a good relationship with his step-mother, and has stepsisters and a half-sister, and is enrolled in school here.

Per the Expert Witness Report and Testimony of Dr. Kishinevsky regarding the conclusions drawn from her observations as to the benefit that the Child would have if he were to remain with his family unit here in the United States, she testified that the Child will benefit

from living with two parents with siblings, and where he receives the emotional support that he needs. She also explained that it will be extremely important for the Child to stay in America in order for him to develop his sense of self.

**Meaningful Connections With People and Places in the United States**

Notwithstanding the foregoing connections forged with the Child and his family here in the United States as set forth above. The Child has additionally made connections with new friends as explained in the testimony of respondent, wherein he explains that the Child has explained to Petitioner on many occasions that he likes living in the United States and that he has made many friends here.

**Statements by Parents**

As set forth above, the Petitioner clearly and unequivocally stated her explicit agreement for Respondent to permanently move to the United States with the Child. As to her awareness of respondent's plans to move permanently to the United States with the Child and her acquiescence to those plans, this was established via respondent's testimony which was also corroborated by the uncontested Declarations of witnesses Karen Pagosov [ECF No. 13], Gregory Lifshits [ECF No. 15], and Michael Braverman [ECF No. 19], which were admitted as live testimony without cross examination.

**Employment of Parents**

As set forth herein, the Respondent always has been gainfully employed, first in Israel with his entertainment business, and with other businesses that he is currently engaged in domestically here in the United States. At all times, both previously in Israel and up to the time of this writing, the Respondent has provided for a financially stable environment for the Child and his family, and provides for all of the Childs health related, educational

related and other needs. As further set forth herein, Petitioner does not have a valid Israeli work permit.

Based upon the case law set forth above on this issue of Habitual Residence, and given the totality of the circumstances approach set forth in Monasky, *supra*, it is respectfully submitted that all factors weigh overwhelmingly in favor of the conclusion that the Child's Habitual Residence is the United States.

## THE WAS NO "WRONGFUL REMOVAL"

Without engaging in an *ad nauseum* repetition of the arguments and citation to the testimony set forth above, petitioner cannot reasonably be heard to say that respondent wrongfully removed the Child from Israel when the evidence establishes that she was aware of respondent's plans to move to the United States permanently with the Child and had agreed to those plans.

## GRAVE RISK

### The Law

Article 13(b) of the Convention provides that "a grave risk of harm" from repatriating the child to the country of habitual residence arises "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." Saada, *supra* (citing Souratgar, *supra*, at 103). According to the Second Circuit, "[t]he potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high." Id. The grave risk determination includes both "the magnitude of the potential harm" and "the probability that the harm will materialize." Id. The grave risk exception "is to be interpreted narrowly, lest it swallow the

rule." Id. The respondent must prove grave risk of harm "by clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A).

The Second Circuit instructs Courts considering this question to take care to differentiate between "those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences," and "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation." Saada, *supra* (citing Blondin, *supra*, at 162).

### The Harm and Intolerable Situation Awaiting the Child Upon Repatriation to Israel

While secondary to any psychological harm or any "intolerable situation", the undersigned counsel for Respondent simply wishes to note up front for the Court that any repatriation of the Child to Israel in the short term will undisputedly result in the loss, waste and forfeiture of what is otherwise a valid and (likely to be granted) opportunity for the Child to obtain lawful Permanent Resident status in the United States, and ultimately, a U.S. citizenship (which is currently in progress as set forth above).

*The Psychological Harm*

The potential psychological harm suffered by the Child as a result of being separated from his father cannot be understated. On this issue the Court is respectfully referred to the Expert Witness Report and testimony cited above form Dr. Kishinevsky which established that the Child will benefit from the continued stability and warmth of his father's family life, and living with a family unit. Notwithstanding that Dr. Kishinevsky explained that it would be devastating for the Child's mental health if he were ripped from his family unit and forced to return to Israel (where no family is present other than the petitioner) it requires no

mental jumping jacks to understand that all of the positive psychological benefit that the Child receives from his father will be undone and reversed if the Child were torn away from his stable family environment and his father in the U.S., and returned to Israel where nothing is waiting for him. This is a textbook case of the type of grave risk of psychological harm which warrants denial of the Petition. See, e.g., Blondin v. Dubois, 238 F.3d 153 (2d Cir. 2001) (likelihood of post-traumatic stress disorder qualified as "grave risk of psychological harm," of kind sufficient to support court's decision not to order repatriation; and district court could consider, as factors bearing on whether repatriation would pose "grave risk of psychological harm" for children, the fact that they were now settled in United States and that eight-year-old daughter expressed desire to remain in United States).

*The Risk of Being Deported from Israel to Ukraine at a Moment's Notice*

As set forth herein, Petitioner is a Ukrainian citizen currently residing in Israel without legal status and subject to deportation to Ukraine at any time. The exercise of common sense per Redmond, *supra*, and Karkkainen, *supra*, dictate that there are two likely outcomes to a scenario involving the potential deportation of Petitioner from Israel back to Ukraine, and which are, to wit: 1) the Child will be deported to Ukraine along with the Petitioner; 2) the Child will remain in Israel due to his Israeli citizenship and will become a ward of the State. Both of these are unacceptable and demonstrate the type of grave risk of harm or "intolerable situation" which warrant denial of the Petition. See, e.g., Miltiadous v. Tetervak, 686 F. Supp. 2d 544, 552 (E.D. Pa. 2010) (citing Mendoza v. Miranda, 525 F.Supp.2d 1182, 1195 [C.D.Ca.2007]) (Courts have found that the threat of deportation is a constant danger to a child's well-being, potentially undermining every connection to his or her community). See also, e.g., Casimiro v. Chavez, 2006 WL 2938713, at *6 (N.D.Ga. 2006) (There is no

assurance that Respondent will obtain legal resident status in the near future….Should any of the contingencies on which [the mother's] immigration status depends be decided against her, [the mother and the child] would be at risk for detention and deportation).

For the foregoing reasons, the harm and intolerable situation awaiting the child upon repatriation to Israel warrant denial of the Petition.

## RESPONDENT'S CLAIMS ARE NOT BARRED BY RES JUDICATA

As clearly explained by the Court on October 27, 2020, after Oral argument on petitioner's Motion for Judicial Notice and Extension of Comity, the Court explained by Minute Entry, in relevant part, as follows:

> …For the reasons discussed on the record, the petitioner's motion is granted in part and denied in part; I do not adopt the findings of the Kiryat Shmona Family Court at this time, but I take judicial notice of the court's decision and may consider it in making my determination as to whether removal was wrongful within the meaning of the Convention….

## ATTORNEYS' FEES

Petitioner's claim for attorneys' fees should be denied because petitioner has not provided evidence to support her claim and that her Petition will almost surely be denied.

## CONCLUSION

For all the aforementioned reasons, Respondent respectfully requests that the Court deny the Petition, and grant such other relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted,

/s Marcus Aurelius Nussbaum
Marcus A. Nussbaum (MN-9581)

Dated:    Brooklyn, New York
         February 4, 2021