**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATALIA POZNIAK,<br><br>*Petitioner,*<br><br>– *vs.* –<br><br>VLADIMIR SHVARTSMAN,<br><br>*Respondent.* | CIVIL ACTION<br><br><br>Docket No.: 20-cv-02956-AMD-RML |

**RESPONDENT'S OPPOSITION TO PETITIONER'S PROPOSED**
**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

**FISHKIN, GURSHUMOV & NUSSBAUM, P.C.**
Marcus A. Nussbaum, Esq. (MN 9581)
3059 Brighton 7th Street, Fl. 1
Brooklyn, New York 11235
Tel: 201-956-7071
***Attorneys for Respondent***
marcus.nussbaum@gmail.com

## PRELIMINARY STATEMENT

Respondent, Vladimir Shvartsman ("Respondent"), by his attorneys Fishkin, Gurshumov & Nussbaum, P.C., respectfully submits this opposition to the proposed Findings of Fact and Conclusions of Law filed by Natalia Pozniak ("Petitioner") on February 1, 2021 subsequent to the January 25, 2021 trial on her Petition seeking return of the Child, S.P. ("S.P." or "Child") to Israel (the "Petition").[1]

At the time of the bench trial on January 25, 2020, the Court heard testimony and considered evidence on the issues of: a) whether or not the Child habitually resided in Israel; b) whether petitioner was aware of respondent's plans to move permanently to the United States with the Child and agreed to those plans; c) the grave risk of harm that the Child would suffer if returned to Israel due to Petitioner's lack of Israeli citizenship, expiration of her Temporary Resident Status, expiration of her Israeli Work Permit, and the likelihood of petitioner's deportation back to the city of Lugansk in Ukraine, which is a war zone (resulting in the Child either becoming a ward of the State of Israel or returning with his mother to a war zone in Ukraine); and d) the grave risk of harm (and specifically psychological harm) that the Child would suffer if returned to Israel after being ripped away from his family unit here in the United States with which he is well-settled (including his father, step-mother, step-sisters and half-sister) and returning to a country with no other relatives than Petitioner (who now lives 70 Kilometers from where she previously resided with respondent and the child).

---

[1] For personal medical reasons on which this Court was previously briefed, the undersigned respectfully requests that the Court excuse the *de minimus* delay in the filing of this brief, and the undersigned is again prepared to provide supporting documentation upon request of the Court.

For the reasons set forth below, Petitioner has *abjectly failed* to provide this Court with admissible evidence warranting the drastic relief which she now seeks in her Petition (to wit: tearing the Child away from his family unit here in the United States and returning him to Israel where no family awaits except for his mother, who now resides seventy (70) kilometers away from where she previously resided when Child was last in Israel). The relief is drastic indeed, and the psychological impact upon the Child will be devastating as explained by respondent's expert witness, Dr. Vera Kishinevsky. To make matters even worse, and due to petitioner now residing seventy (70) kilometers away from where she previously resided, upon his "repatriation", the Child, who is already starting to forget the Hebrew language would effectively become 'a stranger in a strange land'.

In the first instance, Petitioner's argument that *res judicata* somehow bars respondent's "claims" is fatally flawed for a number of reasons set forth in detail below. This Honorable Court specifically *denied* petitioner's Motion for an Extension of Comity to the findings of the Kiryat Shmona Family Court Decision. Instead, on October 27, 2020 the Court explained that it did *not* adopt the findings of the Kiryat Shmona Family Court Decision at that time, but *may* consider it in determining whether removal of the Child was wrongful within the meaning of the Hague Convention. For a number of additional reasons set forth below, the Kiryat Shmona Family Court Decision may be summarily disregarded by the Court on the issue of whether removal of the Child was wrongful.

Second, the Petitioner failed to meet her burden to establish her *prima facie* case for the Child's return to Israel. As to the specific elements of her claim, such as habitual residence of the child, and whether removal was wrongful and in violation of petitioner's custody rights at the time the Child left Israel, petitioner failed to establish each and every element of her claim. Moreover,

and in her Post-Trial Brief, Petitioner ignores the admissible evidence placed upon the record regarding her explicit and unambiguous consent to the Child's permanent relocation to the United States *prior* to the Child's 2019 flight with the respondent to New York. It was also established at trial, that Petitioner, who is without lawful immigration status in Israel, without a valid Israeli Work Permit, and without a valid Temporary Resident Card and Driver's License, only *recently* pivoted from her prior consent to the Child's permanent move to the United States - - and she did this only after her most recent romantic relationship failed and it became clear that she will not obtain Israeli Citizenship through marriage, making the specter of imminent deportation to Ukraine all the more real.

Third, petitioner's Post-Trial Brief ignores the admissible evidence on the record which undisputedly establishes that return of the Child to Israel would subject him to a grave risk of harm or otherwise place him in an intolerable situation, *squarely* within the meaning of the Convention and the law in this District. Petitioner's lack of a legal immigration status in Israel and imminent deportation to a war zone in Lugansk, Ukraine, places the Child at risk of returning with her to Ukraine, or, alternatively, resulting in the Child (an Israeli citizen) remaining in Israel and becoming a ward of the State. Petitioner's self-serving and conclusory testimony that she intends to appeal any denial of her application for a humanitarian visa in Israel, does not change the fact that the risk of deportation is well within the range of possibility and is not speculative.

Interestingly enough, Petitioner has also taken the bizarre position that if the Child is returned to Israel, that the Respondent has the ability to simply uproot himself and return to Israel if necessary, and abandon his wife and children here in the United States, all of whom are either U.S. Citizens or Green Card Holders (or simply relocate them to Israel where they can all reside together with the Petitioner and the Child).

To the extent that it has been established that that the psychological impact on the Child would be "devastating" if he was returned to Israel, as explained by Dr. Kishinevsky, the petitioner's Post-Hearing Brief misconstrues her Export Report and testimony, and analyzes her conclusions in a myopic line-by-line reading of her statements in a vacuum. Respondent has the utmost faith in this Court's ability to see past petitioner's disingenuous arguments regarding the probative value of Dr. Kishinevsky's Report and testimony and that the Court will take her report under full consideration.

To the extent that petitioner has proffered their own "rebuttal" Expert Witness (to wit: Dr. Yohananoff) who has neither seen, spoken with, nor examined the Child or the Child's family, and who has attempted to discredit Dr. Kishinevsky's conclusions, as explained in detail below, respondent's cross-examination of Dr. Yohananoff exposed his report to be non-probative and otherwise useless for the Court's determination on the grave risk analysis in that: 1) it was based upon an inapplicable and non-binding standard for psychological evaluation which Dr. Kishinevsky was neither obligated to follow, nor would be appropriate for her to follow[2]; and 2) a significant portion of Dr. Yohananoff's report focused on the needs and/or desires of the child as stated by him (while possibly relevant in a custody proceeding, but completely irrelevant in the matter at bar), as well as statements uttered by respondent. Specifically, and rather than focus on the observations made by Dr. Kishinevsky as to the Child's body language, expressed emotions, interactions with his family, etc., Dr. Yohananoff instead focused on evaluating the credibility and/or truthfulness of statements uttered by the Child, the respondent and his wife, all of which are hearsay and irrelevant.

---

[2] Assuming arguendo that this standard held any value, it is applicable only in custody proceedings as per the rules of the Association of Family and Conciliation Courts ("AFCC"), and this Court made it crystal clear that custody is not an issue in this case.

For the reasons set forth in detail below, petitioner has failed to meet her burden to establish a prima facie case under the Convention. Additionally, as set forth below, petitioner's argument that *res judicata* allegedly bars respondent from litigating various issues before this Court is nothing short of pure fiction. Further, the admissible evidence on the record establishes that the removal of the Child from Israel was neither wrongful nor in breach of petitioner's custody rights. Also, returning the Child to Israel will subject him to grave risk of harm or place him in what would otherwise be an intolerable situation (and petitioner has failed to discredit the findings of Dr. Kishinevsky as to the devastating psychological impact on the Child upon repatriation to Israel).

Accordingly, respondent asks that this Court deny the Petition in its entirety, and allow the Child to remain here in the United States with his father, half-sister, step-sisters and step-mother with whom he has been living since July of 2019.

## I.    The Court Denied Petitioner's Motion for an Extension of Comity to the findings of the Kiryat Shmona Family Court Decision

Contrary to petitioner's attempt to rewrite history with regard to the Kiryat Shmona Family Court Decision, this Honorable Court is aware that petitioner's Motion for an Extension of Comity was *denied*, and accordingly, that decision is neither *res judicata*, nor bars respondent's "claims" in this matter. Pursuant to this Court's Minute Entry for proceedings held on October 27, 2020, the issue of the Child's Habitual Residence was left for this Court to decide (accordingly, not *res judicata* on that issue). While the Court stated on October 27, 2020 that it *may* consider the Kiryat Shmona Family Court Decision on the issue whether the removal was wrongful within the meaning of the Convention, that issue was not decided on October 27, 2020 (accordingly, not *res judicata* on that issue).

6

As a preliminary matter, the Decision of the Kiryat Shmona Family Court is defective in that it improperly makes a determination on the issue of the child's habitual residence in violation of the Hague Convention. Pursuant to the well-established precedent in this District and pursuant to the Convention itself, no full faith and credit can be given to the Kiryat Shmona Family Court's determination of habitual residence because that determination must be made here in the United States, where the child was living at the time that the petition in this matter was filed. See, Diorinou v. Mezitis, 132 F. Supp. 2d 139, 144 (S.D.N.Y. 2000) (citing Feder v. Evans-Feder, 866 F. Supp. 860, [E.D.Pa. 1994] and explaining that no full faith and credit given to Australian Family Court's determination of habitual residence because under Convention that determination is left to authorities of county in which child is living at time petition is filed).

Regardless of the foregoing, the respondent has proffered admissible evidence establishing that the petitioner agreed with respondent's desire to reside in the United States permanently with the Child, and accordingly, removal could not have been wrongful or in violation of any custody rights allegedly asserted by petitioner:

- Petitioner spoke with respondent's friends from Texas regarding life in United States and the legalization process. Prior to moving to Texas, Mr. Braverman resided in Israel. When respondent's mother passed away in July of 2017, Mr. Braverman and his family traveled to Israel to pay their respects. At that time, petitioner noted that respondent expressed to her that now that his mother passed away, that there was nothing holding him back in Israel. Petitioner asked Mr. Braverman questions about America and particularly about Mr. Braverman's (and his family's) status in the United States. In particular, she stated that she was aware that respondent was married to an American Citizen. (See, Declaration of Michael Braverman [ECF No. 19], which was admitted as live testimony without cross examination).

- Petitioner participated in a conversation between respondent and Mr. Karen Pagasov, whom respondent appointed to manage and operate his business in Israel. During that conversation which took place in July of 2019, on the eve of respondent's travel to the United States, petitioner was present and took part in a conversation on the issue of the respondent's plans to move to the United States with the Child. During the conversation, respondent mentioned to petitioner that respondent's travel to the United States was "long-term" so that the Child could receive a Green Card. Mr. Pagasov testified that petitioner

was "pleased with the idea" and said that the trip would be beneficial to the Child in learning the English language, and petitioner noted that when the Child receives a green card she will also be able to obtain lawful resident status through him. During this conversation, petitioner never objected to respondents' plans to move permanently to the United States with the Child.  (Tr. p. 88/ln. 14-25; p. 89/ln. 1-15) (See, Declaration of Karen Pagasov [ECF No. 13], which was admitted as live testimony without cross examination).

- Petitioner participated in a conversation between respondent and Mr. Gregory Lifshits in the afternoon of May 10, 2019, when petitioner stopped by to pick up the Child from Mr. Lifshits' home where respondent and the Child were present at a barbeque. In the parking lot outside of Mr. Lifshits' home, petitioner joined in an ongoing conversation regarding respondents' travel plans with the Child, including respondent's plans to move to New York with the Child and remain there indefinitely. Petitioner expressed her happiness with that arrangement, stating as follows: "First you get your green cards, and then you'll use that to bring me to the United States too". In the meantime, she said, she would remain in Israel with her boyfriend. During this conversation, petitioner never objected to respondents' plans to move permanently to the United States with the Child. (Tr. p. 89/ln. 23-25; p. 90/ln. 1-19) (See, Declaration of Gregory Lifshits [ECF No. 15], which was admitted as live testimony without cross examination).

- Petitioner was aware of the Respondent's intent to relocate and move permanently to the United States and admits it in her Petition stating "[a]round 2016, Respondent began pursuing permanent residency in the United States". (Petition, ¶ 30). Respondent additionally advised Petitioner that once his documents would be in order, he planned to begin the process of legalizing the Child in United States. (Tr. p. 90/ln. 4-19; pp. 98-99).

- Respondent also advised the Petitioner that the Child's legalization documents in United States were in process (which in this particular case took four years), so bringing the Child back for a visit to Israel in the short term might be problematic. Specifically after the Child's petition for a Green Card was filed, the Child would eventually receive "advance parole and work authorization". (Tr. p. 90/ln. 15-25; pp. 91-93) (Respondent's Exhibit "G"). See also, Petitioner's Exhibit "21" at page "17".

- A week after they arrived in the United States, Petitioner called Respondent to find out the legal status of both the Respondent and Child and if the Respondent knew how long the process would take. The Respondent stated that he did not know nor was he advised of a specific date. After that conversation the Petitioner regularly called to inquire on the Child's status. See, Petitioner's Exhibit "1A" at page "2".

- Between the time of the Child's enrollment in school for the fall of 2019 and the filing of the Petition in July of 2020, the Petitioner raised no objection to the Child remaining in school in the United States and proceeding with his education here.

## II.   Petitioner Has Failed To Meet Her Burden To Establish Her Prima Facie Case For The Child's Return To Israel

Since petitioner's fiction of issue and/or claim preclusion has now been exposed, and for the reasons set forth within respondent's Post-Hearing Findings of Fact and Conclusions of Law, respondent respectfully requests that the Court conclude that the petitioner failed to meet the first element of her *prima facie* case, in that the Child's habitual residence was *never* Israel - -  as the evidence and testimony established that: a) the child was born in Lugansk, Ukraine in 2011 and moved to Israel with his mother in mid-2012 where the Child resided with petitioner and respondent for one year, after which time the Child moved back to Ukraine with Petitioner in September of 2013; b) the Child returned to Israel in the spring of 2014 where he lived in respondent's home until Respondent brought him to the U.S. on July 19, 2019; and c) while the Child is an Israeli citizen, he is also a Ukrainian citizen. (Petitioner's Exhibit "22" at ¶¶ 3, 7-9)

Contrary to petitioner's argument that habitual residence was "the only prong" of petitioner's purported *prima facie* case that respondent contests, and as to the second element of petitioner's *prima facia* case (to wit: whether petitioner had custodial rights and whether or not they were allegedly violated), again, even if the Court decides to consider the Kiryat Shmona Family Court Decision on the issue whether the removal was wrongful within the meaning of the Convention, the Court may recall that: 1) the parties are not disputing the issue of custody in these proceedings and that this point was emphasized by the Court multiple times during the course of these proceedings (Transcript at pp. 8/ln. 1-6; p. 58/ln. 10-11); 2) in the parties' Joint Statement of Stipulated Facts; 2) the parties stipulated that while Petitioner and Respondent did not have a formal custody agreement, they worked out an informal arrangement pursuant to which both exercised shared custody over the Child (Petitioner's Exhibit "22" at ¶ 12); and 3) as set forth above, the evidence on the record establishes that the removal could not be wrongful inasmuch as

the petitioner had consented to the Child's permanent move to the United States and even encouraged respondent to proceed with his plans to obtain a Green Card for the Child so that she might be able to obtain one as well.

Even if the Court were to apply the standard of review set forth in petitioner's Post Hearing Brief on the issue of petitioner's consent and acquiescence to the Child's removal to the United States, it is respectfully submitted that the Court could only conclude that she did in fact agree to allow the Child to remain here permanently. Based upon the conversations that she participated in with respondent's witnesses, as her own admissions set forth in the telephone conversation transcripts cited above, there is no question as to petitioner's subjective intent and whether or not she actually contemplated and agreed to allow the Child to leave Israel permanently. As set forth above, in the presence of witnesses, she specifically encouraged respondent to proceed with his plans to obtain a Green Card for the Child *so that she might be able to obtain one as well*. As additionally set forth above, she inquired during a telephone conversation as to the status of respondent's efforts to obtain a Green Card.

To the extent that petitioner relies upon a communication between respondent and an official at the Child's school in Israel in support of an argument that this somehow undermines his "story" regarding petitioner's consent and acquiescence, the Court may summarily disregard that communication as hearsay. Nevertheless, even if the Court were to consider that communication on this issue, it still means nothing - - why would the respondent *not* leave a spot reserved in a prestigious school in Israel if some unforeseen circumstances required the Child to return with respondent to Israel, for example if respondent's Green Card application would be denied, or if his marriage here in the United States were to have ended. Accordingly, the evidence established that petitioner did in fact consent and acquiesce to the Child's permanent move to the United States.

**III.    Respondent Has Overwhelmingly Established That Returning The Child to Israel Will Subject Him to Grave Risk of Harm or Otherwise Place Him in an Intolerable Situation**

*1.   The Psychological Impact On The Child If Returned To Israel Would Be Devastating*

As to the grave risk of harm that the Child would suffer if returned to Israel, respondent's Expert Witness (Dr. Vera Kishinevsky who is the Child's treating psychologist) testified that if the Child were returned to Israel after being ripped away from his family unit here in the United States with which he is well-settled (including his father, step-mother, step-sisters and half-sister), that the psychological impact on the Child would be "devastating". She also explained that if returned to Israel, the Child will feel "depersonalized", "out of control, and that the Child wants to stay where his needs are addressed, where his feelings are respected, and where he has a "normal life".

Petitioner attempts to argue that respondent allegedly introduced "no evidence" that the Child's return to Israel would necessarily separate the two of them, and in doing so, ignores the evidence on the record regarding the respondent's family unit here. While the Court explained that in many of these Hague Convention cases where the child is returned, that the abducting parent also returns to the jurisdiction, as stated above Petitioner has taken the bizarre position that if the Child is returned to Israel, that the Respondent has the ability to simply uproot himself and return to Israel if necessary, and abandon his wife and children here in the United States, all of whom are either U.S. Citizens or Green Card Holders (or simply relocate them to Israel where they can all reside together with the Petitioner and the Child).

11

Contrary to petitioner's argument that Dr. Kishinevsky's report and testimony allegedly "conflates" the Child's return to Israel with return to petitioner's custody, her report and testimony, together with the evidence on the record establish that aside from Petitioner, the Child has no other immediate family in Israel. Respondent has resided in New York for over one year now with the Child, together with Respondent's wife, their newborn daughter, and his two step-daughters - - a family unit. It cannot be disputed that the Child has developed meaningful relationships with his family here in the United States. Per the testimony on the record, the Child is well adjusted in the United States with his new family and is happy here. He has a good relationship with his step-mother, and has stepsisters and a half-sister, and is enrolled in school here.

Per the Expert Witness Report and Testimony of Dr. Kishinevsky regarding the conclusions drawn from her observations as to the benefit that the Child would have if he were to remain with his family unit here in the United States, she testified that the Child will benefit from living with two parents with siblings, and where he receives the emotional support that he needs. She also explained that it will be extremely important for the Child to stay in America in order for him to develop his sense of self.

Petitioner's argument that Dr. Kishinevsky's report and testimony are allegedly "nothing more than a custody recommendation" is simply an attempt to mislead this Court. A careful reading of her report and review of her testimony (which petitioner studiously ignores), indicates that the conclusions drawn by her regarding the psychological impact on the Child if returned to Israel were based upon her observations of the Child in the family therapy sessions, and were *not* based upon an assessment of the truthfulness of statements uttered by the Child or respondent's family members (which would have been hearsay in any event). Her report

12

and testimony make no recommendations on the issue of custody, and to the extent that she explains that the Child's psyche will be harmed if returned to Israel, it is respectfully submitted that this evidence meets the standard set forth in <u>Blondin v. Dubois</u>, 238 F.3d 153 (2d Cir. 2001) cited by petitioner. Dr. Kishinevsky's explanation that the psychological impact on the Child would be "devastating" falls in line with the type of grave risk discussed in <u>Blondin</u>, *supra*, (to wit: that the child's return to France would trigger PTSD).

To the extent that petitioner takes issue with the fact that Dr. Kishinevsky is the Child's treating therapist, petitioner cites to no authority which would prohibit her from opining as an expert in this matter. It is also respectfully submitted that her testimony and opinions would be all the more credible to the extent that she was not a 'hired gun' for these proceedings and openly and honestly testified before this Court that she was not hired to participate in this matter. She explained that she was hired to help the Child relieve his stress, help him develop better coping skills, and strengthen his father's parenting skills. (Transcript at pp. 130-131).

To the extent that petitioner has proffered her own "rebuttal" Expert Witness (to wit: Dr. Yohananoff) who has neither seen, spoken with, nor examined the Child or the Child's family, and who has attempted to discredit Dr. Kishinevsky's conclusions, respondent's cross-examination of Dr. Yohananoff exposed his report to be non-probative and otherwise useless for the Court's determination on the grave risk analysis in that it was based upon an inapplicable and non-binding standard for psychological evaluation which Dr. Kishinevsky was neither obligated to follow, nor would be appropriate for her to follow.[3]

---

[3] When asked if there was any specific obligation to follow model standards with regard to the conduct of her observations, Dr. Kishinevsky explained that her observations were done in a "…therapeutic mode, not the legal mode" and that is why she followed her "clinical opinion". (Transcript at p. 140/ln. 2-5). When Dr. Yohananoff was questioned regarding the model standards cited heavily throughout his report, he admitted that the standards are non-binding and that they are "educational" in nature. (Transcript at p. 151/ln. 21-25). He also acknowledged that the standards were designed to apply only to analyzing different parenting plans (to wit: custody, which was not an issue in Dr. Kishinevsky's report). (Transcript at p. 152/ln. 14-25; p. 153/ln. 1-3).

Additionally, a significant portion of Dr. Yohananoff's report incorrectly focused on an evaluation of the needs and/or desires of the child as stated by the Child (while possibly relevant in a custody proceeding, but completely irrelevant in the matter at bar), as well as statements uttered by respondent. Specifically, and rather than focus on the observations made by Dr. Kishinevsky as to the Child's body language, expressed emotions, interactions with his family, etc., Dr. Yohananoff instead focused on evaluating the credibility and/or truthfulness of statements uttered by the Child, the respondent and his wife, all of which are hearsay and irrelevant. (Transcript at p. 153/ln. 20-25; p. 154/ln. 1-21; p. 155/ln. 17-25; p. 156/ln. 1-25; p. 157/ln. 1-21). In sum, Dr. Yohananoff's entire report was based upon an evaluation of the truthfulness of statements which in all instances would be disregarded by this Court as inadmissible hearsay.

Accordingly neither Dr. Yohananoff's report nor his testimony have any probative value in these proceedings and they fail to contradict the observations of Dr. Kishinevsky as to the Child's psyche.

2.  *The Harm and Intolerable Situation Awaiting the Child Upon Repatriation to Israel*

While secondary to any psychological harm or any "intolerable situation", the undersigned counsel for Respondent simply wishes to note up front for the Court that any repatriation of the Child to Israel in the short term will undisputedly result in the loss, waste and forfeiture of what is otherwise a valid and (likely to be granted) opportunity for the Child to obtain lawful Permanent Resident status in the United States, and ultimately, a U.S. citizenship (which is currently in progress as set forth above).

*The Risk of Being Deported from Israel to Ukraine at a Moment's Notice*

As set forth herein, Petitioner is a Ukrainian citizen currently residing in Israel without legal status and subject to deportation to Ukraine at any time. It is undisputed that her Israeli Temporary Resident Card is expired, as is her Israeli Work Permit and her Driver's license. This is not speculation. What is speculation is that the petitioner will remain in Israel if her application for a humanitarian visa is denied. Petitioner's lack of a legal immigration status in Israel and imminent deportation to a war zone in Lugansk, Ukraine, places the Child at risk of returning with her to Ukraine, or, alternatively, resulting in the Child (an Israeli citizen) remaining in Israel and becoming a ward of the State. Petitioner's self-serving and conclusory testimony that she intends to appeal any denial of her application for a humanitarian visa in Israel, does not change the fact that the risk of deportation is well within the range of possibility and is not speculative.

While petitioner argues that respondent has allegedly failed to cite to "a single case" establishing a grave risk defense arising out of the left-behind parent's immigration status, it is respectfully submitted that in this particular context, the petitioner has herself cited the applicable case law on this matter, citing to In re Koc, 181 F.Supp. 2d at 155 (grave risk of harm arises where returning the child means sending him to a zone of war). In this particular matter, and despite petitioner's stated intent to appeal any denial of her application for a humanitarian visa, the probability of the grave risk of harm materializing is real. See, Souratgar v. Lee, 720 F3d 96 (2d Cir. 2013).

Accordingly, and for the foregoing reasons, it is respectfully submitted that the grave risk of harm due to the damage to the Child's psyche, as well as the fact that petitioner is without lawful status in Israel, warrants that this Court Order that the Child remain here in the United States with his family unit, where he will complete his process towards obtaining

advance parole and eventually, lawful permanent resident status in the United States, and ultimately U.S. Citizenship (which would otherwise be abandoned if the Child is "repatriated" to Israel).

## CONCLUSION

For all the aforementioned reasons, Respondent respectfully requests that the Court deny the Petition, and grant such other relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted,

/s Marcus Aurelius Nussbaum
Marcus A. Nussbaum (MN-9581)

Dated:          Brooklyn, New York
                February 12, 2021