UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                    :

**NATALIA POZNIAK**,
                        :

                     Petitioner,   :  **MEMORANDUM DECISION**
                             :  **AND ORDER**

         – against –        :  20-CV-2956 (AMD) (RML)
                             :

**VLADIMIR SHWARTSMAN**,
                        :
                  Respondent.  :
                             :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

      The petitioner, Natalia Pozniak, brought this case against the respondent, Vladimir

Shvartsman[1], pursuant to the Hague Convention on the Civil Aspects of International Child

Abduction ("Hague Convention"), as implemented by the International Child Abduction

Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. The petitioner, a Ukrainian citizen residing

in Israel, seeks the immediate return of her nine-year-old son, S.P., to Israel, and claims that the

respondent, S.P.'s father, wrongfully retained S.P. in the United States.

      I held a one day bench trial on January 25, 2021, at which the petitioner, the respondent

and two expert witnesses testified. The parties offered evidence on three contested issues: (1)

S.P.'s habitual residence; (2) whether the petitioner agreed that the respondent could keep S.P. in

the United States; and (3) whether S.P. will face a grave risk of harm if he is returned to Israel.

(*See* ECF No. 50 at 5; ECF No. 51 at 2.) In addition, the parties submitted post-trial briefing.

(ECF Nos. 50-53.) After carefully considering all of the evidence, the parties' submissions and

---

[1] The petitioner and the respondent spell the respondent's last name differently in their filings. I use the
respondent's spelling.

the applicable law, I make the following findings of facts and conclusions of law, and grant the petition for the return of S.P. to Israel.

## FINDINGS OF FACT

### 1. The Parties

The petitioner, a Ukrainian citizen, was born in the former Soviet Union, and has lived in Israel continuously since 2014. (Ex. 22 (ECF No. 34) ¶ 1.) The respondent, an Israeli citizen, was born in Kazakhstan, and currently lives in Queens, New York. (*Id.* ¶ 2.) The petitioner and respondent have one child together, nine-year-old S.P., who was born in Ukraine and moved to Israel with the petitioner when he was a young child. (*Id.* ¶¶ 3, 9.) S.P. is a dual Israeli-Ukrainian citizen. (*Id.* ¶¶ 3, 10.)

### 2. S.P.'s Childhood in Israel

The petitioner and the respondent met online in about May of 2010. (*Id.* ¶ 6.) After communicating online and by phone for several months, the petitioner visited the respondent in Israel in August of 2010, and stayed with him in his home. (*Id.*) The petitioner learned that she was pregnant in October of 2010, and returned to Ukraine that month. (*Id.*)

In June of 2011, the petitioner gave birth to S.P. in Lugansk, Ukraine. (*Id.* ¶ 7.) S.P.'s birth certificate lists the petitioner as his mother and "Vladimir Pozniak" as his father. (*Id.* ¶ 7.) The petitioner and S.P. lived in Ukraine until they moved to Israel at the end of the summer of 2012. (*Id.* ¶¶ 7, 8.) They moved back to Ukraine after about a year, but returned to Israel in the spring of 2014 to live with the respondent. (*Id.* ¶¶ 8, 9.) The respondent helped S.P. and the petitioner obtain immigration status in Israel; S.P. became an Israeli citizen, and the petitioner acquired a work visa and a temporary residence card. (*Id.* ¶ 10.)

The petitioner and the respondent were never married. (*Id.* ¶ 5.) After the petitioner returned to Israel in 2014, she and the respondent lived together at times, and separately at other times. (*See* Tr. 56:13-18, 57:16-23; Ex. 22 ¶ 11.) They did not have a formal custody agreement, but "worked out an informal arrangement pursuant to which both exercised shared custody over S.P." (Ex. 22 ¶ 12.) They had "a relationship of mutual understanding and assistance," and "communicat[ed] openly about shared custody of their son." (*Id.*) There are no orders or agreements that limit the petitioner's custodial rights over S.P. under Israeli law. (*Id.* ¶ 13.)

S.P. lived in Israel continuously until the respondent brought him to the United States on July 19, 2019. (*Id.* ¶ 9; Tr. 20:24-21:3.) By both parents' accounts, S.P.'s life in Israel was "vibrant and fulfilling." (Ex. 22 ¶ 14.) S.P. "was surrounded by friends and loved ones," "including neighbors and friends." (*Id.* ¶ 15.) According to the petitioner, S.P. grew up "as a very happy child;" he enjoyed going to school, had many friends, and participated in activities including horseback riding and sports. (Tr. 21:4-22:19.) The petitioner and S.P. went to the seashore, waterfalls, the woods, playgrounds and historic sites together, and played at home together. (Tr. 22:20-23:2, 23:18-23.) The respondent testified that he provided S.P. with "everything he needed" in Israel; S.P. attended a prestigious school and had many relatives in Israel. (Tr. 83:4-84:21.)

Before July of 2019, the respondent took S.P. to the United States three times during holidays. (Ex. 22 ¶ 16; Tr. 24:11-25:13, 86:19-87:2.) Each trip lasted two to three weeks, and S.P. did not miss any school. (Ex. 22 ¶ 16; Tr. 25:14-17.) The first trip was in November of 2015, and the last was in the summer of 2018. (Ex. 22 ¶ 16; Tr. 25:6-13.) Before each trip, the petitioner and the respondent "discussed the approximate length" of the trip, but decided on the

return date after the respondent and S.P. got to the United States, so that they could maintain flexibility and take advantage of cost-efficient flights. (Ex. 22 ¶ 17.) The petitioner spoke with S.P. every day during these trips. (*Id.* ¶ 18.)

### 3. July 2019 Departure to the United States

On July 19, 2019, the respondent left Israel for New York with S.P. (Ex. 22 ¶ 24.) The petitioner and the respondent gave somewhat different accounts of the events that led up to the departure.

The parties agree that the respondent began pursuing permanent residency in the United States sometime in 2016, and traveled regularly between Israel and the United States to file paperwork related to his immigration petition. (*Id.* ¶¶ 19, 20.) There is also no dispute that the respondent decided to take S.P. on a trip to the United States in July of 2019, and that the petitioner knew about the trip. (*Id.* ¶¶ 22-24.) The parties dispute, however, whether the petitioner agreed that S.P. would move to the United States permanently.

According to the respondent, the petitioner agreed S.P. could move with him to the United States. (Tr. 104:18-22.) He testified that he had thought about moving to the United States since he married his wife in 2016, and he made the decision to move in 2017, the year that his mother passed away. (Tr. 84:22-86:7.) He said that he discussed these plans to move with the petitioner, who was "happy" because she believed that she and S.P. would be able to get green cards. (Tr. 87:16-88:5, 98:25-99:3.) He also claimed that he spoke about his plans in the petitioner's presence, in conversations with the managing partner of his business, Karen Pagosov, and a photographer with whom he worked, Gregory Lifshits, and that the petitioner "never objected" to the respondent's plans. (Tr. 87:16-90:19.)

The declarations of Mr. Pagosov and Mr. Lifshits are part of the record. (*See* Tr. 158:6-19.)[2] In his declaration, Mr. Pagosov recounted a conversation in July of 2019, "on the eve of [the respondent's] trip to the USA," in which the respondent "mentioned" to the petitioner that the trip to the United States "was a long-term trip to receive a green card," and that the petitioner "was pleased with the idea." (ECF No. 13.) Mr. Lifshits states in his declaration that on May 10, 2019, he, the respondent and the petitioner discussed the respondent's "plans to move to New York with their son and remain there indefinitely." (ECF No. 15.) The petitioner "expressed her happiness with that arrangement," and said, "First you get your green cards, and then you'll use that to bring me to the United States[,] too." (*Id.*)

The petitioner, on the other hand, denies that she agreed to S.P.'s permanent relocation to the United States, and that she agreed only that the respondent could take S.P. on a trip, as he had on other occasions. She testified that she and the respondent discussed a July 2019 trip some time in May of 2019. (Tr. 25:18-22.) According to her, the respondent said that he would take S.P. to the United States "as usual as he did it before," and that he wanted S.P. to spend time in the United States for the summer holidays. (Tr. 25:23-26:4.) She asked the respondent to bring S.P. back at the end of August, or September 1st at the latest so that he would not miss the beginning of school. (Tr. 26:10-15.) On the morning of July 19, 2019, the respondent brought S.P. to the petitioner so she could say goodbye and wish him a good trip—the "usual procedure" they followed when the respondent took S.P. on a trip. (Tr. 26:22-27:9.)[3]

---

[2] In a declaration that is also part of the record, the respondent's friend, Michael Braverman, claims that the petitioner asked questions about the United States, and told him about the respondent's statement that "there was nothing holding him back in Israel" since his mother passed away. (ECF No. 19.)

[3] There is no writing memorializing any agreement that the respondent could take S.P. to the United States permanently. (Tr. 103:7-104:4.)

In resolving the parties' conflicting accounts, I generally credit both parties' testimony. I find, however, that the petitioner's testimony, particularly on the subject of her understanding of the nature of the July 2019 trip, was more credible, and was corroborated by other evidence, including the respondent's own words and actions. While there is some evidence that accords with the respondent's account, the weight of the persuasive evidence is on the petitioner's side.

### 4. S.P.'s Time in the United States

The petitioner testified that she talked with S.P. on the phone regularly after he arrived in the United States, and asked for photographs of the places he visited. (Tr. 27:16-20, 32:10-15.) In mid-August of 2019, she asked the respondent when he was planning to bring S.P. back to Israel. (Tr. 27:20-22; Ex. 1 at 2.) The respondent answered, "I don't know yet, we're still here." (Tr. 27:23-28:1.) On about August 20, 2019, the respondent told the petitioner that he did not "have an answer yet," but that they would "most likely" stay in the United States until the end of September. (Tr. 29:8-15.) When the petitioner said that S.P. had to start school, the respondent replied that he wanted to enroll S.P. in school in the United States "for about a month." (Tr. 29:15-18.) The petitioner told the respondent that she was not happy with that answer. (Tr. 29:18-21; *see also* Ex. 1 at 2 (In a WhatsApp conversation on August 26, 2019, the petitioner asked the respondent about "the documents" and when they would be coming home; the respondent said, "I am working on resolving the issues. We're here for now. . . . I've not heard yet." The petitioner told the respondent that she was not happy that S.P. would be going to school in the United States for a month.).) The petitioner testified that she was "vexed" at the respondent because they had talked about him bringing S.P. back by September 1st. (Tr. 44:24-45:1.)

On August 27, 2019, the respondent sent a letter to S.P.'s school in Israel in which he stated, "[S.P.] is with me in the USA.  We are supposed to come back to Israel in October, after the holidays.  I ask that you reserve a spot for him in the class.  Thank you for understanding." (Ex. 5.)  The director of S.P.'s school sent the petitioner a copy of the letter.  (Ex. 4; Tr. 35:10-25.)

In September of 2019, the respondent asked the petitioner to send him documents for a visa application, a request she "didn't really understand" because they were planning to return in September, and because she would not have been able to return to Israel had she left.  (Tr. 45:20-46:8.)  At the end of September, she asked the respondent again when they planned to return; he answered that he would "know better by mid-October," after the Jewish holiday Sukkot.  (Tr. 29:22-30:3.)

She asked him about the return plans in an October 3, 2019 exchange over WhatsApp (Ex. 1 at 4-5), and again in a telephone conversation, in which the respondent said, "I don't know yet" (Ex. 21 at 1; Tr. 42:1-10).  In the telephone conversation, the respondent suggested that the petitioner come to the United States, but did not give the petitioner a direct answer about their return plans.  (Ex. 21.)

"[A]fter numerous promises that they would return soon," the petitioner realized that the respondent did not plan to bring S.P. back to Israel.  She "didn't really know what to do," so she consulted the administrators at S.P.'s school, and met with the director and school psychologist on about October 22, 2019.  (Tr. 30:4-15.)  The petitioner asked if they had "heard anything about when Mr. Shvartsman would return;" the school director told the petitioner that the respondent had told her the same story that he told the petitioner—that they would return after the holidays.  (Tr. 30:15-18.)

On October 22, 2019, the respondent wrote a letter to S.P.'s school in Israel, stating: "I wish to inform you that [S.P.] is registered for school in New York. The estimated date of his return to Israel is currently unknown. I will inform you immediately when I find out. I will appreciate your understanding." (Ex. 9.)

The petitioner continued to ask the respondent about their plans to return, and demanded that he bring S.P. back to Israel. (*See* Ex. 1 at 5-8 (the petitioner asked the respondent about their return on October 30, November 2 and 16, and December 29 via WhatsApp); Tr. 47:9-13 ("I asked him that question all the time.").) When the petitioner asked him on November 16, 2019, the respondent said, "I received an official letter that they must give an answer within 60 days." (Ex. 1 at 5.)

The petitioner talked with S.P. by telephone every day from July to November of 2019. (Tr. 32:10-15.) In November, however, S.P. became impatient and angry with her. (Tr. 32:16-17.) Sometimes he "went back to his normal way" and they would talk for hours; other times he was angry and said "bad things," which made the petitioner believe that he was "out of balance." (Tr. 32:16-33:8.)

The respondent filed a petition to obtain a green card for S.P. in the United States. (Tr. 90:20-91:1; Ex. G.) He "believe[s] it was mentioned" to the petitioner that he filed an application for S.P. to obtain permanent residence status in the United States. (Tr. 98:19-99:5.)

The respondent also filed a petition in the Queens County Family Court, seeking sole custody of S.P. (Ex. 22 ¶ 27.) The petitioner received the petition in early March of 2020. (*Id.*) The family court proceedings have been stayed pending the resolution of this case. (*See id.*)

S.P. has not returned to Israel and is currently living in Queens, New York with the respondent. (*Id.* ¶¶ 3, 26-27.) The respondent testified that S.P. is "happy" in the United States;

he lives a "healthy lifestyle," "attends his school with great pleasure," and is among family, including the respondent, the respondent's wife, and S.P.'s half-sister and stepsisters. (Tr. 96:25-98:6.)

### 5. The Petitioner's Status in Israel

The petitioner moved to Israel in 2014 but has not obtained Israeli citizenship. (Ex. 22 ¶ 1; Tr. 20:24-25, 34:19-24.) She applied for a humanitarian visa based on the unstable political situation in Ukraine and her integration in Israel. (Tr. 34:22-24, 70:16-18, 72:20-25.) The Israeli government has not taken any steps to deport her. (Tr. 34:25-35:3.)

### 6. Expert Testimony and Submissions

Dr. Vera Kishinevsky, a psychologist who started treating S.P. in November of 2019, and who prepared a report in connection with this case, testified for the respondent. The petitioner called Dr. Alberto Yohananoff as a rebuttal witness.

Dr. Kishinevsky worked for the Board of Education of the City of New York for approximately 31 years, and has been in private practice treating families since 2002. (Tr. 107:8-11; Ex. F (amended Jan. 24, 2021).) She testified that the respondent brought S.P. to see her in November of 2019 "because the child needed significant help;" he had difficulty sleeping and was in a "sad state of mind." (Tr. 111:2-7.) Dr. Kishinevsky "worked with him and with his father in order to provide care" and a "better supportive system." (Tr. 111:10-12.) She has done individual and family therapy with S.P. and the respondent from November of 2019 until the present. (Tr. 126:6-127:7.)

Dr. Kishinevsky testified that S.P. talked at the initial visit about "his difficulty handling his mother's pressure and his desire to stay with his father." (Tr. 112:5-12.) Dr. Kishinevsky observed that S.P. "looked extremely stressed when he spoke about his mother because he felt

guilty;" he spoke about "painful experiences" involving his mother, "had difficulty explaining what was going on," and cried. (Tr. 113:2-16.) When he spoke about his father, however, "he spoke about good things they did together," and was enjoying his "normal life" with his father. (Tr. 113:17-114:14.) S.P. has "started developing better coping skills." (Tr. 112:13-16.) Dr. Kishinevsky testified that it was "unfair for the child" to be in the "battleground," and to be "put in the situation when he has to make choices that are not age appropriate." (Tr. 114:15-22.)

She also opined that it would be "devastating" for S.P. to be "pulled away from the family unit that he's living with here" because "he does not have a say when it comes to his mother;" he would "feel depersonalized" and "out of control." (Tr. 117:19-119:20; *see also* Ex. F ("If [S.P.] is returned to his mother, [he] may suffer from emotional and behavioral stressors that are beyond his coping skills and may cause him significant mental health problems.").) Staying in the United States would be a "positive experience" because he would be "living with two parents [and] siblings," have a "normal life" with his father who "addresses his needs," and be able to develop his "sense of self." (Tr. 119:21-120:9.) Dr. Kishinevsky did not express an opinion about whether S.P. should live with his father in Israel or the United States because it "[d]oesn't matter to [her]." (Tr. 138:4-13.)

According to the model standards promulgated by the Association of Family and Conciliation Courts, an evaluator in a child custody dispute should use diverse data-gathering methods and a "balanced process;" an evaluator's pre-existing relationship with a child or a parent can affect the evaluator's objectivity. (Tr. 128:25-129:15, 131:23-134:19.) Dr. Kishinevsky did not follow those standards in this case because she was giving her "clinical opinion," and "did not believe it was necessary." (Tr. 127:18-129:15.) Her "work with the child was to help him relieve his stress, help him develop better coping skills, [and] strengthen his

father's parenting skills;" she was "not hired to participate in the Court" proceedings, and "was not part of the child custody dispute." (Tr. 130:25-131:5, 134:12-19.) Her "observations were done in a therapeutic mode, not the legal mode." (Tr. 140:2-5.) She acknowledged that she did not consider potential biases or alternative hypotheses, and that her only sources of information were her therapy sessions with S.P. and his family. (Tr. 127:14-17, 129:16-19, 136:2-137:2.) She did not try to get any information from the petitioner, or ask to interview her. (Tr. 130:15-20, 133:2-10.)

Dr. Alberto Yohananoff, a psychologist with approximately 28 years of experience, including forensic evaluations in custody cases, reviewed Dr. Kishinevsky's report. (Ex. 23; Tr. 144:24-145:3.) Dr. Yohananoff explained that "the whole idea of forensic evaluation" is for the evaluator to be "dispassionate, impartial, [and] objective," which is difficult if the evaluator is also the subject's therapist. (Tr. 146:6-21.) In custody evaluations, "the given is that the parties present with competing narratives," and the job of a forensic evaluator is to "mesh competing narratives." (Tr. 147:8-9, 13-19.) He testified that evaluators in child custody matters should follow the Association of Family and Conciliation Courts' model standards because child custody evaluations are difficult and involve "parties with competing narratives;" the model standards ensure—as much as possible—the reliability of evaluators' conclusion. (Tr. 144:1-15.) Under those standards, an evaluator should not function as both a therapist and a forensic evaluator—a "dual role"—because it might affect her objectivity. (Tr. 145:19-146:9.) In Dr. Yohananoff's view, Dr. Kishinevsky's report is not reliable because she "did not follow" the model standards; she adopted the point of view of the respondent, his wife and S.P., "without any deeper investigation to complete her analysis, to complete her processes." (Tr. 145:4-13.) Dr. Kishinevsky's report includes only one perspective; there is "no testing" of the mother's

perspective, and "it is difficult to assume that what you've been told is accurate because the party has an agenda." (Tr. 148:2-6.)

Dr. Yohananoff opined that Dr. Kishinevsky should have considered "parental alienation," where a child in a high-conflict situation "might decide, not consciously, of course, but over time to align himself or herself with one of the parties, which is the favorable party, and completely reject the other party." (Tr. 148:7-25.) Dr. Yohananoff believed that there were "distinct suggestions" that "parental alienation might be at play" in this case: S.P.'s inability to recall positive memories about his mother, his adoption of a "perspective that is consistent with that of the father," and his "black-and-white picture of the parents." (Tr. 149:1-16.) Dr. Yohananoff suggested that if there is parental alienation, it might not be in the child's best interest to continue living with his father because it "essentially would ensure that the mother will be completely cut off from the relationship." (Tr. 149:16-150:2.) Dr. Kishinevsky did not explore that possibility. (Tr. 149:15-16.)

As Dr. Yohananoff explained, because "any forensic report, no matter how good it is, will have limitations," the model standards suggest that evaluators recognize that their reports have limitations, so that the reader will be aware of the limitations. (Tr. 150:3-11.) An "obvious limitation" in Dr. Kishinevsky's report is the absence of "alternative hypotheses[e]s;" Dr. Kishinevsky "did not consider the possibility of parent alienation," and did not speak to S.P.'s mother. (Tr. 150:3-16.) In Dr. Yohananoff's opinion, these limitations are "severe," and "the report is very flawed." (Tr. 150:17-25.)

Dr. Yohananoff's testimony was objective and credible. Although Dr. Kishinevsky is an experienced therapist, neither her testimony nor her report supports the respondent's claim that S.P. would be subject to a grave risk of harm if he were returned to Israel. As she conceded, she

was not acting as an objective evaluator, but as a therapist for S.P. and the respondent's family. She relied only on information from S.P. and the respondent. She did not interview or consider the perspective of the petitioner, and did not consider any potential biases or alternative hypotheses for her conclusions.

### 7. Proceedings in Israel

In May of 2020, the petitioner filed an Article 15 petition in the Kiryat Shmona Family Court in Israel seeking declaratory relief. (*See* Ex. 17 (ECF No. 24-1) at 2.) The Israeli Court held a hearing on July 12, 2020, in which the petitioner, petitioner's counsel and respondent's counsel participated. (*Id.*)

On August 25, 2020, the Israeli court issued a decision, concluding that the respondent wrongfully removed S.P. from Israel in violation of the petitioner's custody rights. (*Id.* at 15.) The parties did not dispute that S.P.'s habitual residence was Israel; the court noted that "it cannot be disputed that the [child's] habitual place of residence, within the meaning of the phrase under the Convention, was in Israel." (*Id.* at 9-10.) On the issue of consent, the court found that "even if the mother agreed to [S.P.'s] lengthy travel, it was not proved to me that she gave her consent to his emigration to the United States, all the more, where she herself cannot leave Israel and visit him as much as she desires." (*Id.* at 10.) The court concluded that the respondent's removal of S.P. violated the petitioner's "basic custody rights" because it deprived her of the "right to participate in the education, upbringing and development of her son," and caused "harm" to S.P.'s "right to be raised and educated by both his parents." (*Id.* at 15.)

The court explained that "[t]he practice set forth in section 15 is intended to enable the authorities of the State in which the proceedings are conducted in the minor's case to apply to the authorities in the State of the minor's habitual residence in order to clarify the relevant law

through them and to assist them in deciding whether the minor was unlawfully removed;" the Israeli court was "not required to decide on the issue of returning [S.P.], as the proceeding of returning [S.P.] under the Hague Convention was initiated by the [petitioner] in the state of New York." (*Id.* at 6-8.)

## CONCLUSIONS OF LAW

The Hague Convention, to which the United States and Israel are signatories, is meant to address "the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010); *see also Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005). The Convention's purpose is "to secure the prompt return of children wrongfully removed to or retained in any contracting state," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. The Convention is "especially aimed at the unilateral removal or retention of children by those close to them, such as parents, guardians, or family members." *Gitter*, 396 F.3d at 129. The Convention prevents parties from removing or retaining a child in a jurisdiction "more favorable to their custody claims in order to obtain a right of custody from the authorities of the country to which the child has been taken." *Id.* (citation and quotation marks omitted).

A decision under the Hague Convention "shall not be taken to be a determination on the merits of any custody issue." Hague Convention, art. 19. "The Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings." *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012).

A petitioner bringing a Hague Convention action for the wrongful retention of a child must show that (1) the child was "habitually resident" in one contracting state and was retained in another contracting state; (2) the retention breached the petitioner's custody rights under the

law of the contracting state of habitual residence; and (3) the petitioner was exercising those rights at the time of retention or would have been exercising those rights but for the retention. *Gitter*, 396 F.3d at 130-31; *see* Hague Convention, art. 3. The petitioner must prove these elements by a preponderance of the evidence. *Gitter*, 396 F.3d at 131; 22 U.S.C. § 9003(e)(1)(A).

Even when a petitioner establishes a *prima facie* claim under the Hague Convention, "[r]eturn is not required if the abducting parent can establish that a Convention exception applies." *Abbott*, 560 U.S. at 22; *see also* 22 U.S.C. § 9001(a)(4). Two defenses are of particular relevance to this case: (1) the defense of consent or acquiescence; and (2) the defense of grave risk of harm. *See* Hague Convention, art. 13. A respondent must establish the consent or acquiescence defense by a preponderance of the evidence, and the grave risk defense by clear and convincing evidence. *Id.*; 22 U.S.C. § 9003(e)(2). The Second Circuit has cautioned that the defenses listed in the Convention should be applied "narrowly," and even where an exception has been established, the district court may still order the child's return. *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013).

## I.    Habitual Residence

The parties dispute only one element of the petitioner's *prima facie* case: whether Israel is S.P.'s habitual residence. (*See* ECF No. 50 at 5; ECF No. 51 at 2; Ex. 22 ¶ 12 (the parties agree that they "did not have a formal custody agreement," and had an "informal agreement pursuant to which both exercised shared custody over S.P.").) The petitioner claims that S.P.'s habitual residence is Israel, while the respondent claims that it is the United States. (*See* ECF No. 50 at 19-23; ECF No. 51 at 14-20.)

The Convention does not define "habitually resident," but courts have provided guidance on the habitual residence inquiry. *See, e.g.*, *Monasky v. Taglieri*, 140 S. Ct. 719, 726-29 (2020); *Grano v. Martin*, 821 F. App'x 26, 27-28 (2d Cir. 2020) (summary order). As the Supreme Court explained in *Monasky*, "a child's habitual residence depends on the totality of the circumstances specific to the case." 140 S. Ct. at 723. Because the inquiry is "fact-driven," "courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 727 (citation and quotation marks omitted). "Some factors for courts to consider in determining 'habitual residence' include where a child has lived, the length of time there, acclimatization, and the 'purposes and intentions of the parents.'" *Grano*, 821 F. App'x at 27 (quoting *Monasky*, 140 S. Ct. at 728).

Habitual residence is determined as of the time of removal or retention. "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 140 S. Ct. at 726; *see also* Hague Convention, art. 3 (the wrongful removal inquiry concerns custody rights under "the law of the State in which the child was habitually resident immediately before the removal or retention").

The parties agree that S.P. "lived continuously in Israel" from the spring of 2014 until the respondent "brought him to the United States on July 19, 2019" (Ex. 22 ¶ 9)—in other words, that he was habitually resident in Israel at the time the respondent brought him to the United States. Citing *Monasky*, the respondent argues that S.P. is now habitually resident in the United States, essentially taking the position that S.P.'s residence is wherever his father is; the respondent says that S.P. now has meaningful connections with family and friends here, and also cites S.P.'s previous trips to the United States and his pending green card application. (ECF No.

51 at 14-20.)[4]  While the respondent is correct that *Monasky* requires a consideration of the particular circumstances of each case, he overlooks the Supreme Court's very clear statement about the time by which habitual residence is determined, which is "at the time of removal or retention," not after the child has been removed or retained.  140 S. Ct. at 726.  That directive is consistent with the text of the Convention, which provides that removal or retention is wrongful if it is in breach of custody rights "under the law of the State in which the child was habitually resident immediately before the removal or retention."  Hague Convention, art. 3.  The respondent's contrary interpretation, aside from being flatly contradicted by the Convention's language, would undermine the Convention by permitting the abducting parent simply to claim that the child's home is wherever the parent is.[5]

The petitioner has demonstrated by a preponderance of the evidence that S.P.'s habitual residence is Israel.  As the respondent concedes, S.P. "lived continuously in Israel" from 2014 until the respondent "brought him to the United States on July 19, 2019."  (Ex. 22 ¶ 9.)  S.P. "was surrounded by friends and loved ones," and lived a "vibrant and fulfilling" life.  (*Id.* ¶¶ 14-15; Tr. 21:4-23:2, 23:18-23, 83:4-84:21.)  *See Lukic v. Elezovic*, No. 20-CV-3110, 2021 WL 466029, at *5 (E.D.N.Y. Feb. 9, 2021) ("[I]t is undisputed that [the child] resided in Montenegro her entire life, up to the point when respondent took her to the United States more than eighteen months ago. . . . Thus, '[c]ommon sense suggests' that Montenegro is her habitual residence.") (*quoting Monasky*, 140 S. Ct. at 727).

---

[4] As part of his discussion about habitual residence, the respondent argues that the petitioner consented to a permanent move.  As discussed in Section II, a preponderance of the evidence does not support that position.

[5] The respondent is not invoking the Convention's "well settled" defense, which an abducting parent can claim if a petitioner commences proceedings more than one year after the date of the wrongful removal or retention, and the child is "settled" in the new environment.  Hague Convention, art. 12.  The petitioner commenced proceedings within a year of the wrongful retention, so the defense does not apply.

Moreover, the respondent's previous trips to the United States with S.P. did not change S.P.'s residence. It would defy common sense—and contradict the parties' stipulation that S.P. lived in Israel continuously until July 19, 2019—to conclude that S.P. was at home in the United States because he took vacations to various cities in the United States. Nor does S.P.'s pending green card application tip the balance in the respondent's favor. The "common sense" conclusion is that S.P.'s habitual residence is Israel. *Monasky*, 140 S. Ct. at 727.

This conclusion accords with the decision issued by the Kiryat Shmona Family Court in Israel, in which the Israeli court concluded that S.P. was "unlawfully removed from Israel" and noted that "it cannot be disputed that the [child's] habitual place of residence, within the meaning of the phrase under the Convention, was in Israel." (Ex. 17 at 1, 9-10, 15 (quotation marks omitted).)[6]

---

[6] On October 27, 2020, I granted in part and denied in part the petitioner's motion for judicial notice and extension of comity to the Israeli court's decision. I took judicial notice of the decision in making my determination as to whether removal was wrongful within the meaning of the Convention. In her post trial brief, the petitioner renews her request that the Court find the respondent barred from "re-litigating" the merits of the *prima facie* case in light of the Israeli court's decision. (ECF No. 50 at 18-19.) Although "the exercise of comity . . . is at the heart of the Convention," *Blondin v. Dubois*, 189 F.3d 240, 248 (2d Cir. 1999), the Court is not required to adopt wholesale another court's findings issued pursuant to Article 15. As the Israeli court noted, the petitioner filed her Article 3 petition in this court. Moreover, neither the Court nor the United States Department of State requested Article 15 materials. *See Pignoloni v. Gallagher*, No. 12-CV-3305, 2012 WL 5904440, at *45 n.45 (E.D.N.Y. Nov. 25, 2012) ("The court notes that, as previously determined at trial, the Central Authority's letter, although admitted into evidence, does not constitute an Article 15 letter under the Hague Convention because neither the court nor the United States Department of State requested Petitioner to obtain this ruling from the Central Authority. Moreover, even if the letter were an Article 15 determination, the court could take notice of, but is not bound by that determination.") (citing *Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 635 n.1 (E.D.N.Y. 2000) (the court "may under Article 15 take notice of . . . decisions" made by the Australian family court)), *aff'd*, 555 F. App'x 112 (2d Cir. 2014); *Whallon v. Lynn*, 230 F.3d 450, 457 n.8 (1st Cir. 2000) (assigning a letter from the Mexican Central Authority for Child Abduction to the National Center for Missing and Exploited Children, issued pursuant to Article 15, "little weight"). The Israeli court acknowledged the limited purpose of its decision pursuant to Article 15. *See* Ex. 17 at 7-8 ("The practice set forth in section 15 is intended to enable the authorities of the State in which the proceedings are conducted in the minor's case to apply to the authorities in the State of the minor's habitual residence in order to clarify the relevant law through them and to assist them in deciding whether the minor was unlawfully removed."). In any case, whether I deem the petitioner's habitual residence argument barred by the Israeli court's decision or not is purely a technical matter, as I reach the same conclusion as the Israeli court.

## II.    Consent or Acquiescence

A respondent raising the consent or acquiescence exception must show by a preponderance of the evidence that the petitioner "consented to or subsequently acquiesced in the removal or retention."  Hague Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B).  The "key" to the consent analysis is "the petitioner's subjective intent," and the inquiry "includes the nature and scope of the alleged consent."  *Nissim v. Kirsh*, 394 F. Supp. 3d 386, 398 (S.D.N.Y. 2019) (citation and quotation marks omitted).  "When considering whether the petitioner consented to the removal, 'it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country.'"  *Chumachenko on Behalf of P.B. v. Belan*, No. 18-CV-9728, 2018 WL 6437062, at *8 (S.D.N.Y. Dec. 7, 2018) (quoting *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir.2005)); *see also Hofmann v. Sender*, 716 F.3d 282, 294-95 (2d Cir. 2013) ("Article 13(a) does not provide that if a parent consents to removal of the child for a period, under certain conditions or circumstances, that retention of the child beyond those conditions or circumstances is necessarily permissible.") (quoting *Baxter*, 423 F.3d at 370) (internal quotation marks omitted).

The acquiescence defense—"analytically distinct" from the consent defense because it "addresses whether the petitioner subsequently agreed to or accepted the removal or retention"— "requires a higher degree of formality" such as "a formal statement" or a "consistent attitude of acquiescence over a significant period of time."  *Kosewski v. Michalowska*, No. 15-CV-928, 2015 WL 5999389, at *15 (E.D.N.Y. Oct. 14, 2015) (citations and quotation marks omitted).

The respondent claims that the petitioner consented to S.P.'s permanent move to the United States; the petitioner maintains that she did not.  (*See* ECF No. 50 at 23-27; ECF No. 51 at 17-18.)  The respondent has not met his burden.

The respondent testified about his plan to move to the United States. (*See* Tr. 84:22-86:7, 87:16-90:19, 98:25-99:3.) Although he claimed that the petitioner agreed to let him take S.P. to the United States permanently (Tr. 104:18-22), he did not testify that the petitioner agreed or knew that the July 2019 trip was to be a permanent move.[7] The respondent offered some evidence—the declarations of Gregory Lifshits and Karen Pagosov—suggesting that the petitioner knew that the July 2019 trip was a permanent move. In his declaration, Gregory Lifshits stated that two months before the respondent took S.P. to the United States, he, the respondent and the petitioner discussed the respondent's "plans to move to New York with their son and remain there indefinitely." (ECF No. 15.) Karen Pagosov stated in his declaration that the night before the respondent's departure, the petitioner was pleased with the prospect of getting a green card; he did not describe the visit as a permanent move, but as a "long-term trip." (ECF No. 13.) In my view, the declarations are not compelling proof that the petitioner knew that the respondent was taking S.P. to the United States for good.

The evidence supporting the petitioner's version was far stronger, consisting not only of her testimony, but of contemporaneous messages between her and the respondent, and the respondent's own words and actions. The petitioner testified in detail about the respondent's plans and her expectations about the trip, including the agreement that the respondent would bring S.P. back to Israel by September 1, 2019 for school. (*See* Tr. 25:18-26:4, 26:10-15; *see also* Tr. 29:8-21, 44:24-45:1 (the petitioner was "vexed" when the respondent told her they would be staying in the United States for an extra month because this did not accord with the plan that the respondent bring S.P. back by September 1st).) Significant non-testimonial evidence supports the petitioner's account that she did not agree to a permanent move. The

---

[7] The respondent testified that he decided to move in 2017 (Tr. 86:4-7), but he took S.P. to the United States in 2018, a year before the July 2019 trip (*see* Tr. 25:6-13).

petitioner's correspondence with the respondent shows that she asked him multiple times when he was bringing S.P. back: on August 26, October 3, October 30, November 2, November 16, and December 29 via WhatsApp, and in October via telephone. (Ex. 1 at 2, 4-8; Ex. 21 at 1.) The repeated inquiries are not consistent with consent to a permanent move.

The respondent's words and actions also belie his claim. Although during a telephone conversation months after his departure from Israel he discussed the possibility of the petitioner coming to the United States—suggesting that they would all stay in the United States—not once in five months did he explicitly say that S.P.'s move was permanent. (*See* Ex. 1 at 2-7 (WhatsApp exchanges from August to December of 2019); Ex 21.) On the contrary, he repeatedly assured the petitioner that he was bringing S.P. back to Israel. (*See* Ex. 1 at 2 (In a WhatsApp conversation on August 26, 2019, the petitioner asked the respondent about "the documents" and when they would be coming home; the respondent said, "I am working on resolving the issues. We're here for now. . . . I've not heard yet."); Ex. 21 at 1 (The petitioner asked him, during a telephone conversation, when they would return; the respondent said that he did not know "yet"); Ex. 1 at 5 (The petitioner asked the respondent over WhatsApp when he would bring S.P. home on November 16, 2019, and the respondent said, "I received an official letter that they must give an answer within 60 days.").) These exchanges suggest either that the respondent was simply stringing the petitioner along, or that he had not yet made up his own mind. They do not support his claim that she consented to the permanent relocation of her child.

Moreover, the respondent did not make these representations only to the petitioner. He told officials at S.P.'s school in Israel that he planned to bring S.P. back to Israel in October, and asked them to hold a place for him. In an August 2019 letter, he wrote, "[S.P.] is with me in the

USA.  We are supposed to come back to Israel in October, after the holidays.  I ask that you reserve a spot for him in the class.  Thank you for understanding."  (Ex. 5.)

Accordingly, the respondent has not shown by a preponderance of the evidence that the petitioner consented to his permanent removal of S.P. to the United States in July of 2019.[8]  *See Hofmann*, 716 F.3d at 294-95 (consent to removal "for a period" does not make retention "beyond those conditions" permissible).  Nor has he shown that the petitioner subsequently acquiesced to the move.  There is no "formal statement" of the petitioner's agreement nor is there a "consistent attitude of acquiescence over a significant period of time" following S.P.'s departure.  *See Kosewski*, 2015 WL 5999389, at *15.  On the contrary, the persuasive evidence— the petitioner's repeated requests that the respondent return S.P. to Israel, and the respondent's own statements to the petitioner and to S.P.'s school—shows that there was neither consent nor acquiescence.

## III.    Grave Risk of Harm

A respondent raising the defense of grave risk of harm must show by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A).  For the exception to apply, "[t]he potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high.  The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize."  *Souratgar*, 720 F.3d at 103 (citations, quotation marks and alterations omitted).  Courts must

---

[8] The Kiryat Shmona Family Court judge reached the same conclusion.  (*See* Ex. 17 at 10 ("[E]ven if the mother agreed to [S.P.'s] lengthy travel, it was not proved to me that she gave her consent to his emigration to the United States, all the more, where she herself cannot leave Israel and visit him as much as she desires.").)

interpret the exception "narrowly, lest it swallow the rule." *Id.* (citations and quotation marks omitted).

The respondent cites two bases for a grave risk determination: (1) that S.P. will experience psychological harm if he is separated from his father; and (2) that S.P. will be deported to Ukraine or become a ward of the State of Israel if the petitioner is deported to Ukraine. (*See* ECF No. 51 at 21-23.) The respondent did not show by clear and convincing evidence that S.P. will experience a grave risk of harm if returned to Israel under either theory.

### a. Separation from the Respondent

To support his claim of grave risk, the respondent relies on Dr. Kishinevsky, who testified that returning S.P. to his mother would be "devastating" because "he does not have a say when it comes to his mother;" he would "feel depersonalized" and "out of control." (Tr. 117:19-119:20; *see also* Ex. F ("If [S.P.] is returned to his mother, [he] may suffer from emotional and behavioral stressors that are beyond his coping skills and may cause him significant mental health problems.").) As explained above, Dr. Kishinevsky's opinion is not reliable; as she conceded, she was not testifying as an objective forensic expert, but as a treating therapist. She based her opinion on her interactions with S.P., the respondent, and the respondent's family. She did not interview the petitioner, or seek any objective information about her, and did not consider any potential biases or alternative hypotheses for her conclusions. (*See* Tr. 127:14-17, 129:16-19, 130:15-131:5, 133:2-10, 134:12-19, 136:2-137:2, 140:2-5.) Nor did she address the undisputed evidence that S.P.'s life in Israel was "vibrant and fulfilling." (*See* Ex. 22 ¶ 14); *see Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 297 (S.D.N.Y. 2000) (distinguishing the circumstances before the court—the children would be "returned to the country where they were severely abused, physically and emotionally, by their father for an extended period of time"—

from cases in which courts declined to apply the grave risk exception even though separation from a parent would cause "psychological harm") (collecting cases), *aff'd sub nom. Blondin v. Dubois*, 238 F.3d 153 (2d Cir. 2001).

In any event, the respondent's grave risk argument rests on a faulty premise: that ordering S.P.'s return to Israel requires that he be separated from the respondent. There is no evidence that the respondent could not travel to Israel with S.P., or that returning S.P. to Israel would interfere with the respondent's custody rights. *See Abbott*, 560 U.S. at 9 ("A return remedy does not alter the preabduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence."). Of course, the respondent may choose to stay in the United States, but that choice would not establish grave risk.[9] *See In re Koc*, 181 F. Supp. 2d 136, 156 (E.D.N.Y. 2001) ("[T]o the extent that respondent asserts that an order of this Court returning [the child] to Poland would cause [the child] 'grave harm' because she would be denied 'the benefit of motherly love,' . . . respondent ignores the fact that this is a consequence of choices made by respondent and not one that this Court may consider in determining the questions presented here."), *report and recommendation adopted* (Apr. 3, 2001); *Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524, 2019 WL 5189011, at *31 (E.D.N.Y. Oct. 15, 2019) ("It would defy the policy undergirding the Convention if a respondent could avoid a custody dispute in the state of habitual residence by refusing to return, and thus prevail by default by defeating a petition for return."), *aff'd*, 813 F. App'x 619 (2d Cir. 2020); *Wtulich v. Filipkowska*, No. 16-CV-2941, 2019 WL 2869056, at *5 (E.D.N.Y. July 3, 2019) ("If . . . [the respondent] chooses to stay in the United States rather than care for her daughter in Poland while the authorities there

---

[9] Even Dr. Kishinevsky did not conclude that simply living in Israel would pose a grave risk to S.P.; the location "[did not] matter" to her. (Tr. 138:4-13.)

determine the parties' respective custodial rights, the resulting incremental harm to [the child] will flow from [the respondent's] decision rather than [the Court's].").

### b. The Petitioner's Deportation

The respondent claims that the petitioner is subject to deportation in Ukraine, which he says presents an "intolerable situation" for S.P. (*See* ECF No. 51 at 22-23.) But the respondent has not shown by clear and convincing evidence that the petitioner's deportation is likely or imminent, or that the ramifications for S.P. if the petitioner were to be deported meet the grave risk standard.

The petitioner has lived in Israel since 2014, and the Israeli government has not initiated any deportation proceedings against her. (Ex. 22 ¶ 1; Tr. 20:24-25, 34:25-35:3.) She has applied for a humanitarian visa in Israel, citing the political instability and military conflict in Ukraine and her integration into Israel. (Tr. 34:22-24, 70:16-18, 72:20-25.)

Not only has the respondent presented no evidence that the petitioner will be deported, he cites no authority for the proposition that a child faces a grave risk of harm because of the petitioning parent's immigration status, and the Court is not aware of any. The cases he does cite do not support his theory. (*See* ECF No. 51 at 22-23); *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 551 n.9 (E.D. Pa. 2010) (considering the respondent's and the children's asylum status in the United States—the country to which the children were taken—as part of the habitual residence inquiry); *In re B. del C.S.B., Mendoza v. Miranda*, 525 F. Supp. 2d 1182, 1194-95 (C.D. Cal. 2007) (considering the child's immigration status in the United States—the country to which the child was taken—in determining whether the child was well settled in the United States), *rev'd sub nom. In re B. Del C.S.B.*, 559 F.3d 999 (9th Cir. 2009) ("We can see nothing in the Convention itself, in our case law, or in the practical reality of living in this country without

documented status, to persuade us that immigration status should ordinarily play a significant, let alone dispositive, role in the 'settled' inquiry."); *Casimiro v. Chavez*, No. 06-CV-1889, 2006 WL 2938713, at *6 (N.D. Ga. Oct. 13, 2006) (considering the child's immigration status in the United States—the country to which the child was taken—as a factor that weighed against the child's preference to remain in the United States).

The ramifications for S.P. if the petitioner were deported are equally speculative. The respondent offered no evidence about what would happen to S.P. if the petitioner were to be deported. Indeed, ordering S.P.'s return to Israel would "not alter the preabduction allocation of custody rights," *Abbott*, 560 U.S. at 9; thus, there is no proof that deportation or becoming a ward of the State would be S.P.'s only options.

Although a grave risk of harm arises "where returning the child means sending him to a zone of war," *Souratgar*, 720 F.3d at 103 (quoting *Blondin*, 238 F.3d at 162), there is insufficient evidence that returning S.P. to Israel—where he is a citizen, where the respondent is a citizen, where the petitioner has lived continuously since 2014 without the initiation of deportation proceedings, and where the preabduction allocation of custody rights would remain in place— means sending S.P. to a war zone. The conjectural sequence of events that the respondent offers does not amount to "clear and convincing" evidence that S.P. will face "severe" harm.

## CONCLUSION

For the reasons stated above, the petition is granted. The Clerk of Court is respectfully directed to enter judgment in favor of the petitioner. S.P. is to be returned to Israel as soon as travel arrangements can be made. This order is stayed for thirty days to allow the parties to resolve the timing and circumstances of S.P.'s return.


**SO ORDERED.**

                                            s/Ann M Donnelly
                                            _____
                                            ANN M. DONNELLY
                                            United States District Judge


Dated: Brooklyn, New York
        March 15, 2021